**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | |
|---|---|
| NILSON BARAHONA, NIKOLAS GAZETAS, and OMAR ISAIAS TAVIRA GARCIA, | |
| *Plaintiffs,* | **CLASS ACTION COMPLAINT** |
| v. | Jury Trial Demanded |
| LASALLE MANAGEMENT COMPANY, LLC d/b/a LASALLE CORRECTIONS, LASALLE CORRECTIONS, LLC, LASALLE SOUTHEAST, LLC, and IRWIN COUNTY DETENTION CENTER, | No. _____ |
| *Defendants.* | |

## <u>COMPLAINT</u>

Plaintiffs Nilson Barahona, Nikolas Gazetas, and Omar Isaias Tavira Garcia (collectively, "Plaintiffs," and each a "Plaintiff"), individually and on behalf of all other similarly situated, by and through the undersigned counsel, bring this civil class action lawsuit based upon personal knowledge of Plaintiffs and based upon the investigation of counsel, allege and state the following claims against Defendants LaSalle Management Company, LLC, d/b/a LaSalle Corrections, LaSalle Corrections, LLC, LaSalle Southeast LLC, and Irwin County Detention Center (collectively "Defendants" or "LaSalle" and each a "Defendant").

## SUMMARY OF THE CASE

1.      Plaintiffs, individually and on behalf of themselves and members of the Proposed Classes defined herein, as former civilly-detained immigrants[1] at the Irwin County Detention Center in Ocilla, Georgia ("Irwin"), bring this civil action seeking remedy for Defendants' illegal labor and detention profiteering practices.

2.      In or around May 2021, the federal government ended its contractual relationship with LaSalle for the detention of immigrants at Irwin.  Notably, Irwin is one of the first private detention facilities to have its intergovernmental service agreement with the federal government terminated due to allegations of LaSalle's abuse and harm of detained immigrants at the facility. In announcing the termination of this federal contract, Secretary of Homeland Security Alejandro N. Mayorkas stated: "We have an obligation to make lasting improvements to our civil immigration detention system[.]  This marks an important first step to realizing that goal.  DHS detention facilities and the treatment of individuals in those facilities will be held to our health and safety standards.  Where we discover they fall short, we will continue to take action as we are doing today."[2]

3.      Defendants, who collectively comprise a multimillion dollar private prison corporation that owns and operates, among other facilities, Irwin, maintained a deprivation scheme intended to force detained immigrants, who are civil detainees, to work for nearly free.

4.      LaSalle deprived civilly detained immigrants of basic healthcare, subsistence, sustenance, and legal necessities, such as access to medically required food, hygienic products,

---

[1] This Complaint uses the term "detained immigrants" or "immigrants" to describe all persons detained at the Irwin facility on behalf of U.S. Immigration and Customs Enforcement ("ICE").

[2] U.S. Department of Homeland Security, "ICE to Close Two Detention Centers" (May 20, 2021), *available at* https://www.dhs.gov/news/2021/05/20/ice-close-two-detention-centers (last accessed March 7, 2023).

and access to contact with their support networks, loved ones, immigration officials, and legal representation, forcing them to work for as little as $1 per day in order to purchase these necessities.

5. LaSalle's deprivation scheme ensured that the detained immigrants at Irwin provided Defendants, a multimillion dollar corporation, with a ready supply of available and cheap labor needed to operate the Irwin facility. Among other things, detained immigrants mop and sweep floors, including in communal areas; wash dishes, utensils, pans, and other kitchen items; cook, serve, and deliver meals and beverages to other detained immigrants; unload food delivery trucks; provide barber services; and, clean the Irwin facility, including communal areas, daily for at least 600 (if not, upon information and belief, up to 1,200) detained immigrants that were locked inside Irwin.

6. For their labor, LaSalle paid most detained immigrants $1 per day,[3] regardless of the number of hours or shifts that each Plaintiff and members of the Proposed Classes worked in a single day. Under no circumstances did LaSalle pay the detained immigrant workers the federal minimum hourly wage, much less the federal Service Contract Act wage, that Defendants would have paid for the same services but for their unlawful scheme to obtain detained immigrants' labor by prohibited means.

7. Detained immigrants at Irwin, including Plaintiffs and members of the Proposed Classes, had no meaningful choice but to work. The Irwin facility failed to provide Plaintiffs and other detained immigrants with adequate and basic hygiene items, proper and adequate amounts of food and nutrition, free internet access, free telephone access, and a safe and clean environment.

_____

[3] Upon information and belief, LaSalle paid up to $5 per day for some limited job positions, but the vast majority of detained immigrants received $1 per day for work performed at Irwin, regardless of the hours worked or tasks performed in a single day.

Thus, Plaintiffs and others similarly situated had no choice but to work to ensure they obtained basic necessities like soap, better food or adequate amounts of food, access to the internet (which is the principal means by which detained immigrants could submit requests for medical attention and grievance forms, in addition to checking on the status of their immigration proceedings), and telephone access to phone loved ones, support networks, and legal representation. Under these circumstances, no labor at Irwin was voluntary—it was forced.

8. Pursuant to a contract between the federal government and LaSalle, the federal government pays LaSalle a fixed bed-day rate per detained immigrant to operate Irwin. Among other things, that fixed bed-day rate was intended to cover LaSalle's costs related to housing, clothing, feeding, and caring for detained immigrants at Irwin plus up to an additional fifteen percent profit margin. In addition to this fixed bed-day rate, upon information and belief, the same contract provided a guaranteed bed minimum subsidy to LaSalle, which ensured that LaSalle received a set minimum amount of funds for operating Irwin, regardless of the actual number of detained immigrants sent by the federal government to the Irwin facility. Under this contractual scheme, LaSalle generated additional revenues and profits based on expenses saved—both in labor costs and in costs associated with the care of detained immigrants—through its deprivation scheme, which was intended to minimize the amount LaSalle spent to provide for the basic needs of detained immigrants, including Plaintiffs and members of the Proposed Classes, while simultaneously charging Plaintiffs and members of the Proposed Classes for the same basic necessities withheld by LaSalle. This scheme forced Plaintiffs and other similarly situated detained immigrants to use LaSalle's Work Program, discussed herein, as the sole or principal means to pay for those withheld necessities.

9.     Under these circumstances, LaSalle engaged in a deliberate scheme, pattern, and plan intended to coerce Plaintiffs' and members of the Proposed Classes' labor.

10.     Under these circumstances, LaSalle engaged in a deliberate scheme, pattern and plan intended to cause Plaintiffs and members of the Proposed Classes serious harm if they were unwilling to work in forced labor positions for LaSalle at Irwin.

11.     Plaintiffs reasonably feared serious harm of safety and security if they did not continue working for LaSalle at Irwin.

12.     Plaintiffs were under the complete control of LaSalle and working in forced labor conditions which excluded basic workplace protections.

13.     Plaintiffs, and members of the Proposed Classes they seek to represent, are former detained immigrants at Irwin who were forced to work for LaSalle for as little as $1 per day. Individually, and on behalf of all others similarly situated, Plaintiffs bring this class action lawsuit seeking damages, among other relief, flowing from LaSalle's illegal labor practices.

## JURISDICTION

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Trafficking Victims Protection Act,[4] 18 U.S.C. §§ 1589, 1594, and 1595, and the Alien Tort Statute, 28 U.S.C. § 1350.

---

[4] The Trafficking Victims Protection Act was enacted in 2000, *see* Pub. L. No. 106-386, 114 Stat. 1486 (2000), and has been amended on multiple occasions since then. *See, e.g.*, Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2875; Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No. 109-164, 119 Stat. 3558 (Jan. 10, 2006); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044; Violence Against Women Reauthorization Act of 2013 (Title XII), Pub. L. No. 113-4, 127 Stat. 54; Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, 129 Stat. 227; Trafficking Victims Protection Reauthorization Act of 2017, Pub. L. No. 115-427, 132 Stat. 5503 (Jan. 9, 2019). This complaint refers to the provisions of 18 U.S.C. §§ 1589, 1594, and 1595, including all amendments, as the Trafficking Victims Protection Act ("TVPA").

15.    This Court has personal jurisdiction over LaSalle because the corporation regularly conducts business in and has sufficient minimum contacts with the Middle District of Georgia.

16.    Plaintiffs also invoke supplemental jurisdiction over claims under state law, pursuant to 28 U.S.C. § 1367.

## VENUE

17.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because all of the events giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

### *Plaintiffs*

18.    Plaintiffs bring this suit on behalf of themselves and others similarly situated to challenge LaSalle's forced labor scheme.

19.    Plaintiff Nilson Barahona ("Barahona") is an adult and currently resides in Gwinnett County, Georgia.  He was formerly detained by ICE at the Irwin facility between approximately October 2019 and May 2020. While detained at Irwin, Barahona worked for LaSalle in the Irwin facility kitchen.

20.    Plaintiff Nikolas Gazetas ("Gazetas") is an adult and resides in Jefferson County, Georgia.  He was formerly detained by ICE at the Irwin facility between approximately February 2020 and January 2021. While detained at Irwin, Gazetas worked as a cleaner for LaSalle.

21.    Plaintiff Omar Isaias Tavira Garcia ("Garcia") is an adult and resides in Gwinnett County, Georgia.  He was formerly detained by ICE at the Irwin facility between approximately June 2019 and June 2020. While detained at Irwin, Garcia worked on the Irwin facility kitchen for LaSalle.

*Defendants*

22.     Defendant LaSalle Management Company, LLC, d/b/a LaSalle Corrections ("LaSalle Management"), is a business entity formed under the laws of the State of Tennessee and is responsible—directly or through one or more subsidiaries—for the day-to-day operations of the Irwin facility pursuant to the contract referenced in Paragraph 26, *infra*.

23.     Defendant LaSalle Corrections, LLC ("LaSalle Corrections"), is a business entity formed under the laws of the State of Tennessee and is responsible—directly or through one or more subsidiaries or affiliates—for the day-to-day operations of the Irwin facility pursuant to the contract referenced in Paragraph 26, *infra.*

24.     Defendant LaSalle Southeast ("LaSalle Southeast," and collectively with LaSalle Management and LaSalle Corrections, the "Defendants" or "LaSalle") is a subsidiary or affiliate of LaSalle Corrections, and is responsible—directly or through one or more subsidiaries or affiliates—for the day-to-day operations of the Irwin facility, pursuant to the contract referenced in Paragraph 26, *infra*.

25.     The LaSalle Defendants, along with other affiliates and/or subsidiaries of LaSalle Corrections, together own and/or manage at least 18 correctional centers in Louisiana, Texas, and Georgia, including Irwin.

26.     Defendants operated the Irwin facility pursuant to an intergovernmental service agreement ("IGSA") with the federal government.  This IGSA allowed U.S. Immigration and Customs Enforcement ("ICE"), an agency subcomponent of the U.S. Department of Homeland Security ("DHS"), to contract with Defendants to detain, on behalf of ICE, a minimum population of at least, upon information and belief, 600 detained immigrants awaiting civil immigration

proceedings (and upon further information and belief, could detain up to approximately 1,200 detained immigrants per day).

27.     In or around May 2021, the Biden Administration announced that ICE would end its contract with Irwin in response to a whistleblower complaint brought on behalf of a number of female detained immigrants at Irwin which detailed horrific detainee abuse at the facility, including LaSalle's intentional failure to follow Covid-19 protocols and contractually-mandatory protocols outlined in ICE's Performance Based National Detention Standards, and a pattern and practice of non-consensual, invasive, and medically unnecessary gynecological procedures carried out on many female detained immigrants at Irwin.  Upon information and belief, LaSalle's contract with ICE related to the Irwin facility was terminated in or around October 2021.  Upon information and belief, as of the date of the filing of this Complaint, LaSalle no longer detains any  immigrants on behalf of ICE at Irwin.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

28.     Each year, hundreds of thousands of individuals are locked up in civil immigration detention facilities while awaiting immigration or citizenship status determinations.  Individuals detained include U.S. citizens, lawful permanent residents (green card holders) with longstanding family and community ties, children, pregnant women, asylum seekers, victims of human trafficking, and survivors of torture.  Some detained immigrants were brought to the United States as children and thousands more ultimately have their United States citizenship or legal residency affirmed by an immigration court or federal judge.

29.     Immigration violations are civil violations, and immigration detention is civil in nature.  Many detained immigrants have no criminal history at all.  Because immigration detention

is civil, the Supreme Court has held that immigration officials may not force detained immigrants to work. *See Wong Wing v. United States*, 163 U.S. 228 (1896).

30.     Notwithstanding immigration detention's civil nature and purpose, detained immigrants at Irwin are subjected to conditions created by LaSalle that are typical of the *criminally* incarcerated. Detained immigrants are frequently subjected to punitive and long-term solitary confinement, inadequate medical care, sexual and physical assault, lack of access to counsel, and other harsh conditions of confinement: all without a right to a speedy trial, a jury, a government-appointed lawyer, or a duly-entered conviction.

31.     LaSalle has a significant financial interest in the detention of immigrants and is more profitable when it detains more people. A substantial portion of its revenue from its IGSA with ICE resulted from per diem payments based on daily occupancy rates. LaSalle's facility operating costs at Irwin are relatively fixed despite occupancy rates; therefore, when occupancy rates drop, LaSalle's revenues and profits decline.

32.     Upon information and belief, LaSalle received at least $60.50 per detained immigrant at Irwin per day from its contract with ICE.[5]

33.     As part of its immigration detention enterprise, LaSalle owns and operates Irwin.

34.     LaSalle's economic windfall, and the profitability of its immigration detention enterprise, including the operation of Irwin, arises from its corporate scheme, plan, and pattern of systemically withholding basic necessities from detained immigrants inside of Irwin and/or threatening retaliation and the safety and wellbeing of detained immigrants inside of Irwin, all in

---

[5] The most recent IGSA between ICE and LaSalle for Irwin was effective on June 15, 2020, which included a bed day rate of $83 per detained immigrant for the first 600 detained immigrants, and $65 per detainee above the 600-person threshold. Upon information and belief, LaSalle was able to detain up to approximately 1,200 detained immigrants at the Irwin facility.

an effort to ensure a readily available, captive labor force that cleaned, maintained, and operated its facilities for subminimum wages, resulting in significant cost-savings for LaSalle and therefore significant increased profits. Without this nearly free labor, LaSalle's windfall from immigrant detention would be substantially decreased.

### LaSalle's Use of Detained Immigrants to Clean, Maintain, and Operate Irwin

35.     LaSalle used detained immigrants to perform work at Irwin.

36.     The Performance Based National Detention Standards ("PBNDS"), which are issued by ICE, and to which LaSalle was required to adhere to pursuant to its IGSA with ICE, provide, among other things, that Irwin's Work Program comply with the PBNDS, that detained immigrants "shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping[,]" that the maximum work day for a detained immigrant shall not be in excess of "8 hours daily, 40 hours weekly[,]" and that any detained immigrant working shall receive compensation of "at least $1.00 (USD) per day."[6]

37.     Moreover, DHS's Office of Inspector General has determined that "requiring [detained immigrants] to clean common areas used by all detainees is in violation of ICE standards, as detainees are only required to clean their immediate living area."[7]

38.     According to LaSalle's Prisoner/Detainee Manual, LaSalle had a voluntary work program at Irwin (the "Work Program"). The Work Program used detained immigrants to perform work that directly contributed to Irwin's institutional operations.

---

[6] Performance Based National Detention Standards 2011, Revised 2016, Section 5.8 "Voluntary Work Program," available at https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf (last accessed January 25, 2023).

[7] DHS Office of Inspector General, "Management Alert on Issues Requiring Immediate Action at the Theo Lacy Facility in Orange, California," at p.6, available at https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-43-MA-030617.pdf (last accessed Jan. 30, 2023).

39.     In the course of their labor for LaSalle, detained immigrants in the Work Program performed a wide range of work, including but not limited to:

(a) Sweeping and mopping floors;

(b) Preparing, cooking, and serving meals;

(c) Washing dishes and trays;

(d) Cleaning the kitchen and cafeteria before and after meals;

(e) Unloading food trucks that arrive at the Irwin facility;

(f) Cleaning the kitchen, hallways, and other common areas of the Irwin facility; and

(g) Barber services.

40.     Kitchen jobs were highly valued by Plaintiffs and other detained immigrants at Irwin because in addition to receiving $1 (and sometimes up to $3) per day for a kitchen job, detained immigrants also regularly received extra food if they worked in the Irwin kitchen. This is important because detained immigrants, including Plaintiffs and members of the Proposed Classes, received very little food from LaSalle at the Irwin facility (detained immigrants were strictly fed only three times per day, with dinner served around 3pm each day, thus detained immigrants often became even more hungry later in the day), and the food they did receive was very poor quality and significantly nutritionally deficient. Thus, Plaintiffs and other similarly situated detained immigrants consistently felt hungry and nutritionally deprived. Plaintiffs and other detained immigrants thus had no meaningful choice but to supplement their diets by purchasing items at the Irwin commissary, or suffer from hunger. Plaintiffs and other similarly-situated detained immigrants also feared retaliation or punishment if they attempted to ask LaSalle employees for additional food. Thus, the only way Plaintiffs and other detained immigrants at Irwin could supplement the minimal amount of nutritionally inadequate food they received was by

purchasing additional food items from the Irwin commissary, which purchases further profited LaSalle.

41. LaSalle's provision of extra food to Plaintiffs and other detained immigrants that worked in the Irwin facility kitchen is also in violation of LaSalle's binding contractual requirements with ICE. Specifically, Section 4.1 of the PBNDS, which LaSalle is contractually obligated to follow through its IGSA with ICE, provides: "Food shall never be used as reward or punishment." That same section also specifies that detained immigrant workers shall receive the "same fare as other detainees."

42. LaSalle paid Plaintiffs and other similarly-situated detained immigrants $1 (and in some limited instances up to $5) per day regardless of the number of hours or shifts worked or the type of work performed in a single day.

43. LaSalle did not pay Plaintiffs and other similarly-situated detained immigrants the federal minimum hourly wage or Service Contract Act wage, and generally Plaintiffs and other detained immigrant's hourly wages were well under $1 per hour.

44. LaSalle's use of detained immigrants to perform such work is financially and otherwise beneficial to LaSalle, which would otherwise have to hire individuals to perform this work from the free labor market. The use of detained immigrants instead of persons recruited from the free labor market also allows LaSalle to avoid: payment of legally mandated wages, provision of benefits to detained immigrants, paying the costs of potential unionization, paying federal and state payroll taxes (like Medicare), among other things. This results in a significant reduction in LaSalle's operational costs of Irwin and an increase in LaSalle's profits.

**LaSalle Withholds Basic Necessities from Detained Immigrants at Irwin**

45. Despite its name as a "Voluntary" Work Program, work by detained immigrants at Irwin was not voluntary.

46.     LaSalle maintained a corporate scheme, plan, pattern and practice at Irwin of depriving detained immigrants with basic necessities, including hygienic products and adequate nutrition, and outside contact with significant persons, including legal counsel, communications with immigration officials, and loved ones/support networks. These deprivations were exacerbated by deplorable and inhumane conditions at the Irwin facility, which conditions include the failure to provide adequate basic necessities to detained immigrants, the failure to provide adequate and timely medical care to detained immigrants, and the ongoing fear of retaliation or punishment (including but not limited to placement in solitary confinement, placed in "lock down" within one's own cell, denied access to medical care, or losing one's job position in the Work Program) if any detained immigrant attempted to voice any concerns or issues to LaSalle or its employees or agents about the Irwin facility and its operations, among other things. As a result, Plaintiffs and other similarly-situated detained immigrants are forced to submit to LaSalle's labor scheme.

47.     Plaintiffs and other similarly-situated detained immigrants rely upon telephone and tablet access at Irwin not only to contact loved ones but also to correspond with their legal representatives and immigration officials, including with ICE. Tablets are the only source of internet access (and video calls) for detained immigrants at Irwin. Tablet access is thus crucial to Plaintiffs and other detained immigrants at Irwin as it allows them to contact their attorneys, check on the status of their immigration proceedings, and communicate with immigration officials about medical requests and grievances, including with ICE and DHS. Because tablets at Irwin had video cameras, tablets were also an extremely important resource used by Plaintiffs and other detained immigrants to communicate with loved ones and support networks outside of the facility. Often the loved ones and other support individuals assisting Plaintiffs and other detained immigrants

from outside of the Irwin facility acted as a significant resource—assisting with communications to other third parties, providing additional financial support for the detained person (where available), and playing a very important emotional support role to detained immigrants, many of whom had never committed a crime, had never been incarcerated, and who were awaiting lawful applications for immigration to the United States, if not already lawfully present in this country.

48.     For those detained immigrants eligible for release on immigration bond, parole, or discretionary orders of supervision, contact with individuals outside of Irwin—including legal counsel and community support—is critical: it represents the only means of securing their freedom from detention (among other things, release from immigration custody often requires a U.S. citizen to account for a detained immigrant until immigration proceedings have concluded).  Cutting off this contact therefore allows LaSalle to minimize the number of detained immigrants transferred into and out of the Irwin facility, which in turn reduces the expenses incurred when people enter or exit the facility, such as initial health screenings, new bunk cleanings, fresh laundry, and other related expenses.  Moreover, minimizing the number of transfers out of the facility also serves to keep the bed day rate at Irwin higher, meaning increased profits for LaSalle.

49.     Plaintiffs and other detained immigrants at Irwin paid to use Irwin's telephones and tablets.  Upon information and belief, telephone calls cost $0.21 per minute.  Consequently, a detained immigrant making $1 per day has to work three days to save up enough money to cover a 15 minute phone call.  This fact significantly limits Plaintiffs' and other detained persons' ability to communicate with their legal representatives, immigration officials, and loved ones/support networks, among others.

50.     Upon information and belief, it costs between $0.15 to $0.25 per minute to use a tablet at the Irwin facility to access the internet, depending on what the tablet is used for.  Thus,

detained immigrants had to work 4-7 days (depending on minute pricing) to be able to afford any meaningful amount of tablet usage time (*i.e.*, 15 or more minutes). Upon information and belief, Plaintiffs and other detained immigrants were provided with 15 minutes every 4 hours per day of free tablet usage time to complete some limited tasks on the tablet, like filling out a commissary order or grievance/medical request form. However, not all tablet functions (like video calling, other internet usage, and other items) were included in the free 15 minutes of time. If Plaintiffs or any other detained immigrant required additional time on the tablet, they were required to pay out-of-pocket for those additional tablet minutes.

51. Upon information and belief, it costs $3.00 per 30 seconds of video calling on the Irwin tablet. Thus, a detained immigrant would have to work three days to earn enough money to cover a 30 second video call.

52. Because detained immigrants are civilly detained while their immigration claims are pending, their ability to access facility-provided tablets to check on the status of immigration proceedings and communicate with immigration officials is critical. In fact, certain communications with DHS and ICE are most efficiently and effectively made through submission of an electronic form on the internet through use of a tablet (including medical requests, grievance forms, and status updates on any detained immigrants' individual immigration proceedings), which electronic forms can only be completed by Plaintiffs and other detained immigrants through use of the tablet. Thus, tablet use is not optional, but critical to detained immigrants and their immigration process.

53. Moreover, when LaSalle installed tablets at the Irwin facility for use by detained immigrants, those tablets became the only method for detained immigrants to place orders with

the Irwin commissary. Prior to LaSalle's provision of tablets, detained immigrants filled out paper forms to make commissary purchases.

54. Consequently, and considering that detained immigrants only received a mere 15 minutes every 4 hours per day of free time to use a tablet, Plaintiffs and other detained immigrants often had to choose between completing their commissary orders on the tablet (to ensure they could secure items like food, other basic hygiene items, or phone cards) or submit grievance request forms, including medical grievance request forms, as not all of these items could be achieved within the free 15 minute period provided. Moreover, many detained immigrants have no or very little English language proficiency, yet the tablets provided at Irwin only displayed information in English. This fact also severely slowed down many detained immigrant's use of the tablets, including forcing detained immigrants to find other detainees to help translate tablet usage or to slowly attempt to use the English-language tablet alone. This also resulted in forcing detained immigrants to choose between completing various tasks on the tablets as it was not possible for many detained immigrants to complete multiple tasks (or even one task) on a tablet (like fill out a commissary order form *and* a grievance form) within the free 15 minute period provided.

55. Detained immigrants at Irwin, including Plaintiffs, are also forced to work to be able to purchase alternative food sources from the Irwin commissary to supplement insufficient and severely nutritionally inadequate meals supplied by LaSalle. Many detained immigrants were not adequately fed and did not obtain a sufficient amount of nutrition from the meals provided by LaSalle at Irwin and were left extremely hungry and with no choice but to purchase additional food items from the Irwin commissary or go hungry. The water supplied by LaSalle at Irwin was barely potable—it was brown in color, hard to consume, and often made detained immigrants ill.

Due to the inadequate amount of and nutritionally deficit quality of the food and water provided by LaSalle at Irwin, there was a categorical, class-wide denial of adequate nutrition for detained immigrants, including Plaintiffs. Moreover, detained immigrants had or developed medical issues from the food and/or water supplied by LaSalle at Irwin and thus had no choice but to purchase alternative food and/or beverage items from the Irwin commissary.

56. Upon information and belief, LaSalle contracts with Trinity Services Group, Inc. ("Trinity") to provide food services at Irwin. Through Trinity as its agent, LaSalle fails to provide adequate food to detained immigrants at Irwin.

57. Detained immigrants at Irwin, including Plaintiffs, were also forced to work to be able to purchase basic necessities and hygienic products from the Irwin commissary. At Irwin, LaSalle would initially supply Plaintiffs and other detained immigrants with extremely limited amounts of basic hygienic products like soap, shampoo, toothpaste and a single, low quality, toothbrush. Moreover, the facility would often run out of basic hygiene products for detained immigrants. Detained immigrants, including Plaintiffs, were therefore forced to purchase basic necessities (like soap, toothbrushes, and toothpaste) from the Irwin commissary, or go without such necessary hygienic items. Given the extremely poor quality of the minimal hygienic items provided by LaSalle, detained immigrants also developed rashes and/or other medical reactions to the free soap and/or shampoo, and developed tooth and/or other dental problems, and thus were forced to purchase alternative hygiene products from the Irwin commissary. This fact was exacerbated by LaSalle's failure to provide appropriate medical care to detained immigrants, which medical care was often denied or significantly delayed; thus, detained immigrants were forced to purchase items from the Irwin commissary in attempt to alleviate their own medical symptoms.

58.     The deprivations at Irwin caused by LaSalle as explained herein became even more acute during the Covid-19 pandemic.  During the pandemic, LaSalle failed to provide detained immigrants, including Plaintiffs, with adequate hygiene products, including soap and hand sanitizer, which the facility repeatedly ran out of and did not refill.  Moreover, when Plaintiffs and other detained immigrants attempted to raise concerns with LaSalle employees or agents about the lack of adequate soap and/or hand sanitizer at the Irwin facility during the Covid-19 pandemic, they were threatened with retaliation or in fact punished, including  solitary confinement, threats of deportation, and lock down within one's own cell, among other threats of serious harm. Consequently, detained immigrants, including Plaintiffs, were forced to work to earn funds to purchase soap and other hygienic items from the Irwin commissary or otherwise go without those hygienic products during a critical period of extreme health concern, which health risk was known to be mitigated in part by proper hygiene, like regular and consistent handwashing with soap.

59.     Also at some point during the Covid-19 pandemic, upon information and belief, LaSalle limited or restricted physical visitors to the Irwin facility.  This  forced detained immigrants to pay LaSalle for use of either the telephone or tablet, which resources were detained immigrants' only means to communicate with persons outside of the facility for a multi-month period.

60.     Also, at some point during the Covid-19 pandemic, LaSalle removed all tablets from the Irwin facility as collective punishment for the attempt of a detained immigrant to use a tablet's built-in camera to record the deplorable and inhumane prison conditions that existed at Irwin.  In response, LaSalle removed all of the tablets from the Irwin facility for a period of approximately 6 or 7 months.  The removal of all tablets from Irwin significantly and critically curtailed the ability of detained immigrants to communicate with individuals outside of the Irwin

facility for an extended period of time and resulted in forcing detained immigrants to pay for use of the payphone to connect with loved ones and make other important communications outside of the facility.

61.     LaSalle also used direct coercive threats to force detained immigrants to work. Upon information and belief, LaSalle threatened detained immigrants with placement in solitary confinement or lock down within their individual cell if they chose not to work or were perceived to have not completed, or in fact did not complete, their job responsibilities.

62.     LaSalle also coerced detained immigrants to work by threatening detained immigrants with loss of their Irwin Work Program job position (and thus their main or only source of income to purchase medically or hygienically necessary products or their ability to communicate with individuals outside of the facility) where detained immigrants missed work for medical necessity or medical appointments.  Detained immigrants injured while working or otherwise in need of medical services could not leave their work shift to seek medical attention or medical services because if they did leave during any work shift LaSalle employees and agents would threaten detained immigrants with loss of their job position.

63.     Upon information and belief, LaSalle owns the commissary inside of Irwin or otherwise monetarily profits and/or receives some or all of the proceeds from the commissary inside of Irwin.

64.     The commissary at Irwin is the only place inside of the facility where detained immigrants can purchase basic necessities, including hygiene products, clothes, food, and phone cards, among other items.

65.     In furtherance of LaSalle's scheme to profit from detained immigrants, items sold at the Irwin commissary for purchase by detained immigrants were expensive and overpriced,

especially when compared with the $1 per day most detained immigrants earn from their labor for LaSalle. Upon information and belief, many if not all basic necessity items sold at the Irwin commissary by LaSalle were marked up in price by more than 200% from their retail value. Consequently, for $1 per day, a detained immigrant often, if not always, would have to work more than one, if not multiple, days to afford even a single item from the Irwin commissary. The high cost of food and beverage items at the Irwin commissary also exacerbated issues with Plaintiffs' and other detained immigrants' existing hunger and significant nutritional deprivation due to LaSalle's failure to provide adequate amounts of nutritionally appropriate food at the Irwin facility and/or need to purchase commissary items due to health concerns or necessary medical diets.

66. When detained immigrants make purchases at Irwin's commissary, they are in fact returning their wages back to LaSalle. This fact furthers LaSalle's scheme, plan, pattern, and practice of intentionally depriving detained immigrants of basic necessities, which can only be purchased at the Irwin commissary.

**ICE Terminates its Contract with LaSalle Because of Irwin's Deplorable Prison Conditions And Serious Harm of Detained Immigrants**

67.     LaSalle's scheme of intentionally depriving detained immigrants of basic necessities and its failure to meet federal standards concerning housing, food, hygiene products, and detainee safety, is well documented.[8]

68.     For example, ICE's own inspection reports found that Irwin was consistently in violation of PBNDS standards that "directly affect detainee life, health, safety, and/or well-being."[9]

69.     More recently, in or around May 2021, the Biden administration announced that it would be ending ICE's IGSA with LaSalle to detain immigrants at Irwin due to over a decade of documented deplorable conditions and severe abuses of detained immigrants' rights at the facility, including but not limited to LaSalle's failure to follow Covid-19 protocols and a pattern of unnecessary, non-consensual invasive gynecological procedures performed on female detained immigrants held at the facility.

---

[8] *See, e.g.*, S. Poverty Law Ctr., Shadow Prisons: Imm. Det. in the South 36 (Nov. 21, 2016), https://www.splcenter.org/sites/default/files/leg_ijp_shadow_prisons_immigrant_detention_report.pdf; United States Senate, Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, "Medical Mistreatment of Women in ICE Detention – Staff Report," *available at* https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-11-15%20PSI%20Staff%20Report%20-%20Medical%20Mistreatment%20of%20Women%20in%20ICE%20Detention.pdf (last accessed Feb. 20, 2023); Project South: Institute for the Elimination of Poverty & Genocide, Letter Dated September 14, 2020, "Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the Irwin County Detention Center," *available at* https://projectsouth.org/wp-content/uploads/2020/09/OIG-ICDC-Complaint-1.pdf (last accessed March 9, 2023).

[9] *See* U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, "Office of Detention Oversight Compliance Inspection, Enforcement and Removal Operations, ERO Atlanta Field Office, Irwin County Detention Center, Ocilla, GA, March 3-5, 2020," *available at* https://www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntr_OcillaGA_Mar3-5_2020.pdf (last accessed Feb. 16, 2023).

70.     The termination of ICE's contract with LaSalle to detain ICE immigrants at Irwin was largely prompted by a federal investigation into conditions at the facility after dozens of female detained immigrants came forward in or around September 2020 with a whistleblower complaint to the DHS Office of Inspector General about being forced to undergo unnecessary medical procedures, which medical procedures were performed without their consent and related to LaSalle's failure to follow Covid-19 protocols at Irwin.[10] Those unnecessary gynecological procedures included, but were not limited to, forced sterilization (including the removal of the uterus, ovaries and/or fallopian tubes), medically unnecessary vaginal ultrasounds, and placing women on birth control without their consent.

71.     The whistleblower complaint also noted that when detained immigrants tried to document the lack of any Covid-19 protocol at Irwin, including by sending letters and videos about the conditions at Irwin to the public, they were punished by LaSalle employees, including with solitary confinement or "lock down" within one's own cell. Moreover, where detained immigrants attempted to file urgent medical requests and grievances, LaSalle employees intentionally failed to record or even shredded those documents. Similarly, while detained at Irwin, female detained immigrants attempted to notify LaSalle about the horrifying medical abuse they were enduring, but in response to those cries for help, they were threatened by LaSalle employees with retaliation.

72.     The whistleblower complaint further noted recurring deficiencies relating to healthcare, detention conditions, and mistreatment of people detained at the facility, including the

---

[10] Government Accountability Project and Project South, October 4, 2022 letter to Joseph V. Cuffari, Inspector General re: Status of Investigations into September 2020 Disclosures of Whistleblower Dawn Wooten and Immigrant Women Detained at Irwin County Detention Center, available at https://whistleblower.org/wp-content/uploads/2022/10/100422-Letter-to-DHS-OIG-from-Government-Accountability-Project-Project-South-re-open-investigations-at-ICDC-1.pdf (last accessed Feb. 20, 2023).

lack of medical and mental healthcare, unsanitary conditions, lack of prenatal care for women and the aggressive use of solitary confinement in violation of ICE standards.

73.     The report prompted a Congressional inquiry and related federal investigation of LaSalle's operation of Irwin, which investigation culminated in the issuance of a report by the U.S. Senate's Permanent Subcommittee on Investigations, entitled the "Medical Mistreatment of Women in ICE Detention" (the "PSI Report").[11]

74.     The PSI Report, among other things, concluded that the medical care provided to detainees at Irwin was known to be "deficient" and that LaSalle knew of this fact but failed to take "effective corrective action."[12]

75.     The PSI Report also states that as of September 3, 2021, all detained immigrants previously detained by ICE at Irwin were removed from that facility and transferred to other ICE detention facilities.[13]   The PSI Report also notes that effective October 7, 2021, ICE's contract with LaSalle regarding Irwin was terminated.[14]

76.     In addition to determining that female detained immigrants at Irwin were in fact subjected to non-consensual, "excessive, invasive, and often unnecessary gynecological

---

[11] United States Senate, Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, "Medical Mistreatment of Women in ICE Detention – Staff Report," available at https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-11-15%20PSI%20Staff%20Report%20-%20Medical%20Mistreatment%20of%20Women%20in%20ICE%20Detention.pdf (last accessed Feb. 20, 2023).

[12] *Id.* at p. 3.

[13] *Id.* at p. 4.

[14] *Id.* at p. 4.  Despite termination of ICE's contract with LaSalle to detain immigrants at Irwin, "the federal government continues to contract with LaSalle to operate other detention facilities throughout the country."  *Id.*

procedures,"[15] the PSI Report also determined that LaSalle knew medical care provided to detained immigrants at Irwin was deficient including frequent complaints by detained immigrants about the quality and timeliness of medical care, including "numerous, repeated, and serious deficiencies with the [Irwin] medical unit as far back as 2012[.]"[16]

77.     The PSI Report also notably discusses Irwin's significant understaffing and other facility cost-related issues that incentivized forced labor by LaSalle at Irwin.[17]

78.     The PSI Report also evidences the significant importance of detained immigrants' access not only to appropriate and adequate medical care, but to the grievance submission process including medical grievance forms, at Irwin.    The PSI Report relied heavily on its review of grievance forms submitted by detained immigrants at Irwin in its investigative findings.[18]    Paper grievance forms were supposed to be made available by LaSalle to detained immigrants at Irwin, but Plaintiffs and other detained immigrants often found that hard copy grievance forms were significantly unreliable as LaSalle employees at Irwin would either intentionally or negligently fail to submit or significantly delay submission of those forms to the appropriate supervisory personnel (or otherwise discard those forms).    Consequently, detained immigrants relied heavily on the use of the tablets provided by LaSalle (once available) at Irwin to submit grievance forms, including medical grievance forms, by electronic submission.    Although, upon information and belief, Plaintiffs and other detained immigrants at Irwin received 15 minutes of free tablet usage every 4 hours per day, the free 15 minute period was often (if not always) not enough time to in fact complete and submit any grievance form as the tablets were also the only manner in which detained

---

[15] *Id.* at pp. 4-12.

[16] *Id.* at pp. 12-13.

[17] *See generally id.*

[18] *See, e.g.*, *id.* at pp. 35-36.

immigrants could submit commissary orders and carry out other required online tasks, or alternatively, many detained immigrants did not speak English or had very basic English language proficiency skills. Thus, filling out any grievance form on the tablet took longer than the free 15 minute period provided. Consequently, Plaintiffs and other detained immigrants often were unable to submit grievance forms, including medical grievance forms, unless they paid for additional minutes for use of the tablet, which made Plaintiffs' and other detained immigrants' employment by LaSalle no longer optional but a requirement to access medical care and submit other grievance concerns.

79. Given these horrifying and inhuman conditions at Irwin that have existed since at least 2012, if not earlier, Plaintiffs and many other similarly situated detained immigrants had no choice but to work for LaSalle—it was a necessity to be able to survive at Irwin.

## **PLAINTIFF'S INDIVIDUAL FACTUAL ALLEGATIONS**

### **Plaintiff Barahona's Labor at Irwin**

80. Plaintiff Barahona performed work for LaSalle as a result of its unlawful forced labor scheme, plan, pattern, and practice.

81. Barahona was a detained immigrant at Irwin from approximately October 2019 to May 2020.

82. While detained at the Irwin facility, Barahona worked for LaSalle through LaSalle's Work Program and had a position working in the Irwin facility kitchen.

83. As part of his job responsibilities, Barahona was responsible for organizing, cleaning, and transporting food trays to and from the Irwin kitchen and various cell units. Barahona was also responsible for cleaning the food trays after meals. Barahona would also set up the kitchen production line area, which is the area of the kitchen where food is served to the

detained immigrants. Barahona's job responsibilities also included general facility cleaning which included cleaning the kitchen area, common hallways, and other common areas leading up to and including the access areas to the individual units where immigrant detainees were held. These general cleaning responsibilities included mopping floors, washing pans, dishes, and utensils, taking out the trash, and unloading food trucks upon their arrival. When unloading food trucks, Barahona and other detained immigrants were forced to go outside of the Irwin facility, sometimes in very cold weather conditions. When this happened, Barahona and other detained immigrants were not provided with coats or other adequate clothing appropriate for the cold weather conditions.

84. While employed by LaSalle, Barahona earned $1 per day for his work. LaSalle's pay of $1 per day to Barahona was not altered by the number of hours that he worked in a single day or by the job responsibilities that he had to complete in a single day.

85. Barahona typically worked approximately 8 hours per day, 7 days per week. Barahona on occasion worked more than 8 hours per day. No matter the duration of time that he worked or the job responsibilities that he completed in a single day, LaSalle paid Barahona $1 per day for each day that he worked for LaSalle.

86. Barahona also sometimes received a small amount of extra food on the days he worked in the kitchen.

87. Barahona was forced to work to obtain money to buy medically-necessary food items from the Irwin commissary. While detained at Irwin, Barahona was diagnosed with diabetes. Barahona's diabetic condition required that he receive special, medically-necessary diabetic-friendly meals, which LaSalle was required to provide to Barahona pursuant to the PBNDS. Despite this fact, LaSalle rarely provided Barahona with his medically-necessary diabetic meals

which forced Barahona to work for LaSalle at Irwin so that he could make money to purchase alternative food items from the Irwin commissary in an effort to avoid deleterious effects to his health. LaSalle also failed to provide Barahona with adequate hygiene products and as a result Barahona was forced to work for LaSalle to be able to purchase soap from the Irwin commissary.

88. The lack of adequate soap became increasingly critical during the Covid-19 pandemic where LaSalle failed to provide adequate soap and/or hand sanitizer at Irwin. Barahona tried to voice concerns and issues with LaSalle employees at Irwin about the lack of soap or other hand sanitizing products during this critical time where hand washing was known to mitigate significant health risks posed by the Covid-19 virus. In response to his attempts to raise issues about these and other conditions, Barahona was threatened with retaliation by LaSalle employees, including with threats of being placed in solitary confinement or lock down within his own cell.

**Plaintiff Gazetas' Labor at Irwin**

89. Plaintiff Gazetas performed work for LaSalle as a result of its unlawful forced labor scheme, plan, pattern, and practice.

90. Gazetas was a detained immigrant at Irwin from approximately February 2020 through January of 2021.

91. While detained at the Irwin facility, Gazetas worked for LaSalle through LaSalle's Work Program.

92. Gazetas worked at Irwin as a cleaner for LaSalle. Gazetas' job responsibilities included cleaning (sweeping, mopping, disinfecting) the floors and hallways outside of individual cells, the stairwells, and other Irwin common areas. Gazetas was also tasked with handing out toilet paper to other detained immigrants.

93.     While employed by LaSalle, LaSalle paid Gazetas $1 per day for his work. Gazetas' pay of $1 per day was not altered by the number of hours that he worked in a single day or by the job responsibilities that he had to complete in a single day.

94.     Gazetas worked for LaSalle while detained at Irwin for approximately one and a half months. Gazetas typically worked approximately 4 hours per day, 7 days per week. No matter the duration of time worked by Gazetas in a single day, he received only $1 per day while working for LaSalle.

95.     Plaintiff Gazetas was forced to work for LaSalle to obtain basic necessities and nutritionally adequate food from the commissary. The food served to detained immigrants at Irwin was significantly nutritionally deficient, was repetitive, and largely inedible. The water provided at Irwin was not clean and was barely potable—the water at Irwin was brown in color and difficult to consume given its color and putrid taste. Upon information and belief, while at Irwin, Gazetas' health became negatively affected by the food and water provided at Irwin, including contributing to his development of a kidney stone, significant tooth decay, and other health issues, which continue to the present day.

96.     While at Irwin, Gazetas developed significant issues with his teeth. Gazetas believes that his significant tooth issues were also caused by the severely poor quality of the food and water provided at Irwin and the lack of appropriate dental hygienic items provided to detained inmates, including Gazetas, at Irwin, like appropriate quality and adequate amounts of toothbrushes and toothpaste. Irwin would supply detained inmates with an extremely small quantity of toothpaste and a single toothbrush, which was extremely poor quality and broke easily.

97.     Gazetas also repeatedly attempted to visit the medical center (and otherwise seek medical care) at Irwin for treatment of his kidney stone and other undiagnosed stomach pains and

also for his significant dental issues. Each time Gazetas went to the medical center at Irwin his complaints of medical issues, including kidney stones, stomach pains, and tooth issues, were either dismissed or downplayed by both medical staff and other LaSalle employees.

98.     Consequently, Gazetas was forced to work for LaSalle to be able to purchase alternative food items from the commissary which were necessary to avoid and/or ameliorate significant health issues that Gazetas developed while at Irwin, which likely stemmed from the nutritionally deficient food and barely potable water provided at Irwin and which medical issues were exacerbated and worsened by the lack of timely and adequate medical care provided to Gazetas. Gazetas was also forced to work at Irwin to purchase alternative dental hygiene products from the Irwin commissary which was not optional as Irwin's medical facility repeatedly ignored or downplayed his significant dental issues.

99.     Moreover, Gazetas was reprimanded and punished by LaSalle employees because of what they perceived to be too frequent visits to the Irwin facility medical center or requests by Gazetas for medical attention. Any medical issues that Gazetas raised with LaSalle's employees at the Irwin facility were dismissed or minimized, despite Gazetas' significant dental issues and development of a kidney stone and other stomach pains.

100.     Gazetas also was forced to work for LaSalle so that he could purchase basic toiletries from Irwin's commissary, like soap and shampoo, among other things. The minimal amount and low quality of the hygienic products, like soap and shampoo, provided by LaSalle at the Irwin facility for free to detained immigrants would often cause Gazetas to develop skin rashes, and would in any event frequently run out due to the very small quantity provided for free by the facility. Thus, Gazetas was forced to work so that he could purchase basic and necessary toiletry items for his personal hygiene.

**Plaintiff Garcia's Labor at Irwin**

101.    Plaintiff Garcia performed work for LaSalle as a result of its unlawful forced labor scheme, plan, pattern, and practice.

102.    Garcia was a detained immigrant at Irwin from approximately June 2019 through June 2020.

103.    While detained at the Irwin facility, Garcia worked for LaSalle through LaSalle's Work Program and had a position working in the Irwin facility kitchen.

104.    As part of his job responsibilities, Garcia was responsible for cleaning trays and dishes.    Over time, and as Garcia continued to work for LaSalle, he was given additional responsibilities and ultimately a managerial role overseeing all kitchen functions at the Irwin facility, including assisting with and later overseeing: food preparation and cooking, the service of prepared food to other detained inmates,  assisting with unloading food delivery trucks and putting away food items, cleaning the kitchen area, including cleaning the floors, tables, trays, dishes, utensils, and all other items associated with meal preparation at Irwin.  Garcia would also assist in taking out the trash.  Garcia would also clean hallways, cell units, and other communal spaces at Irwin.

105.    While employed by LaSalle, Garcia earned $1 to $3 per day for his work.  Garcia's pay of $1 to $3 per day was not altered by the number of hours that he worked in a single day or by the job responsibilities that he had to complete in a single day.

106.    Garcia also sometimes received a small amount of extra food on the days he worked in the kitchen.

107.    Garcia worked for LaSalle while detained at Irwin for approximately 9 or 10 months.  Garcia worked between approximately 14 hours to 18 hours per day, 7 days a week.  No

matter the duration of time that he worked or the job responsibilities that he completed in a single day, LaSalle paid Garcia $1 to $3 per day for each day that he worked.

108.    Garcia worked so that he could buy additional food items from the Irwin commissary.  While detained at Irwin, Garcia was fed strictly three times per day, with breakfast served at approximately 6:00 a.m., lunch served at approximately 12:00 p.m., and dinner served at approximately 3:00 p.m.  The food served at Irwin was repetitive, was significantly nutritionally deficient, and was an insufficient quantity.  Moreover, food was not served after 3:00 p.m. each day.  Consequently, Garcia was often very hungry and nutritionally deprived.  Thus, Garcia was forced to work for LaSalle to make money to be able to purchase additional food items from the Irwin commissary so that he could eat an adequate amount of food each day and not go hungry. Garcia's work for LaSalle was therefore not optional—Garcia was forced to work for LaSalle.

109.    Garcia was also forced to work for LaSalle to be able to use the payphones and tablets at the Irwin facility.  Garcia was forced to use his pre-paid telephone minutes to use the payphone at the Irwin facility to contact his attorney about his immigration proceedings.

110.    Garcia was also forced to work for LaSalle to be able to purchase basic toiletries and other hygienic items from the Irwin commissary.  The toiletry items provided to detained immigrants for free by LaSalle at Irwin are very low quality, break easily, and are in very small quantities.  Thus, Garcia was forced to buy additional toiletries items, like shampoo, soap, toothbrushes, and toothpaste.

111.    Garcia was detained at Irwin during the Covid-19 pandemic during which LaSalle failed to ensure that the Irwin facility had adequate soap and/or hand sanitizer.  This was despite the fact that consistent hand washing with soap or use of hand sanitizer was known to mitigate the significant health risks of Covid-19.  Consequently, Garcia was forced to purchase soap from the

Irwin commissary to ensure adequate hygiene and safety at a time when LaSalle failed to provide soap or soap alternatives, like hand sanitizer, during the Covid-19 pandemic.

112.    Garcia's work for LaSalle was therefore not optional—he was forced to work to obtain adequate food, adequate toiletry/personal hygiene items, and during Covid-19 was forced to work to ensure his own health and safety by access to soap – a required and necessary item to mitigate the effects of a deadly and highly contagious virus.  Garcia was forced to work so that he could also afford to use the tablet and payphone at Irwin, including to contact his legal representation related to his immigration proceedings.

113.    Moreover, on one occasion while working in the kitchen at Irwin, Garcia was severely burned.  At the time of the incident, Garcia asked LaSalle employees if he could receive medical attention for his burns.  In response, LaSalle employees threatened Garcia and told him that if he left his job shift to seek medical attention he would lose his job position.  As Garcia could not afford to lose his employment with LaSalle so that he could purchase necessary items at the Irwin commissary, like additional food, phone time, and tablet usage, Garcia did not seek medical attention for his employment-related injury and continued to complete his shift that day and continued working for LaSalle until he was transferred to a different facility in or around June 2020.

## **CLASS ACTION ALLEGATIONS**

114.    Plaintiffs bring this class action on behalf of themselves individually and all others similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3), for their requests for damages.

115.    Plaintiffs seek to certify the following two classes (together, the "Proposed Classes"):

(a) All civil immigration detainees who performed work for LaSalle at Irwin starting ten years prior to the date this Complaint was filed (March 10, 2023) until the date of final judgment in this matter ("Forced Labor Class").

(b) All civil immigration detainees who performed work for LaSalle at Irwin starting four years prior to the date this Complaint was filed (March 10, 2023) until the date of final judgment in this matter ("Unjust Enrichment Class").

116. Excluded from the class definitions are Defendants, their officers, directors, management, employees, subsidiaries, and affiliates, and all federal governmental entities.

117. Plaintiffs reserve the right to amend the definition of the Proposed Classes if discovery and further investigation reveals that either or both definitions should be expanded or otherwise modified.

**Class Certification Requirements under Rule 23(b)(3)**

118. **Numerosity:** The class is so numerous that joinder of all members is impracticable. Plaintiffs do not know the exact size of the class because that information is within the control of the LaSalle Defendants. However, upon information and belief, the class members number in the thousands. Membership in the class is readily ascertainable from LaSalle's detention and Work Program records.

119. **Commonality:** There are numerous questions of law or fact common to the Proposed Classes, and those issues predominate over any question affecting only individual class members. The common legal and factual issues include the following:

<blockquote>
(a) Whether the LaSalle Defendants' conduct as set forth in Count I violated the forced labor and attempt provisions of the Trafficking Victims Protection Act (18 U.S.C. §§ 1589, 1594, and 1595);

(b) Whether the LaSalle Defendants were unjustly enriched by the Work Program;

(c) Whether the LaSalle Defendants engaged in violations of human dignity and of specific, universal, and obligatory international human rights norms prohibiting forced labor constituting a claim under the Alien Tort Statute, 28 U.S.C. § 1350;

(d) Whether Plaintiffs and members of the Proposed Classes, as defined herein, are entitled to damages and other monetary relief and, if so, in what amount.
</blockquote>

120.  **Typicality:** The claims asserted by Plaintiffs are typical of the claims of the Proposed Classes, in that the representative Plaintiffs, like all members of the Proposed Classes, were subject to and impacted by the LaSalle Defendants' uniform policy. Each member of the Proposed Classes has been similarly injured by the LaSalle Defendants' misconduct.

121.  **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Proposed Classes. Plaintiffs have retained attorneys experienced in class and complex litigation. Plaintiffs and their counsel intend to vigorously prosecute this litigation. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other class members.

122.  **Predominance of Common Questions:** The questions of law or fact common to the Proposed Classes, identified above in Paragraph 119, predominate over any questions affecting only individual members.  Specifically, the LaSalle Defendants' scheme, plan, and pattern to force

labor applies to the Proposed Classes as a whole and has resulted in substantially similar injuries to the classes.

123. **Superiority:** Plaintiffs and members of the Proposed Classes have all suffered and will continue to suffer harm and damages as a result of the LaSalle Defendants' wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many members of the Proposed Classes who could not individually afford to litigate a claim such as is asserted in this complaint. Additionally, a class action is superior because the Proposed Classes is comprised of many individuals who do not speak English as their native language and who are geographically dispersed. Finally, this class action likely presents no difficulties in management that would preclude maintenance as a class action.

## COUNT I
### THE TRAFFICKING VICTIMS PROTECTION ACT
### Forced Labor (18 U.S.C. § 1589)
### On behalf of the Forced Labor Class

124. Plaintiffs and members of the Forced Labor Class reallege and incorporate by reference herein all allegations above as if stated in full herein.

125. Plaintiffs and members of the Forced Labor Class are authorized to bring this claim against the LaSalle Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595, because the LaSalle Defendants violated the forced labor provisions of 18 U.S.C. § 1589.

126.    18 U.S.C. § 1589 of the Federal TVPA provides:

Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means – (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause that person to believe that, if that person did not perform such labor or services, that person, or another person would suffer serious harm or physical restraint, shall be punished as provided under [18 U.S.C. § 1589] subsection (d)."

127.    Plaintiffs and members of the Forced Labor Class are authorized to bring this claim under the TVPA, 18 U.S.C. § 1595, because the LaSalle Defendants knowingly benefitted financially from participating in a venture which the LaSalle Defendants knew or should have known resulted in violations of the forced labor provisions of the TVPA.

128.    The LaSalle Defendants knowingly obtained the labor or services of Plaintiffs and members of the Forced Labor Class by means of serious harm and threats of serious harm, in violation of 18 U.S.C. § 1589(a)(2).

129.    The LaSalle Defendants knowingly obtained the labor or services of Plaintiffs and members of the Forced Labor Class by means of any scheme, plan, or pattern intended to cause Plaintiffs and members of the Forced Labor Class to believe that, if they did not perform such labor or services, they or another person would suffer serious harm, threats of serious harm, or physical restraint, in violation of 18 U.S.C. § 1589(a)(4).

130.    The serious harm the LaSalle Defendants caused and threatened included the withholding of basic necessities, threats of retaliation, violations of contractual provisions and its own policies and procedures that were intended to protect the health, safety, and wellbeing of detained immigrants inside of Irwin.  LaSalle withheld or threatened to withhold basic necessities from Plaintiffs and members of the Forced Labor Class, thereby forcing them to work for

subminimum wages to purchase those basic necessities at the Irwin commissary to avoid hunger, undernourishment, lack of personal hygiene, and lack of contact with loved ones, legal representation, and immigration officials, among other harms.

131.     Upon information and belief, the LaSalle Defendants own the commissary at Irwin and thus forced Plaintiffs and members of the Forced Labor Class to buy items from the commissary and resulted in Plaintiffs and members of the Forced Labor Class paying back their wages to the LaSalle Defendants.

132.     The LaSalle Defendants' conduct, as described herein, constitutes "serious harm" as defined in 18 U.S.C. § 1589(c)(2) because it is "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances [of Plaintiffs and members of the Forced Labor Class] to perform or to continue performing labor or services in order to avoid incurring that harm."

133.     The LaSalle Defendants knowingly obtained the labor or services of Plaintiffs and members of the Forced Labor Class "by means of a scheme, plan or pattern" as the LaSalle Defendants "intended to cause . . . [Plaintiffs and members of the Forced Labor Class] to believe that if . . . [they] did not perform such labor or services, . . . [they] would suffer serious harm" as described herein, in violation of 18 U.S.C. § 1589(a)(4).

134.     The LaSalle Defendants significantly profited from LaSalle's unlawful practice of forcing and coercing Plaintiffs and members of the Forced Labor Class to perform uncompensated forced labor through human trafficking.  By exploiting these unlawful practices, the LaSalle Defendants materially and significantly reduced its labor costs and expenses, in addition to increasing its profits.

135.     Plaintiffs and members of the Forced Labor Class are victims of forced labor under 18 U.S.C. § 1589.

136.     The LaSalle Defendants committed the illegal and unlawful offense(s) of forced labor against the Plaintiffs and members of the Forced Labor Class under 18 U.S.C. § 1589, *et seq*.

137.     The LaSalle Defendants knowingly and financially benefitted from implementing and participating in a venture, plan, scheme, pattern of conduct, and practice that the LaSalle Defendants knew or should have known was unlawful and in violation of forced labor laws under 18 U.S.C. § 1589.

138.     Plaintiffs and the members of the Forced Labor Class are entitled to, without limitation, the remedies set forth in 18 U.S.C. § 1593 and 18 U.S.C. § 1589(a).

139.     18 U.S.C. § 1593 states:

(a) Notwithstanding section 3663 or 3663A, and in addition to any other civil or criminal penalties authorized by law, the court shall order restitution for any offense under this chapter.

(1) The order of restitution under this section shall direct defendant to pay the victim (through the appropriate court mechanism) the full amount of the victim's losses, as determined by the court under paragraph (3) of this subsection.

(2) An order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under 3663A.

(3) As used in this subsection, the term "full amount of the victim's losses" has the same meaning as provided in section 2259(c)(2) and shall in addition include the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act (29 U.S.C. § 201 *et seq.*).

(4) The forfeiture of property under this subsection shall be governed by the provisions of section 413 (other than subsection (d) of such section) of the Controlled Substances Act (21 U.S.C. § 853).

(b) As used in this section, the term "victim" means the individual harmed as a result of a crime under this chapter, including, in the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or a representative of the victim's estate, or another family member, or any other person appointed as suitable by the court, but in no event shall the defendant be named such representative or guardian.

140. Plaintiffs and members of the Forced Labor Class have suffered damages in an amount to be determined at trial.

141. 18 U.S.C. § 1595(a) states:

An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees.

142. Plaintiffs and members of the Forced Labor Class have suffered damages in an amount to be determined at trial. Plaintiffs and members of the Forced Labor Class request that the Court enter an Order pursuant to 18 U.S.C. § 1595(a) awarding Plaintiffs and members of the Forced Labor Class compensatory and punitive damages.

143. Plaintiffs and members of the Forced Labor Class request that the Court enter an Order pursuant to 18 U.S.C. § 1593 awarding Plaintiffs and members of the Forced Labor Class mandatory restitution in addition to the recovery of their reasonable attorneys' fees that they are entitled to recover pursuant to 18 U.S.C. § 1595(a).

144. Plaintiffs and members of the Forced Labor Class also seek pre- and post-judgment interest and attorneys' fees and costs as allowed by statute as they are entitled to recover pursuant to 18 U.S.C. 1595(a).

**COUNT II**
**THE TRAFFICKING VICTIMS PROTECTION ACT**
**Attempt to Commit Forced Labor (18 U.S.C. § 1594(a))**
*On behalf of the Forced Labor Class*

145.     Plaintiffs and members of the Forced Labor Class reallege and incorporate by reference herein all allegations above as if stated in full herein.

146.     Plaintiffs and members of the Forced Labor Class are authorized to bring this claim against the LaSalle Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595, because LaSalle violated the attempt forced labor provisions of 18 U.S.C. § 1594(a).

147.     Plaintiffs and members of the Forced Labor Class also are authorized to bring this claim under the TVPA, 18 U.S.C. § 1595, because the LaSalle Defendants knowingly benefitted financially from participating in a venture which the LaSalle Defendants knew or should have known involved violations of attempted forced labor pursuant to 18 U.S.C. § 1594(a).

148.     The LaSalle Defendants attempted to obtain the labor or services of Plaintiffs and members of the Forced Labor Class by the means described herein in violation of 18 U.S.C. § 1594(a).

149.     Plaintiffs and members of the Forced Labor Class have suffered damages in an amount to be determined at trial.  Plaintiffs and members of the Forced Labor Class request that the Court enter an Order pursuant to 18 U.S.C. § 1595(a) awarding Plaintiffs and members of the Forced Labor Class compensatory and punitive damages.

150.     Plaintiffs and members of the Forced Labor Class request that this Court enter an Order pursuant to 18 U.S.C. § 1593 awarding Plaintiffs and members of the Forced Labor Class mandatory restitution in addition to the recovery of their reasonable attorneys' fees that they are entitled to recover pursuant to 18 U.S.C. § 1595(a).

151. Plaintiffs and members of the Forced Labor Class also seek pre- and post-judgment interest and attorneys' fees and costs as allowed by statute as they are entitled to recover pursuant to 18 U.S.C. 1595(a).

## COUNT III
## UNJUST ENRICHMENT
### Georgia Common Law
*On behalf of the Unjust Enrichment Class*

152. Plaintiffs reallege and incorporate by reference herein all allegations above as if fully restated herein.

153. The LaSalle Defendants materially and significantly reduced their labor costs and expenses, and increased their corporate profits, by obtaining undercompensated labor from Plaintiffs and members of the Unjust Enrichment Class.

154. Plaintiffs and members of the Unjust Enrichment Class conferred non-gratuitous benefits upon the LaSalle Defendants by performing work for $1 to $5 per day for which the LaSalle Defendants would otherwise have had to pay at least the applicable minimum hourly wage or more, thereby significantly and materially increasing the LaSalle Defendants' profits and unjustly enriching the LaSalle Defendants at the expense and to the detriment of Plaintiffs and members of the Unjust Enrichment Class.

155. The LaSalle Defendants' retention of any benefit collected directly and indirectly from this undercompensated labor violated principles of justice, equity, and good conscience.

156. As a direct and proximate result of the LaSalle Defendants' forced labor practices, Plaintiffs and members of the Unjust Enrichment Class have suffered concrete harm and injury, including physical and emotional injury, and the unlawful violation of their rights.

157. Plaintiffs and members of the Unjust Enrichment Class are entitled to recover from the LaSalle Defendants all amounts that the LaSalle Defendants have wrongfully and improperly

obtained, and the LaSalle Defendants should be required to disgorge to Plaintiffs and members of the Unjust Enrichment Class the benefits they have unjustly obtained. Plaintiffs and members of the Unjust Enrichment Class are also entitled to recover exemplary damages.

## COUNT IV
### Alien Tort Statute, 28 U.S.C. § 1350
#### *On behalf of the Forced Labor Class*

158.    Plaintiffs and all members of the Forced Labor Class reallege and incorporate by reference herein all allegations above as if stated in full herein.

159.    The Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, enacted in 1789, permits non-citizens to bring suit in U.S. courts for violations of the law of nations or of a treaty of the United States.

160.    Under the ATS, federal courts are authorized to recognize a common law cause of action for violations of clearly defined, widely accepted human rights norms that are embodied in customary international law.  Such an international norm must be specific, universal, and obligatory.

161.    In particular, under customary international law, Defendants are forbidden to subject those persons held in civil detention, as is the case of detained immigrants at Irwin, to forced labor.  This prohibition of forced labor is a specific, universal, and obligatory international norm, as demonstrated by various treaties that the United States has ratified, including the Slavery Convention of 1926 and the later Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery (the "Supplementary Slavery Convention").  The overwhelming majority of nations in the world are also parties to these treaties, which demonstrate that the international and universal prohibition on slavery has evolved, particularly after World War II, to forbid more contemporary forms of servitude and forced labor. Specifically, the Supplementary Slavery Convention, in expressly widening the scope of the

international prohibition to similar forms of forced labor or servitude, does not define "forced labor" but explicitly references the United Nations International Labour Organization Convention No. 29 Concerning Forced or Compulsory Labour ("ILO Convention 29").

162.    ILO Convention 29, to which the United States is a signatory, and which has been ratified by 180 nations, defines "forced or compulsory labor" as "all work or service which is exacted from any person under the menace of any penalty and for which the said person has not offered himself voluntarily."

163.    The United Nations International Labour Organization has issued a list of factors to help identify forced labor in practice and to interpret ILO Convention 29.  Factors that indicate the presence of the "menace of any penalty" include, *inter alia,* the actual presence or credible threat of: imprisonment or other physical confinement; financial penalties; deportation; and deprivation of food, shelter, or other necessities.  Specific threats may not be necessary if the person is kept in a general state of fear such as to coerce them to work.

164.    To identify the lack of voluntary consent prong of the ILO Convention 29 definition, the ILO guidance includes, among others, the following indicators:  physical abduction, physical confinement in the work location (whether in prison or private detention), and induced indebtedness (including by inflated prices, reduced value of goods or services produced, or excessive charges).  Again, specific threats may not be necessary if the person is kept in a general state of fear such as to render their offer to work coerced.

165.    Plaintiffs and members of the Forced Labor Class worked for the LaSalle Defendants under the menace of penalty:

    (a) At all relevant times, Plaintiffs and members of the Forced Labor Class were physically confined to Irwin, a prison facility owned and operated by the LaSalle

Defendants, and during which time Plaintiffs and members of the Forced Labor Class were physically prevented from leaving.

(b) At all relevant times, Plaintiffs and members of the Forced Labor Class were effectively threatened by the LaSalle Defendants with deportation by the prospect of being rendered unable to confer meaningfully with their legal counsel to advance their effort to seek asylum or otherwise avoid deportation, and to communication with immigration officials (including ICE and DHS) about their immigration claims and proceedings, unless Plaintiffs and members of the Forced Labor Class worked for the LaSalle Defendants at subminimum and nearly free wages to pay for computer internet access and telephone access.

(c) At all relevant times, Plaintiffs and members of the Forced Labor Class were forced to work for the LaSalle Defendants under penalty of not receiving edible or medically-appropriate food or not receiving usable soap or shampoo and other essential hygiene and sanitary products, including but not limited to during a time of an infectious viral Covid-19 pandemic, because such life necessities were available only through purchase from the Irwin commissary, which is owned and operated by the LaSalle Defendants.

(d) Upon information and belief, members of the Forced Labor Class were forced to work for the LaSalle Defendants under penalty of solitary confinement, lock down within one's own cell, threats of deportation, or other acts or threats of punishment, retaliation, or harm towards detained immigrants. Plaintiffs and members of the Forced Labor Class were kept by LaSalle in a general state of fear which coerced them to work.

166.     Plaintiffs and members of the Forced Labor Class worked for the LaSalle Defendants under compulsion and did not offer their work or services voluntarily:

(a) At all relevant times, Plaintiffs and members of the Forced Labor Class had been physically abducted under color of law by INS agents or other government authority, and involuntarily delivered into the custody and care of the LaSalle Defendants.

(b) At all relevant times, Plaintiffs and members of the Forced Labor Class worked physically confined to the LaSalle Defendants' facility, and rendered all services and labor exclusively at the LaSalle Defendants' facility, without the ability or liberty to work anywhere else or for any other employer.

(c) At all relevant times, Plaintiffs and members of the Forced Labor Class were subject to the LaSalle Defendants' system and scheme to impose induced indebtedness on them, consisting of a deliberate practice of providing absurdly low wages of typically $1 (and no more than $5) for a single day of work (no matter how many hours worked or what job tasks this entailed) while charging grossly excessive fees to purchase necessities at the Irwin commissary by making edible or medically-appropriate food available only through purchase from the LaSalle-owned commissary at LaSalle's unilaterally-determined price and by charging for computer and telephone access necessary to meaningfully contribute to Plaintiffs' and members of the Forced Labor Class individual attempts to achieve freedom from the LaSalle Defendants' confinement facility—up to and including a coercive and arbitrarily exploitative exchange rate by which an entire day's physical labor

"earned" no more than approximately 4 minutes of video call time and approximately 10 minutes of tablet time.

167. The actions of the LaSalle Defendants here meet both prongs of the ILO Convention 29 test. Here, Plaintiffs and members of the Forced Labor Class are civil detainees who had not been charged with any crime, thus the LaSalle Defendants' practices are an egregious violation of human dignity and violate specific, universal, and obligatory international human right norms prohibiting forced labor. Plaintiffs and members of the Forced Labor Class have therefore stated a cognizable claim under the ATS.

168. Plaintiffs and members of the Forced Labor Class have suffered damages in an amount to be determined at trial.

169. Plaintiffs and members of the Forced Labor Class are entitled to recover compensatory and punitive damages.

170. Plaintiffs and members of the Forced Labor Class are entitled to recover mandatory restitution in the full amount of their losses.

171. Plaintiffs and members of the Forced Labor Class are entitled to recover their costs and reasonable attorney's fees.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of the proposed Forced Labor Class and the proposed Unjust Enrichment Class (together the "Proposed Classes"), request that the Court:

a. Certify this action as a class action, with the Proposed Classes as defined above;

b.　Find that Plaintiffs are proper representatives of the Proposed Classes, and appoint the undersigned as Class Counsel;

c.　Order the LaSalle Defendants to identify and disclose to Plaintiffs all members of the Proposed Classes;

d.　Order the LaSalle Defendants to pay for notifying all members of the Proposed Classes of the pendency of this suit;

e.　Award declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and members of the Proposed Classes;

f.　Order disgorgement of the LaSalle Defendants' unjustly-acquired revenue, profits, and other benefits resulting from its unlawful conduct;

g.　Award Plaintiffs and members of the Proposed Classes monetary damages for the LaSalle Defendants' forced labor, or in in the alternative, attempted forced labor, unjust enrichment, and violation of universal and obligatory international human right norms prohibiting forced labor, in an amount to be determined at trial;

h.　Award Plaintiffs and members of the Proposed Classes their reasonable litigation expenses and attorney's fees;

i.　Award Plaintiffs and members of the Proposed Classes pre- and post-judgment interest to the extent allowable; and

j.　Award any further relief that the Court deems just and equitable.

## DEMAND FOR TRIAL BY JURY

Plaintiffs, individually and on behalf of the Proposed Classes, respectfully request a trial by jury as to all matters so triable.

Respectfully submitted this 10th day of March, 2023.

Respectfully,

/s/ _Zack Greenamyre_

Zack Greenamyre

**MITCHELL SHAPIRO GREENAMYRE & FUNT LLP**
Zack Greenamyre (GA Bar No. 293002)
3490 Piedmont Road, Suite 650
Atlanta, Georgia 30305
Phone (404) 812-4747
zack@mitchellshapiro.com

**GRANT & EISENHOFER P.A.**
Barbara J. Hart (*Pro Hac Vice Forthcoming*)
Karin Fish (*Pro Hac Vice Forthcoming*)
Irene R. Lax (*Pro Hac Vice Forthcoming*)
485 Lexington Ave. 29th Floor
New York, NY 10017
Phone (646) 722-8500
bhart@gelaw.com
kfisch@gelaw.com
ilax@gelaw.com

**GRANT & EISENHOFER P.A.**
Samuel Mukiibi (*Pro Hac Vice Forthcoming*)
Pooja Mehta (*Pro Hac Vice Forthcoming*)
123 Justison Street
Wilmington, Delaware 19801
Phone (302) 622-7500
smukiibi@gelaw.com
pmehta@gelaw.com

**ATTORNEYS FOR PLAINTIFFS AND THE PROPOSED CLASS**