**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA**

| | |
|---|---|
| NILSON BARAHONA, NIKOLAS GAZETAS, and OMAR ISAIAS TAVIRA GARCIA,<br><br>   *Plaintiffs,*<br><br>v.<br><br>LASALLE MANAGEMENT COMPANY, LLC d/b/a LASALLE CORRECTIONS, LASALLE CORRECTIONS, LLC, LASALLE SOUTHEAST, LLC, IRWIN COUNTY DETENTION CENTER, LLC, CGL IRWIN PROPERTIES, LLC, and CGL/LASALLE IRWIN PROPERTIES, LLC,<br><br>   *Defendants.* | **CLASS ACTION**<br><br>Jury Trial Demanded<br><br>No. 7:23-cv-0024-HL |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs Nilson Barahona, Nikolas Gazetas, and Omar Isaias Tavira Garcia (collectively, "Plaintiffs," and each a "Plaintiff"), individually and on behalf of members of the Proposed Class defined herein, as former civilly-detained immigrants[1] at the Irwin County Detention Center in Ocilla, Georgia ("Irwin"), based upon the personal knowledge of Plaintiffs and based upon the investigation of counsel, bring this civil action to challenge the illegal labor and detention profiteering practices of Defendants LaSalle Management Company, LLC, d/b/a LaSalle Corrections, LaSalle Corrections, LLC, LaSalle Southeast LLC, Irwin County Detention Center,

---

[1] This Complaint uses the term "detained immigrants" or "immigrants" to describe all persons detained at the Irwin facility on behalf of U.S. Immigration and Customs Enforcement.

1

LLC, CGL Irwin Properties, LLC, and CGL/LaSalle Irwin Properties, LLC (collectively "Defendants" and each a "Defendant"). In support of Plaintiffs' First Amended Complaint (the "Complaint"), Plaintiffs state as follows:

## SUMMARY OF THE CASE

1.     For the first time in history, in or around May 2021, the federal government announced that it would terminate its Intergovernmental Service Agreement ("IGSA") with Defendants due to allegations of Defendants' abuse and harm of detained immigrants in the custody of U.S. Immigration and Customs Enforcement ("ICE") at Irwin.

2.     In announcing the termination of this federal contract, Secretary of Homeland Security Alejandro N. Mayorkas stated: "We have an obligation to make lasting improvements to our civil immigration detention system[.] This marks an important first step to realizing that goal. DHS detention facilities and the treatment of individuals in those facilities will be held to our health and safety standards. Where we discover they fall short, we will continue to take action as we are doing today."[2]

3.     Defendants, who collectively comprise a multimillion dollar private prison corporation that owns and operates, among other facilities, Irwin, maintained a deprivation scheme intended to force detained immigrants to work for nearly free and punish them if they did not work.

4.     Defendants deprived *civilly* detained immigrants of basic access to legally and medically required food, hygienic products, and access to contact with their loved ones, immigration officials, and legal representation. By this deprivation, Defendants forced Plaintiffs

---

[2] U.S. Department of Homeland Security, "ICE to Close Two Detention Centers" (May 20, 2021), *available at* https://www.dhs.gov/news/2021/05/20/ice-close-two-detention-centers (last accessed June 8, 2023).

and others detained immigrants to work for as little as $1 per day in order to purchase these necessities.

5.      Defendants, by this scheme, gained a ready supply of available and cheap labor with which to operate the Irwin facility.  Among other things, detained immigrants mop and sweep floors, wash dishes, clean the kitchen, cook, serve, deliver meals and unload delivery trucks, provide barber services, and clean the Irwin facility daily.

6.      For their labor, Defendants paid most detained immigrants $1 per day,[3] regardless of the number of hours or shifts that each Plaintiff and members of the Proposed Class worked in a single day.  Under no circumstances did Defendants pay the detained immigrant workers the federal minimum hourly wage of $7.25 per hour, much less the Federal Service Contract Act wage. Defendants did not even pay the Georgia minimum wage of $5.15 per hour.  These minimum wages are in stark contrast to the $1 per day Defendants paid Plaintiffs and other detained immigrants.

7.      Detained immigrants at Irwin, including Plaintiffs and members of the Proposed Class, had no meaningful choice but to work.  Plaintiffs and others similarly situated worked to obtain basic necessities like soap, nutritionally adequate and an adequate quantity of food, access to the internet (which is the principal means by which detained immigrants could submit requests for medical attention and grievance forms, in addition to checking on the status of their immigration proceedings, and which also provided a video chat function through use of the tablet camera for video conferences with attorneys and others), and telephone access to phone loved

---

[3] Upon information and belief, Defendants paid up to $3 per day for some limited job positions, but the vast majority of detained immigrants received $1 per day for work performed at Irwin, regardless of the number of hours worked or tasks performed in a single day.

ones, support networks, and legal representation.  Under these circumstances, no labor at Irwin was voluntary—it was forced.

8.    Pursuant to the IGSA contract between the federal government and Defendants, the federal government paid Defendants a fixed bed-day rate per detained immigrant to operate Irwin. Among other things, that fixed bed-day rate was intended to cover Defendants' costs related to housing, clothing, feeding, and caring for detained immigrants at Irwin plus up to an additional fifteen percent profit margin.  Defendants generated additional revenues and profits based on expenses saved—both in labor costs and in costs associated with the care of detained immigrants— through its deprivation scheme, which was intended to minimize the amount Defendants spent to provide for the basic needs of detained immigrants, including Plaintiffs and members of the Proposed Class, while simultaneously charging Plaintiffs and members of the Proposed Class for the same basic necessities withheld by Defendants (by selling those items at a high mark up to detained immigrants at the Irwin commissary).  This scheme forced Plaintiffs and other similarly situated detained immigrants to use Defendants' Work Program, discussed herein, as the sole or principal means to pay for those withheld necessities.

9.    Under these circumstances, Defendants engaged in a deliberate scheme, pattern, and plan intended to coerce Plaintiffs' and members of the Proposed Class' labor in violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1591.

10.    Plaintiffs and members of the Proposed Class reasonably feared serious harm of safety and security if they did not continue working for Defendants at Irwin, including the punitive punishment of being sent to solitary confinement (*i.e.*, segregation).

11.    Plaintiffs were under the complete control of Defendants and working in forced labor conditions which excluded basic workplace protections.

4

12.     Plaintiffs, and members of the Proposed Class they seek to represent, are former detained immigrants at Irwin who were forced to work for Defendants for as little as $1 per day. Individually, and on behalf of all others similarly situated, Plaintiffs bring this class action lawsuit seeking damages, among other relief, flowing from Defendants' illegal labor practices.

## JURISDICTION

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Trafficking Victims Protection Act,[4] 18 U.S.C. §§ 1589, 1594, and 1595, and the Alien Tort Statute, 28 U.S.C. § 1350.

14.     This Court has personal jurisdiction over Defendants because they regularly conduct business in and have sufficient minimum contacts with the Middle District of Georgia.

15.     Plaintiffs also invoke supplemental jurisdiction over claims under state law, pursuant to 28 U.S.C. § 1367.

## VENUE

16.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because all of the events giving rise to Plaintiffs' claims occurred in this District.

---

[4] The Trafficking Victims Protection Act was enacted in 2000, *see* Pub. L. No. 106-386, 114 Stat. 1486 (2000), and has been amended on multiple occasions since then. *See, e.g.*, Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2875; Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No. 109-164, 119 Stat. 3558 (Jan. 10, 2006); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044; Violence Against Women Reauthorization Act of 2013 (Title XII), Pub. L. No. 113-4, 127 Stat. 54; Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, 129 Stat. 227; Trafficking Victims Protection Reauthorization Act of 2017, Pub. L. No. 115-427, 132 Stat. 5503 (Jan. 9, 2019). This complaint refers to the provisions of 18 U.S.C. §§ 1589, 1594, and 1595, including all amendments, as the Trafficking Victims Protection Act ("TVPA").

## PARTIES

### *Plaintiffs*

17.     Plaintiffs bring this suit on behalf of themselves and others similarly situated to challenge Defendants' forced labor scheme.

18.     Plaintiff Nilson Barahona ("Barahona") is an adult and currently resides in Gwinnett County, Georgia.  He was formerly detained by ICE at the Irwin facility between approximately October 2019 and May 2020. While detained at Irwin, Barahona worked for Defendants in the Irwin facility kitchen and as a cleaner.

19.     Plaintiff Nikolas Gazetas ("Gazetas") is an adult and resides in Jefferson County, Georgia.  He was formerly detained by ICE at the Irwin facility between approximately February 2020 and January 2021. While detained at Irwin, Gazetas worked as a cleaner for Defendants.

20.     Plaintiff Omar Isaias Tavira Garcia ("Garcia") is an adult and resides in Gwinnett County, Georgia.  He was formerly detained by ICE at the Irwin facility between approximately June 2019 and June 2020. While detained at Irwin, Garcia worked in the Irwin facility kitchen for Defendants.

### *Defendants*

21.     Defendant LaSalle Management Company, LLC, d/b/a LaSalle Corrections ("LaSalle Management"), is a business entity formed under the laws of the State of Tennessee, and is a Texas limited liability company doing business as "LaSalle Corrections."  LaSalle Management can be served via its agent for process, William K. McConnell at 192 Bastille, Suite 200, Ruston, LA 71270.  LaSalle Management has two registered officers: (1) WMC Enterprises, LLC and (2) KPL, LLC, both with business address of 192 Bastille Lane, Suite 200, Ruston, LA 71270.  LaSalle Management is responsible—directly or through one or more subsidiaries—for

the day-to-day operations of the Irwin facility pursuant to the contract referenced in Paragraph 28, *infra*. LaSalle Management is the parent company of LaSalle Southeast, LLC, and is responsible for ensuring that its subsidiary meets the constitutional and contractual obligations associated with running a detention center.

22.     Defendant LaSalle Corrections, LLC ("LaSalle Corrections"),[5] is a business entity formed under the laws of the State of Tennessee, and can be served via its agent for process, William K. McConnell at 192 Bastille, Suite 200, Ruston, LA 71270. LaSalle Corrections has two registered Officers: (1) PH Temple Family Interests, L.P., and (2) McConnell Southeast Corrections, LLC, both of which have a business address of 192 Bastille Lane, Suite 200, Ruston, LA 71270. LaSalle Corrections is responsible—directly or through one or more subsidiaries or affiliates—for the day-to-day operations of the Irwin facility pursuant to the contract referenced in Paragraph 28, *infra*.[6]

23.     Defendant LaSalle Southeast ("LaSalle Southeast," and collectively with LaSalle Management and LaSalle Corrections, the "LaSalle Defendants") is a subsidiary or affiliate of LaSalle Management and LaSalle Corrections. LaSalle Southeast is a Georgia domestic limited liability company, with offices located in Irwin County, Georgia. LaSalle Southeast's principal

---

[5] "LaSalle Corrections" also appears to be a trade name affiliated with LaSalle Management Company, LLC, which trade name is distinct from the registered entity "LaSalle Corrections, LLC" named as a Defendant herein.

[6] LaSalle Management and LaSalle Corrections themselves confirm their association to Irwin. *See, e.g.*, *Moncus v. LaSalle Management Co., LLC, et al.*, Civ. Action No. 7:19-cv-00075 (M.D.Ga.) (*see* Doc. 31, filed 7/22/2019, Answer, at ¶ 14 "LaSalle and Irwin admit that LaSalle Management Company, LLC, is the parent company of LaSalle Southeast, LLC"); Doc. 94-1, filed 7/27/20, Memorandum in Support of LaSalle Defendants' Motion for Summary Judgment, at p. 3) (stating Defendants LaSalle Management Company, LLC, d/b/a LaSalle Corrections, LaSalle Southeast, LLC, CGL/LaSalle Irwin Properties, LLC, CGL Irwin Properties, LLC, and Phil Bickham (then Warden of Irwin) as "several corporate entities affiliated with [Irwin.]").

office address is also 192 Bastille Lane, Suite 200, Ruston, LA, 71270.  LaSalle Southeast has five registered officers, (1) William K. McConnell, (2) Roderick Cooper, (3) Ryan Horvath, (4) Sandra Long, and (5) Daniel Galvain, all with business address of 192 Bastille Lane, Suite 200, Ruston, LA, 71270.  LaSalle Southeast is responsible—directly or through one or more subsidiaries or affiliates—for the day-to-day operations of the Irwin facility, pursuant to the contract referenced in Paragraph 28, *infra*.  LaSalle Southeast also entered into an Operation Management and Maintenance Agreement dated December 2, 2013 (the "OMMA"), with the County of Irwin, Georgia, and CGL/LaSalle Irwin Properties, LLC to manage, operate and maintain Irwin, including but not limited to, providing record-keeping and billing services, adequate staffing, food and beverage services, uniforms, engineering and maintenance, recreational, vocational, counseling, education and exercise programs, training of all personnel, medical care at Irwin, facility commissary, telephone facilities, vending machines, and all other services necessary or proper for the efficient and safe operation of Irwin.[7]

24.     Defendant Irwin Detention Center, LLC ("Irwin LLC") is a business entity formed under the laws of the State of Georgia, and is a facility support services company for the Irwin facility.  Upon information and belief, Irwin LLC contracts with Defendants for its facility support services.  Irwin LLC has its principal place of business at 132 Cotton Drive, Ocilla, GA 31774, where the Irwin facility is located.  Irwin LLC has five registered officers, (1) Michael Croft (2) David Paulk, (3) Laura Royals, and (4) Terrence O'Brien, all of whom have a business address of 132 Cotton Drive, Ocilla, GA 31774.

---

[7] *See* (Doc. 16-3).

25.     Defendant CGL Irwin Properties, LLC ("CGL Irwin") is a limited liability company formed under the laws of the State of Delaware, with its principal place of business in El Paso, Texas.  CGL Irwin is authorized to transact business in the State of Georgia.

26.     Defendant CGL/LaSalle Irwin Properties, LLC ("CGL/LaSalle" and collectively with the LaSalle Defendants, Irwin LLC, and CGL Irwin, the "Defendants" and each a "Defendant") is a limited liability company formed under the laws of the State of Delaware,  with its principal place of business in El Paso, Texas.  CGL/LaSalle is a party to the OMMA, which specifies that it is the owner of the Irwin facility, including the land and all improvements thereon.[8] CGL Irwin is authorized to transact business in the State of Georgia.  Upon information and belief, CGL/LaSalle is a joint venture of CGL Irwin and LaSalle Southeast.

27.     The LaSalle Defendants, along with their affiliates and/or subsidiaries, together own and/or manage at least 18 correctional centers in Louisiana, Texas, and Georgia, including Irwin.

28.     Defendants operated the Irwin facility pursuant to an IGSA with the federal government.[9]  This IGSA allowed ICE, an agency subcomponent of the U.S. Department of Homeland Security ("DHS"), to contract with Irwin County and the Defendants to detain, on behalf of ICE, a minimum population of at least 600 detained immigrants awaiting civil

---

[8] *See* (Doc. 16-3).

[9] The OMMA entered into between Irwin County, LaSalle Southeast, and CGL/LaSalle further states that Irwin "County is authorized by the State of Georgia to detain, house and/or control any detainees referred to the Facility, pursuant to a Prisoner Detention Agreement or Intergovernment Agreement ("IGA Contract") and [LaSalle Southeast] is hereby authorized by the County to detain, house and/or control any detainees referred to the Facility pursuant to this agreement."  MTD Doc. 16-3 at p. 1.

immigration proceedings (and upon information and belief, could detain up to approximately 1,200 detained immigrants per day).

29.    In or around May 2021, the Biden Administration announced that ICE would end its contract with Irwin in response to a whistleblower complaint brought on behalf of a number of female detained immigrants at Irwin which detailed horrific detainee abuse at the facility, including Defendants' intentional failure to follow Covid-19 protocols and contractually-mandatory protocols outlined in ICE's Performance Based National Detention Standards ("PBNDS"), and a pattern and practice of non-consensual, invasive, and medically unnecessary gynecological procedures carried out on many female detained immigrants at Irwin. Upon information and belief, Defendants' contract with ICE related to the Irwin facility was terminated in or around October 2021.[10] Upon information and belief, as of the date of the filing of this Complaint, Defendants no longer detain any immigrants on behalf of ICE at Irwin.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

30.    Each year, hundreds of thousands of people are locked up in civil immigration detention facilities while awaiting immigration or citizenship status determinations. Individuals detained include U.S. citizens, lawful permanent residents (green card holders) with longstanding family and community ties, children, pregnant women, asylum seekers, victims of human trafficking, and survivors of torture. Some detained immigrants were brought to the United States

---

[10] Since the closure of the Irwin facility, Defendants CGL/LaSalle and LaSalle Southeast, along with Irwin County, have filed an action against the United States for Bad Faith Breach of Contract, Abuse of Discretion, and for Damages, seeking $66,981,000.00 for wrongful termination of the IGSA, or alternatively for $7,304,723 for costs and/or damages incurred as a result of the Government's termination of the IGSA. *See Irwin County, GA, v. United State of America*, Case No. 1:22-cv-01736-ZNS (Fed. Cl., 2022) (hereafter "Irwin Contract Dispute Lawsuit").

as children and thousands more ultimately have their United States citizenship or legal residency affirmed by an immigration court or federal judge.

31.    Immigration violations are civil violations, and immigration detention is civil in nature.  Because immigration detention is civil, the Supreme Court has held that immigration officials may not force detained immigrants to work.  *See Wong Wing v. United States*, 163 U.S. 228 (1896).

32.    Notwithstanding immigration detention's civil nature and purpose, detained immigrants at Irwin are subjected to conditions created by Defendants that are typical of the *criminally* incarcerated.  Detained immigrants are frequently subjected to punitive and long-term solitary confinement, inadequate medical care, sexual and physical assault, lack of access to counsel, and other harsh conditions of confinement: all without a right to a speedy trial, a jury, a government-appointed lawyer, or a duly-entered conviction.

33.    Defendants have a significant financial interest in the detention of immigrants and are more profitable when they detain more people.  A substantial portion of its revenue from its IGSA with ICE resulted from per diem payments based on daily occupancy rates.  Defendants' facility operating costs at Irwin are relatively fixed despite occupancy rates; therefore, when occupancy rates drop, Defendants' revenues and profits decline.

34.    Upon information and belief, Defendants received at least $60.50[11] per detained immigrant at Irwin per day from its contract with ICE.[12]

---

[11] The most recent IGSA between ICE and Defendants for Irwin was effective on June 15, 2020, which included a bed day rate of $83 per detained immigrant for the first 600 detained immigrants, and $65 per detainee above the 600-person threshold.  Upon information and belief, Defendants were able to detain up to approximately 1,200 detained immigrants at the Irwin facility.

[12] In the Irwin Contract Dispute Lawsuit, Defendants admit that the IGSA guarantees payment by ICE for a minimum population of at least 600 detainees at Irwin and a bed day rate of $83 per

35.    As part of their immigration detention enterprise, Defendants own and operate Irwin.

36.    Defendants' plan and pattern of systemically withholding basic necessities from detained immigrants inside of Irwin, and/or threatening retaliation and the safety and wellbeing of detained immigrants inside of Irwin, ensured a readily available, captive labor force that cleaned, maintained, and operated Defendants' Irwin facility for subminimum wages, resulting in significant cost-savings for Defendants and increased profits.

**Defendants Used Detained Immigrants to Clean, Maintain, and Operate Irwin**

37.    The PBNDS, which are issued by ICE, provide that detained immigrants "shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping."[13]    The PBNDS provide that Irwin's Work Program, as detailed herein, comply with the PBNDS.  Moreover, Defendants were required to adhere to the PBNDS pursuant to their IGSA with ICE.[14]

38.    Defendants used detained immigrants to perform work at Irwin.

39.    Defendants' Prisoner/Detainee Manual sets out a voluntary work program at Irwin (the "Work Program").  The Work Program used detained immigrants to perform work in and for

---

detainee.  *See* (Doc. 1, ¶ 33), *Irwin County, GA, v. United State of America*, Case No. 1:22-cv-01736-ZNS (Fed. Cl., 2022).

[13] Performance Based National Detention Standards 2011, Revised 2016, Section 5.8 "Voluntary Work Program," available at https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf (last accessed June 8, 2023).

[14] The Irwin Contract Dispute Lawsuit admits Irwin was required to follow the 2011 PBNDS, Revised 2016.  *See* (Doc. 1, ¶ 44), *Irwin County, GA v. United State of America*, Case No. 1:22-cv-01736-ZNS (Fed. Cl., 2022).

the Irwin facility in lieu of hiring workers from outside of the facility at higher free market labor costs.[15]

40.    In the course of their labor for Defendants, detained immigrants in the Work Program performed a wide range of work, including but not limited to:

(a)    Preparing, cooking, and serving meals;

(b)    Washing dishes and trays;

(c)    Cleaning the kitchen and cafeteria before and after meals;

(d)    Unloading food trucks that arrive at the Irwin facility;

(e)    Serving other detainees with food;

(f)    Cleaning the kitchen, hallways, and other common areas of the Irwin facility; and

(g)    Barber services.

41.    Kitchen jobs were highly valued by Plaintiffs and other detained immigrants at Irwin because detained immigrants working in the kitchen were regularly rewarded with extra food by being permitted by Irwin employees and agents to consume leftover food or meals.

42.    Detained immigrants, including Plaintiffs and members of the Proposed Class, received nutritionally deficient and inadequate amounts of food from Defendants at the Irwin facility.  Detained immigrants were strictly fed three times per day, with dinner served around 3pm

---

[15] DHS's Office of Inspector General has further specified that "requiring [detained immigrants] to clean common areas used by all detainees is in violation of ICE standards, as detainees are only required to clean their immediate living area.  DHS Office of Inspector General, "Management Alert on Issues Requiring Immediate Action at the Theo Lacy Facility in Orange, California," at p.6, available at https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-43-MA-030617.pdf (last accessed June 8, 2023).

each day.  Detained immigrants were often hungry, including later in the day when they would have to wait after eating their 3pm meal until the following morning to be served their next meal.

43.     The food they were fed was very poor quality and significantly nutritionally deficient, and at times marked as "Not Suitable for Human Consumption."  In many instances, Plaintiffs and putative class members had adverse reactions, including illness, to the food served. Nonetheless, Plaintiffs and putative class members were often hungry and nutritionally deprived. Plaintiffs and other detained immigrants thus had no meaningful choice but to supplement their diets by purchasing items at the Irwin commissary, or suffer from hunger.  Plaintiffs and other similarly-situated detained immigrants also feared retaliation or punishment if they attempted to ask Defendants' employees for additional food.  To abate the hunger, Plaintiffs and other detained immigrants at Irwin would be forced to purchase additional food from the Irwin commissary (which was the only option available to detained immigrants to supplement their diets while detained), which purchases further profited Defendants who, upon information and belief, received some or all of the profits made from purchases from the Irwin facility commissary.

44.     Defendants' provision of extra food to Plaintiffs and other detained immigrants that worked in the Irwin facility kitchen is also in violation of Defendants' binding contractual requirements with ICE.   Specifically, Section 4.1 of the PBNDS, which Defendants are contractually obligated to follow through its IGSA with ICE, provides: "Food shall never be used for reward or punishment."  That same section also specifies that detained immigrant workers shall receive the "same fare as other detainees." Section 4.1 of BNDS

45.     Defendants, generally, paid Plaintiffs and other similarly-situated detained immigrants $1 per day regardless of the number of hours or shifts worked or the type of work performed in a single day.

46.    Defendants did not pay Plaintiffs and other similarly-situated detained immigrants the federal minimum hourly wage or Service Contract Act wage, and generally Plaintiffs and other detained immigrant's daily hourly wages were well under $1 per hour.

47.    Defendants' use of detained immigrants to perform such work is financially and otherwise beneficial to Defendants, as they would otherwise have to hire individuals from the free labor market to perform this work at much higher costs.  The use of detained immigrants instead of persons recruited from the free labor market also allows Defendants to avoid: payment of legally mandated wages, provision of benefits to detained immigrants, potential unionization, federal and state payroll taxes (like Medicare), among other things.  This results in a significant reduction in Defendants' operational costs of Irwin and an increase in Defendants' profits.

## The Federal Trafficking Victims Protection Act

48.    The exploitation of vulnerable people is so common that Congress has passed the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 *et seq.*, a comprehensive statutory framework imposing both criminal and civil liability, *see* 18 U.S.C. § 1595, on any persons engaging or *attempting to* engage or benefit from sexual exploitation, trafficking, or obstruction of anti-trafficking enforcement.

49.    Under the TVPA, it is unlawful to "knowingly . . . obtain[] the labor or services of a person":

    (a)    By means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

    (b)    By means of serious harm or threats of serious harm to that person or another person;

    (c)    By means of the abuse or threatened abuse of law or legal process; or

15

(d)    By means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.  18 U.S.C. § 1589(a).

50.    The TVPA defines the terms "abuse or threatened abuse of law or legal process" and "serious harm" as follows:

a)    The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."

b)    The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(1)-(2).

**Defendants Withheld Basic Necessities from Detained Immigrants at Irwin**
**As Part of a Scheme, Pattern, and Plan to Coerce Labor from Detained Immigrants**

51.    Despite its name as a "Voluntary" Work Program, work by detained immigrants at Irwin was not voluntary.  Generally, immigrants detained by the federal government are without resources of their own.  They have little power over their own situation and from that vulnerable

position (*i.e.*, in immigration removal proceedings), they have no options when the facility in which they are detained exploits them.

52.    Defendants maintained a corporate scheme, plan, pattern and practice at Irwin of depriving detained immigrants of basic necessities, including hygienic products, adequate nutrition, and contact with legal counsel, immigration officials, and loved ones.  These significant deprivations were further exacerbated by years of deplorable and inhumane conditions at the Irwin facility, which conditions include the failure to provide adequate basic necessities, including medical care.  Plaintiffs and the putative class faced ongoing fear of retaliation or punishment (including, but not limited to, placement in solitary confinement, placement in "lock down" within one's own cell, denied access to medical care, or threatened loss of a detained immigrant's job position in the Work Program) if they voiced any concerns or issues to Defendants or the oversight authorities.  As a result, Plaintiffs and other similarly-situated detained immigrants are forced to submit to Defendants' labor scheme.

**Tablet Access at Irwin**

53.    Plaintiffs and other similarly-situated detained immigrants rely upon telephone and tablet access at Irwin not only to contact loved ones but also to correspond with their legal representatives and immigration officials, including with ICE.  Tablets are the only source of internet access (and video calls) for detained immigrants at Irwin.  Tablet access is crucial to Plaintiffs and other detained immigrants at Irwin as it allows them to contact their attorneys, check on the status of their immigration proceedings, and communicate with immigration officials about medical requests and grievances, including with ICE and DHS.  Because tablets at Irwin had video cameras, tablets were also an extremely important resource used by Plaintiffs and other detained immigrants to communicate with loved ones and support networks outside of the facility.  Often

the loved ones and other support individuals assisting Plaintiffs and other detained immigrants from outside of the Irwin facility acted as a significant resource—assisting with communications to other third parties and playing a very important emotional support role to detained immigrants.

54.     For those detained immigrants eligible for release on immigration bond, parole, or discretionary orders of supervision, contact with individuals outside of Irwin—including legal counsel and community support—is critical: it represents the only means of securing their freedom from detention (among other things, release from immigration custody often requires a U.S. citizen to account for a detained immigrant until immigration proceedings have concluded).  Cutting off this contact therefore allows Defendants to minimize the number of detained immigrants transferred into and out of the Irwin facility, which in turn reduces the expenses incurred when people enter or exit the facility, such as initial health screenings, new bunk cleanings, fresh laundry, and other related expenses.  Moreover, minimizing the number of transfers out of the facility also serves to keep the bed day rate at Irwin higher, meaning increased profits for Defendants.

55.     Plaintiffs and other detained immigrants at Irwin paid to use Irwin's telephones and tablets.  Upon information and belief, telephone calls cost $0.21 per minute.  Consequently, a detained immigrant making $1 per day has to work three days to save up enough money to cover a 15 minute phone call.  This fact significantly limits Plaintiffs' and other detained persons' ability to communicate with their legal representatives, immigration officials, and loved ones/support networks, among others.

56.     Upon information and belief, it costs between $0.15 to $0.25 per minute to use a tablet at the Irwin facility to access the internet, depending on what the tablet is used for.  Thus,

detained immigrants had to work 4-7 days (depending on minute pricing) to be able to afford any meaningful amount of tablet usage time (*i.e.*, 15 or more minutes).

57.    Upon information and belief, Plaintiffs and other detained immigrants were provided with a limited amount of free tablet time --- each detained immigrant received 15 minutes to use a tablet for free.  After those free 15 minutes expired, a detained immigrant would have to wait 4 hours until they could use the tablet again for free and again for only another 15 minutes. The free 15 minutes of time did not compound (meaning a detained immigrant could not accumulate free 15 minute tablet sessions to use together in one longer session).  The free 15 minutes of tablet time provided to detained immigrants was also limited – free time only allowed detained immigrants to complete certain limited items on a tablet (as opposed to paid tablet time, which did not limit what tablet functions could be used).  The free 15 minutes of tablet time thus only allowed detained immigrants to complete some limited tasks on the tablet, like filling out a commissary order or a grievance/medical request form.  No other tablet functions (like video calling, other internet usage, and other items) were included in the free 15 minutes of time.  If Plaintiffs or any other detained immigrant required these functions or additional time on the tablet, they were required to pay out-of-pocket for those additional tablet minutes.

58.    Upon information and belief, it costs $3.00 for 30 seconds of video calling on the Irwin tablet.  Thus, a detained immigrant would have to work three days to earn enough money to cover a 30 second video call.

59.    Communications with DHS and ICE are most efficiently and effectively made by a detained immigrant through submission of an electronic form on the internet through use of the Irwin-provided tablets (including electronically submitted medical request forms, grievance forms, and status updates on any detained immigrants' individual immigration proceedings).

60.    Moreover, when Defendants installed tablets at the Irwin facility they made the tablets the only method by which a detained immigrant can place an order from the Irwin commissary.  Previously, detained immigrants filled out paper forms for commissary purchases.

61.    Consequently, and considering that detained immigrants only received a mere 15 minutes every 4 hours per day of free time to use a tablet, Plaintiffs and other detained immigrants often had to choose between completing their commissary orders on the tablet (to ensure they could secure necessary items like food, basic hygiene items, or phone cards, among other things) or submit grievance request forms, including medical grievance request forms, as not all of these items could be achieved within the free 15 minute period provided.  Moreover, many detained immigrants have no or very little English language proficiency, yet the tablets provided at Irwin only displayed information in English.

62.    Also, at some point during the Covid-19 pandemic, upon information and belief, Defendants limited or restricted physical visitors to the Irwin facility (including attorney in person visits to the Irwin facility).  This forced detained immigrants to pay Defendants for use of either the telephone or tablet, which resources were detained immigrants' only means to communicate with persons outside of the facility for a multi-month period.

63.    Also at some point during the Covid-19 pandemic, Defendants removed all tablets from the Irwin facility as collective punishment for the attempt of a detained immigrant to use a tablet's built-in camera to record the deplorable and inhumane prison conditions that existed at Irwin.  In response, Defendants removed all of the tablets from the Irwin facility for a period of approximately 6 or 7 months.  The removal of all tablets from Irwin significantly and critically curtailed the ability of detained immigrants to communicate with individuals outside of the Irwin facility for an extended period of time and resulted in forcing detained immigrants to pay for use

of the payphone to connect with loved ones and make other important communications outside of the Irwin facility.

## Food and Water

64.     Detained immigrants at Irwin, including Plaintiffs, are also forced to work to be able to purchase alternative food sources from the Irwin commissary to supplement insufficient and severely nutritionally inadequate meals supplied by Defendants.  Many detained immigrants were not adequately fed and did not obtain a sufficient amount of nutrition from the meals provided by Defendants at Irwin and were left extremely hungry, nutritionally depleted, and with no choice but to purchase additional food items from the Irwin commissary or go hungry.  The water supplied by Defendants at Irwin was barely potable—it was brown in color, hard to consume, and often made detained immigrants ill.  Due to the inadequate amount of and nutritionally deficit quality of the food and water provided by Defendants at Irwin, there was a categorical, class-wide denial of adequate nutrition for detained immigrants, including Plaintiffs.  Moreover, detained immigrants had or developed medical issues from the food and/or water supplied by Defendants at Irwin and thus had no choice but to buy other food and/or drinks from the Irwin Commissary or otherwise go hungry or consume food and water that made them ill.

65.     Furthermore, "[t]he typical prison diet, which is high in salt, sugar, and refined carbohydrates, contributes to the elevated rates of diabetes and heart disease among the incarcerated population."[16]  Irwin was no different; and so detained immigrants at Irwin were forced to work to be able to purchase food items from the Irwin commissary that had higher

---

[16]     *See*   https://www.aclu.org/news/prisoners-rights/the-reality-of-mealtime-in-prisons-and-jails (accessed, June 15, 2023).

nutritional content, or else choose between going hungry or eating the food served and suffer the consequences of serious health problems and other medical issues.

66.     Upon information and belief, Defendants contracted with Trinity Services Group, Inc. ("Trinity") to provide food services at Irwin.  Through Trinity as its agent, Defendants failed to provide an adequate amount of food that was of sufficient nutritional quality to detained immigrants at Irwin.

## Hygiene Needs

67.     Detained immigrants at Irwin, including Plaintiffs, were also forced to work to be able to purchase basic necessities and hygienic products from the Irwin commissary because the limited hygienic items provided to detained immigrants by Irwin were of such a low quality that they would break, cause rashes or other medical reactions, or would be purchased by a detained immigrant in an attempt to remedy medical ailments not treated by the Irwin facility as detained immigrants were frequently denied medical care, and/or to replace the limited free hygienic items provided by the Irwin facility as the facility would often run out of hygienic items or refuse to replace basic hygienic items for detained immigrants once their initial and limited free items were used up.

68.     At Irwin, Defendants would initially supply Plaintiffs and other detained immigrants with extremely limited amounts of very low quality basic hygienic products like soap, shampoo, toothpaste and a single, low quality, toothbrush.  Moreover, the facility would often run out of basic hygiene products for detained immigrants.  Detained immigrants, including Plaintiffs, were therefore forced to purchase basic necessities (like soap, toothbrushes, and toothpaste) from the Irwin commissary, or go without such necessary hygienic items.  Given the extremely poor quality of the minimal hygienic items provided by Defendants, detained immigrants also

developed rashes and/or other medical reactions to the facility-provided free soap and/or shampoo, and developed tooth and/or other dental problems, and thus were forced to purchase alternative hygiene products from the Irwin commissary.  This fact was exacerbated by Defendants' failure to provide appropriate medical care to detained  immigrants, which medical care was often denied or significantly delayed; thus, detained immigrants were forced to purchase items from the Irwin commissary in attempt to alleviate their own medical symptoms.

69.    The deprivations at Irwin caused by Defendants as explained herein became even more acute during the Covid-19 pandemic.  During the pandemic, Defendants failed to provide detained immigrants, including Plaintiffs, with adequate hygiene products, including soap and hand sanitizer, which the facility repeatedly ran out of and did not refill.  Moreover, when Plaintiffs and other detained immigrants attempted to raise concerns with Defendants' employees or agents about the lack of adequate soap and/or hand sanitizer at the Irwin facility during the Covid-19 pandemic, they were threatened with retaliation or in fact punished, including with placement in solitary confinement or locked within one's own cell ("lock down"), threats of deportation, and other threats of serious harm.  Consequently, detained immigrants, including Plaintiffs, were forced to work to earn funds to purchase soap and other hygienic items from the Irwin commissary or otherwise go without those basic and necessary hygienic products during a critical period of extreme health concern, which health risk was known to be mitigated in part by proper hygiene, like regular and consistent handwashing with soap.

**Deprivations and Coercion**

70.    Defendants also used direct coercive threats to force detained immigrants to work. Upon information and belief, Defendants threatened detained immigrants with placement in

solitary confinement or lock down within their individual cell if they chose not to work or were perceived to have not completed, or in fact did not complete, their job responsibilities.

71.    Defendants' coercive efforts also included threats to detainees of criminal charges for disobeying a detention officer's order if they refused to work and taking away detainees' free time or time that detainees would have to speak to their families.

72.    Defendants also coerced detained immigrants to work by threatening detained immigrants with loss of their Irwin Work Program job position (and thus their main or only source of income to purchase medically or hygienically necessary products or their ability to communicate with individuals outside of the facility) where detained immigrants missed work for medical necessity or medical appointments.  Detained immigrants injured while working or otherwise in need of medical services could not leave their work shift to seek medical attention or medical services because if they did leave during any work shift, Defendants' employees and agents would threaten detained immigrants with loss of their job position.

73.    Upon information and belief, Defendants own the commissary inside of Irwin or otherwise monetarily profit and/or receive some or all of the proceeds from the commissary inside of Irwin.

74.    The commissary at Irwin is the only place inside of the facility where detained immigrants can purchase basic necessities, including hygiene products, clothes, food, and phone cards, among other items.

75.    In furtherance of Defendants' scheme to profit from detained immigrants, items sold at the Irwin commissary for purchase were expensive and overpriced; upon information and belief, with basic necessities at a markup of 200% or more.  Consequently, a detained immigrant often would have to work multiple days to afford even a single item from the Irwin commissary.

24

**Defendants Threatened the Use of Solitary Confinement**
**as a Form of Punishment for the Failure to Work**

76.     Defendants maintained a corporate scheme, plan, and pattern at Irwin of threatening detained immigrants who refuse to work, organize a work stoppage, or participate in a work stoppage with "segregation" (*i.e.*, solitary confinement),[17] criminal prosecution, removal from the work program, downgrading the detained immigrants' housing, and/or revoking access to the commissary, among other sanctions.

77.     Defendants' Detainee Handbook, which every individual detained at Irwin received upon entry, categorizes the following acts as a High Offense, the second-highest offense category: "engaging in or inciting a group demonstration"; "encouraging others to participate in a work stoppage or to refuse to work"; and "signing, preparing, spreading or requesting support for group petitions involving prohibited acts."  Engaging in any of these High Offense acts is punishable by, *inter alia*:

> (a)     Start criminal proceedings;
>
> (b)     Disciplinary transfer;
>
> (c)     Disciplinary segregation (up to 60 days);
>
> (d)     Make monetary restitution if the funds are available;
>
> (e)     Loss of privileges: games, commissary, etc.;
>
> (f)     Change of housing unit;
>
> (g)     Remove from program or group activities;
>
> (h)     Loss of job;

---

[17] *See* Exhibit B of Reply to Response filed by LaSalle Southeast LLC re Motion to Dismiss Complaint, 22, *Manrique Yaruro v. United States of America, et. al.*, No. 7:22-cv-00039-WLS (M.D. Ga. Valdosta).

(i)       Impound inmate's personal property;

(j)       Confiscate contraband;

(k)      Restrict to quarters.[18]

78.     Defendants' Detainee Handbook further categorizes "refusing to work or to accept a program assignment" as a Moderate-High Offense, the third-highest offense category.  Engaging in a Moderate-High Offense act is punishable by, *inter alia*:

(a)      Start criminal proceedings;

(b)      Disciplinary transfer;

(c)      Disciplinary segregation (up to 72 hours);

(d)      Make monetary restitution;

(e)      Loss of privileges, for example, visits;

(f)      Change housing;

(g)      Remove from program;

(h)      Loss of job;

(i)       Confiscate contraband;

(j)       Make monetary restitution;

(k)      Restrict to quarters;

(l)       Reprimand;

(m)     Warning.[19]

---

[18] *Id.* at 22-23.

[19] *Id.* at 23-25.

79.     According to Defendants' Detainee Handbook, "[a]ny combination of low, moderate, and moderate-high offenses during a 90-day period shall constitute a high category offense," subject to more severe sanctions.[20]

80.     "Failure to follow safety or sanitation regulations" and "[b]eing unsanitary or untidy; failing to keep one's person or quarters in accordance with posted standards" are both 400-level "Low Moderate" offenses. These offenses are punishable by, among other things, loss of privileges, property, job, or other program assignment, restriction to the person's housing unit, or a change in housing unit.[21]

81.     Defendants' Detainee Handbook also threatens detained immigrants with solitary confinement for disobeying guards, conduct that disrupts the orderly operation of the facilities, and refusing to comply with corporate facility policies, including Defendants' housing sanitation policies. These more general offenses can be classified as "Highest," "Moderate-High," and "Low Moderate," depending on the circumstances. Punishment for these offenses likewise varies with the particular circumstances.

82.     Defendants maintained a corporate scheme, plan, and pattern at Irwin of threatening Plaintiffs and Class Members who encourage others to stop work, refuse to work, or petition Defendants for change in work conditions with "start[ing] criminal proceedings" against them, which constitutes a threatened abuse of legal process under the TVPA.  Defendants' use of "disciplinary segregation," which ranged anywhere from 72 hours to 60 days, also constituted a threatened abuse of legal process under the TVPA.

---

[20] *Id*. at 25.

[21] *Id*. at 33.

83.    Defendants' overuse of disciplinary measures such as solitary confinement is well-documented.[22]  Detained immigrants at Irwin have reported that they were placed in disciplinary solitary confinement for acts not listed in the Detainee Handbook as offenses, such as assisting another detained immigrant with writing a grievance form.

84.    Defendants also maintained a corporate scheme, plan, and pattern at Irwin of threatening Plaintiffs and Class Members who encourage others to stop work, refuse to work, or petition Defendants for change in work conditions with "disciplinary transfer" or "chang[ing] housing" to living quarter that are less safe, sanitary, or private, or that are more restrictive or isolating.

85.    Detained immigrants who submitted to the Work Program are often rewarded with more favorable living conditions and access to a common area, including greater freedom of mobility, and additional bedding or clothing.

86.    Defendants maintained a corporate scheme, plan, and pattern at Irwin of threatening Plaintiffs and Class Members who encouraged others to stop work, refuse to work, or petition Defendants for change in work conditions, with loss of access to the commissary and by locking immigrant detainees in their cells.

87.    Plaintiffs and Class Members who submitted to the Work Program relied on the $1 per day payment they receive to purchase basic necessities from the Irwin commissary that Defendants do not adequately provide, phone cards to maintain contact with their attorneys and loved ones, and internet time on the tablet to, among other things as detailed herein, check the status of their immigration proceedings.

---

[22] *See* S. Poverty Law Ctr., Shadow Prisons: Imm. Det. in the South 36 (Nov. 21, 2016), https://www.splcenter.org/sites/default/files/leg_ijp_shadow_prisons_immigrant_detention_report.pdf, at p. 25.

88.     By maintaining this scheme, plan, and pattern of threatening Plaintiffs and Class Members who encourage others to stop work, refuse to work, or petition Defendants for change in work conditions, Defendants ensure an available labor pool of detained immigrants will work for nearly free, thus allowing Defendants to continue operating Irwin at an enormous profit.

89.     Upon information and belief, if there were any actual or threatened work stoppages at Irwin, class representatives and other detained immigrants would be charged with disciplinary offenses and placed in solitary confinement. On information and belief, the charges and discipline are retaliatory in nature, designed to force workers to continue to work for Defendants at subminimum wages.

90.     Defendants knowingly benefitted financially, both by way of reduced labor costs and increased commissary revenue, from participating in a venture Defendants knew or should have known forced Plaintiffs and Class Members to work, or attempted to force them to work.

**ICE Terminates its Contract with Defendants Because of Irwin's
Deplorable Prison Conditions And Defendants' Serious Harm of Detained Immigrants**

91.     Defendants' scheme of intentionally depriving detained immigrants of basic necessities and its failure to meet federal standards concerning housing, food, hygiene products, and detainee safety, is well documented.[23]

_____

[23] *See, e.g.*, S. Poverty Law Ctr., Shadow Prisons: Imm. Det. in the South 36 (Nov. 21, 2016), https://www.splcenter.org/sites/default/files/leg_ijp_shadow_prisons_immigrant_detention_report.pdf; United States Senate, Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, "Medical Mistreatment of Women in ICE Detention – Staff Report," *available at* https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-11-15%20PSI%20Staff%20Report%20-%20Medical%20Mistreatment%20of%20Women%20in%20ICE%20Detention.pdf (last accessed June 8, 2023); Project South: Institute for the Elimination of Poverty & Genocide, Letter Dated September 14, 2020, "Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the Irwin County Detention Center," *available at* https://projectsouth.org/wp-content/uploads/2020/09/OIG-ICDC-Complaint-1.pdf (last accessed June 8, 2023).

92.     In fact, ICE's own inspection reports found that Irwin was consistently in violation of PBNDS standards that "directly affect detainee life, health, safety, and/or well-being."[24]

93.     Per ICE's inspection report, Irwin failed to complete a nutritional analysis of its common fare, kosher, and therapeutic or medical menus by a registered dietician, a "priority component" required, at the minimum, on an annual basis to determine whether the menu meets recommended daily allowances by the U.S.D.A. and PBNDS standards.[25]

94.     Detained immigrants at Irwin reported not only small food portions and poor taste, but that they regularly found cockroaches, flies, plastic, and hair in their food and on their food trays, blood on their utensils, and roaches in the cooking pots.[26]

95.     Detainees who were on kitchen duty additionally reported Defendants' practices of adding water to cooked food to expand the quantity of portion sizes and of regularly serving expired canned foods.[27]

96.     Defendants threatened detained immigrants with disciplinary solitary confinement for raising any facility complaints or grievances, including about the nutritional value, sanitary condition, or portion size of the food.[28]

---

[24] *See* U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, "Office of Detention Oversight Compliance Inspection, Enforcement and Removal Operations, ERO Atlanta Field Office, Irwin County Detention Center, Ocilla, GA, March 3-5, 2020," *available at* https://www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntr_OcillaGA_Mar3-5_2020.pdf (last accessed June 8, 2023).

[25] *See Id.* at p. 14.

[26] *See* S. Poverty Law Ctr., Shadow Prisons: Imm. Det. in the South 36 (Nov. 21, 2016), https://www.splcenter.org/sites/default/files/leg_ijp_shadow_prisons_immigrant_detention_report.pdf, at p. 26.

[27] *See Id.*

[28] *See Id.*

97.     Defendants' use of "administrative solitary confinement" is yet another example of its many violations of PBNDS standards. Upon their arrival at Irwin, detained immigrants were forced to remain in administrative solitary confinement until residential units became available, a clearly impermissible use of solitary confinement. As discussed herein, Defendants also placed detained immigrants in disciplinary solitary confinement for minor offenses that had little to do with the safety of the facility, such as assisting another detainee with writing a grievance.[29]

98.     In or around May 2021, the Biden administration announced that it would be ending ICE's IGSA with Defendants to detain immigrants at Irwin due to over a decade of documented deplorable conditions and severe abuses of detained immigrants' rights at the Irwin facility, including but not limited to Defendants' failure to follow Covid-19 protocols and a pattern of unnecessary, non-consensual invasive gynecological procedures performed on female detained immigrants held at the facility.

99.     The termination of ICE's contract with Defendants to detain ICE immigrants at Irwin was largely prompted by a federal investigation into conditions at the facility after dozens of female detained immigrants came forward in or around September 2020 with a whistleblower complaint to the DHS Office of Inspector General about being forced to undergo unnecessary medical procedures, which medical procedures were performed without their consent and related to Defendants' failure to follow Covid-19 protocols at Irwin.[30]  Those unnecessary gynecological

---

[29] *See Id.* at p. 25.

[30] Government Accountability Project and Project South, October 4, 2022 letter to Joseph V. Cuffari, Inspector General re: Status of Investigations into September 2020 Disclosures of Whistleblower Dawn Wooten and Immigrant Women Detained at Irwin County Detention Center, available at https://whistleblower.org/wp-content/uploads/2022/10/100422-Letter-to-DHS-OIG-from-Government-Accountability-Project-Project-South-re-open-investigations-at-ICDC-1.pdf (last accessed June 8, 2023).

procedures included, but were not limited to, forced sterilization (including the removal of the uterus, ovaries and/or fallopian tubes), medically unnecessary vaginal ultrasounds, and placing women on birth control without their consent.

100.    The whistleblower complaint also noted that when detained immigrants tried to document the lack of any Covid-19 protocol at Irwin, including by sending letters and videos about the conditions at Irwin to the public, they were punished by Defendants' employees and/or agents, including with solitary confinement or "lock down" within one's own cell.  Moreover, where detained immigrants attempted to file urgent medical requests and grievances, Defendants' employees intentionally failed to record or even shredded those documents (where submitted in paper form).  Similarly, while detained at Irwin, female detained immigrants attempted to notify Defendants employees and agents about the horrifying medical abuse they were enduring, but in response to those cries for help, they were threatened by Defendants' employees and agents with retaliation.

101.    The whistleblower complaint further noted recurring deficiencies relating to healthcare, detention conditions, and mistreatment of people detained at the Irwin facility, including the lack of medical and mental healthcare, unsanitary conditions, lack of prenatal care for women, and the aggressive use of solitary confinement in violation of ICE standards.

102.    The report prompted a Congressional inquiry and related federal investigation of Defendants' operation of Irwin, which investigation culminated in the issuance of a report by the U.S. Senate's Permanent Subcommittee on Investigations, entitled the "Medical Mistreatment of Women in ICE Detention" (the "PSI Report").[31]

---

[31] United States Senate, Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, "Medical Mistreatment of Women in ICE Detention – Staff Report," available at https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-11-

103.    The PSI Report concluded that the medical and mental health care, food service, and recreation provided to detainees at Irwin was known to be "deficient" and that Defendants knew of this fact but failed to take "effective corrective action." The PSI report additionally identified and noted Irwin's use of force, solitary confinement, and required detainee grievance system did not meet the PBNDS standards, which standards Defendants were obligated to adhere to pursuant to their IGSA with ICE.[32]

104.    The PSI Report also states that as of September 3, 2021, all detained immigrants previously detained by ICE at Irwin were removed from the Irwin facility and transferred to other ICE detention facilities.[33]  The PSI Report also notes that effective October 7, 2021, ICE's contract with Defendants related to the detention of immigrants at Irwin was terminated.[34]

105.    In addition to determining that female detained immigrants at Irwin were in fact subjected to non-consensual, "excessive, invasive, and often unnecessary gynecological procedures,"[35] the PSI Report also determined that Defendants knew medical care provided to detained immigrants at Irwin was deficient including frequent complaints by detained immigrants about the quality and timeliness of medical care, including "numerous, repeated, and serious deficiencies with the [Irwin] medical unit as far back as 2012[.]"[36] The PSI Report also notably

---

15%20PSI%20Staff%20Report%20-%20Medical%20Mistreatment%20of%20Women%20in%20ICE%20Detention.pdf (last accessed June 8, 2023).

[32] *Id.* at pp. 3,

[33] *Id.* at p. 4.

[34] *Id.* at p. 4.  Despite termination of ICE's contract with Defendants to detain immigrants at Irwin, "the federal government continues to contract with [Defendants] to operate other detention facilities throughout the country."  *Id.*

[35] *Id.* at pp. 3-12.

[36] *Id.* at pp. 12-13.

discusses Irwin's significant understaffing and other facility cost-related issues that incentivized forced labor by Defendants at Irwin.[37]

106.    The PSI Report also evidences the significant importance of detained immigrants' access not only to appropriate and adequate medical care, but to the grievance submission process including medical grievance forms, at Irwin.  The PSI Report relied heavily on its review of grievance forms submitted by detained immigrants at Irwin in its investigative findings.[38]  Paper grievance forms were supposed to be made available by Defendants to detained immigrants at Irwin, but Plaintiffs and other detained immigrants often found that hard copy grievance forms were significantly unreliable as Defendants' employees and/or agents at Irwin would either intentionally or negligently fail to submit or significantly delay submission of those forms to the appropriate supervisory personnel (or otherwise discard those forms).

107.    The PSI Report thus evidences why it was critical that detained immigrants had adequate time on the Irwin provided tablets, as electronic submission over the internet was the only reliable means for detained immigrants to submit grievance forms and medical care request forms, among other things, as detained immigrants knew that use of paper grievance and medical care request forms would likely be destroyed by Defendants' employees and agents instead of properly forwarded.  This critical reliance on the tablets combined with the fact, as discussed *supra*, that detained immigrants only received 15 minutes of free tablet internet usage time to conduct some limited functions over the internet (like, in particular, the submission of grievance and medical care request forms) was often (if not always) not enough time to in fact complete and submit any of these forms.

---

[37] *See generally id.*

[38] *See, e.g.*, *id.* at pp. 35-36.

108.    Moreover, as also discussed, once installed, the tablets were the only manner in which detained immigrants could submit their order to purchase items from the Irwin commissary. Thus, detained immigrants were forced to choose between submission of critical grievance or medical care request forms or filling out commissary orders for basic and necessary items (like food or hygienic items) or otherwise work for Defendants to make money to purchase adequate tablet time to complete these necessary items.

109.    Also, many detained immigrants did not speak English or had very basic English language proficiency skills.  Thus, filling out any grievance form on the tablet took longer than the free 15 minute period provided.  Consequently, Plaintiffs and other detained immigrants often were unable to submit grievance or medical care request forms, unless they paid for additional minutes for use of the tablet.

110.    All of the foregoing further evidences why Plaintiffs' and other detained immigrants' labor for Defendants was very much not optional but coerced – it was the only way that many detained immigrants could obtain access to in fact reliably submit critical grievance forms, medical care requests forms, and commissary orders.

111.    Given these horrifying and inhuman conditions at Irwin that have existed since at least 2012, if not earlier, Plaintiffs and many other similarly situated detained immigrants had no choice but to work for Defendants—it was a necessity to be able to survive at Irwin.

## CLASS ACTION ALLEGATIONS

112.    Plaintiffs bring this class action on behalf of themselves individually and all others similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3), for their requests for damages.

113.    Plaintiffs seek to certify the following class (the "Proposed Class"):

> All civil immigration detainees who performed work for Defendants
> at Irwin starting ten years prior to the date this Action was filed
> (March 10, 2023) until the date of final judgment in this matter
> ("Proposed Class").

114.    Excluded from the class definitions are Defendants, their officers, directors, management, employees, subsidiaries, and affiliates, and all federal governmental entities.

115.    Plaintiffs reserve the right to amend the definition of the Proposed Class if discovery and further investigation reveals that either or both definitions should be expanded or otherwise modified.

### Class Certification Requirements under Rule 23(b)(3)

116.    **Numerosity:** The class is so numerous that joinder of all members is impracticable. Plaintiffs do not know the exact size of the class because that information is within the control of the Defendants. However, upon information and belief, the class members number in the thousands. Membership in the class is readily ascertainable from Defendants' detention and Work Program records.

117.    **Commonality:** There are numerous questions of law or fact common to the Proposed Class, and those issues predominate over any question affecting only individual class members. The common legal and factual issues include the following:

> (a)    Whether the Defendants' conduct as set forth in Count I violated the forced
> labor and attempt provisions of the Trafficking Victims Protection Act (18
> U.S.C. §§ 1589, 1594, and 1595);

> (b)    Whether the Defendants were unjustly enriched by the Work Program;

(c)     Whether the Defendants obstructed enforcement of the Trafficking Victims Protection Act (18 U.S.C. §§ 1589, 1594, and 1595);

(d)     Whether the Defendants engaged in violations of human dignity and of specific, universal, and obligatory international human rights norms prohibiting forced labor constituting a claim under the Alien Tort Statute, 28 U.S.C. § 1350;

(e)     Whether Plaintiffs and members of the Proposed Class, as defined herein, are entitled to damages and other monetary relief and, if so, in what amount.

118.    **Typicality:** The claims asserted by Plaintiffs are typical of the claims of the Proposed Class, in that the representative Plaintiffs, like all members of the Proposed Class, were subject to and impacted by the Defendants' uniform policy. Each member of the Proposed Class has been similarly injured by the Defendants' misconduct.

119.    **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Proposed Class. Plaintiffs have retained attorneys experienced in class and complex litigation. Plaintiffs and their counsel intend to vigorously prosecute this litigation. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other class members.

120.    **Predominance of Common Questions:** The questions of law or fact common to the Proposed Class, identified above in Paragraph 119, predominate over any questions affecting only individual members.  Specifically, the Defendants' scheme, plan, and pattern to force labor applies to the Proposed Class as a whole and has resulted in substantially similar injuries to the classes.

121.    **Superiority:** Plaintiffs and members of the Proposed Class have all suffered and will continue to suffer harm and damages as a result of the Defendants' wrongful conduct. A class

action is superior to other available methods for the fair and efficient adjudication of the controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many members of the Proposed Class who could not individually afford to litigate a claim such as is asserted in this complaint. Additionally, a class action is superior because the Proposed Class is comprised of many individuals who do not speak English as their native language and who are geographically dispersed. Finally, this class action likely presents no difficulties in management that would preclude maintenance as a class action.

**COUNT I**
**THE TRAFFICKING VICTIMS PROTECTION ACT**
**Forced Labor (18 U.S.C. § 1589)**
**On behalf of the Proposed Class**

122.    Plaintiffs and members of the Proposed Class reallege and incorporate by reference herein all allegations above as if stated in full herein.

123.    Plaintiffs and members of the Proposed Class are authorized to bring this claim against the Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595, because the Defendants violated the forced labor provisions of 18 U.S.C. § 1589.

124.    18 U.S.C. § 1589 of the Federal TVPA provides:

Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means – (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause that person to believe that, if that person did not perform such labor or services, that person, or another person would suffer serious harm or physical restraint, shall be punished as provided under [18 U.S.C. § 1589] subsection (d).

125.    Plaintiffs and members of the Proposed Class are authorized to bring this claim under the TVPA, 18 U.S.C. § 1595, because the Defendants knowingly benefitted financially from participating in a venture which the Defendants knew or should have known resulted in violations of the forced labor provisions of the TVPA.

126.    Defendants knowingly obtained the labor or services of Plaintiffs and members of the Proposed Class by means of physical restraint and threats of physical restraint of Plaintiffs and Members of the Forced Labor Class, in violation of 18 U.S.C. § 1589(a)(1).   Specifically, Defendants threatened to or did restrain Plaintiffs and members of the Proposed Class to their cells or to solitary confinement when they refused orders to work.

127.    The Defendants knowingly obtained the labor or services of Plaintiffs and members of the Proposed Class by means of serious harm and threats of serious harm, in violation of 18 U.S.C. § 1589(a)(2).

128.    The Defendants knowingly obtained the labor or services of Plaintiffs and members of the Proposed Class by means of any scheme, plan, or pattern intended to cause Plaintiffs and members of the Proposed Class to believe that, if they did not perform such labor or services, they or another person would suffer serious harm, threats of serious harm, or physical restraint, in violation of 18 U.S.C. § 1589(a)(4).

129.    The serious harm the Defendants caused and threatened included the withholding of basic necessities, threats of retaliation, violations of contractual provisions and its own policies and procedures that were intended to protect the health, safety, and wellbeing of detained immigrants inside of Irwin.  Defendants withheld or threatened to withhold basic necessities from Plaintiffs and members of the Proposed Class, thereby forcing them to work for subminimum wages to purchase those basic necessities at the Irwin commissary to avoid hunger, undernourishment, lack of personal hygiene, and lack of contact with loved ones, legal representation, and immigration officials, among other harms.

130.    Upon information and belief, Defendants own the commissary at Irwin and thus forced Plaintiffs and members of the Proposed Class to buy items from the commissary which resulted in Plaintiffs and members of the Proposed Class paying back their wages to the Defendants.

131.    The Defendants' conduct, as described herein, constitutes "serious harm" as defined in 18 U.S.C. § 1589(c)(2) because it is "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances [of Plaintiffs and members of the Proposed Class] to perform or to continue performing labor or services in order to avoid incurring that harm."

132.    Defendants knowingly obtained the labor or services of Plaintiffs and members of the Proposed Class by means of abuse or threatened abuse of legal process, in violation of 18 U.S.C. § 1589(a)(3). Specifically, CoreCivic threatened to initiate criminal proceedings against Plaintiffs and members of the Proposed Class to obtain their labor and to prevent them from refusing to work.

133.    The Defendants knowingly obtained the labor or services of Plaintiffs and members of the Proposed Class "by means of a scheme, plan, or pattern" as the Defendants "intended to cause . . . [Plaintiffs and members of the Proposed Class] to believe that if . . . [they] did not perform such labor or services, . . . [they] would suffer serious harm" as described herein, in violation of 18 U.S.C. § 1589(a)(4).

134.    The Defendants significantly profited from Defendants' unlawful practice of forcing and coercing Plaintiffs and members of the Proposed Class to perform uncompensated forced labor through human trafficking.  By exploiting these unlawful practices, the Defendants materially and significantly reduced its labor costs and expenses, in addition to increasing its profits.

135.    Plaintiffs and members of the Proposed Class are victims of forced labor under 18 U.S.C. § 1589.

136.    The Defendants committed the illegal and unlawful offense(s) of forced labor against the Plaintiffs and members of the Proposed Class under 18 U.S.C. § 1589, *et seq*.

137.    The Defendants knowingly and financially benefitted from implementing and participating in a venture, plan, scheme, pattern of conduct, and practice that the Defendants knew or should have known was unlawful and in violation of forced labor laws under 18 U.S.C. § 1589.

138.    Plaintiffs and the members of the Proposed Class are entitled to, without limitation, the remedies set forth in 18 U.S.C. § 1593 and 18 U.S.C. § 1589(a).

139.    18 U.S.C. § 1593 states:

(a)    Notwithstanding section 3663 or 3663A, and in addition to any other civil or criminal penalties authorized by law, the court shall order restitution for any offense under this chapter.

(1)    The order of restitution under this section shall direct defendant to pay the victim (through the

41

appropriate court mechanism) the full amount of the victim's losses, as determined by the court under paragraph (3) of this subsection.

(2)    An order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under 3663A.

(3)    As used in this subsection, the term "full amount of the victim's losses" has the same meaning as provided in section 2259(c)(2) and shall in addition include the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act (29 U.S.C. § 201 *et seq.*).

(4)    The forfeiture of property under this subsection shall be governed by the provisions of section 413 (other than subsection (d) of such section) of the Controlled Substances Act (21 U.S.C. § 853).

(b)    As used in this section, the term "victim" means the individual harmed as a result of a crime under this chapter, including, in the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or a representative of the victim's estate, or another family member, or any other person appointed as suitable by the court, but in no event shall the defendant be named such representative or guardian.

140.    Plaintiffs and members of the Proposed Class have suffered damages in an amount to be determined at trial.

141.    18 U.S.C. § 1595(a) states:

An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees.

142.    Plaintiffs and members of the Proposed Class have suffered damages in an amount to be determined at trial. Plaintiffs and members of the Proposed Class request that the Court enter

an Order pursuant to 18 U.S.C. § 1595(a) awarding Plaintiffs and members of the Proposed Class compensatory and punitive damages.

143.    Plaintiffs and members of the Proposed Class request that the Court enter an Order pursuant to 18 U.S.C. § 1593 awarding Plaintiffs and members of the Proposed Class mandatory restitution in addition to the recovery of their reasonable attorneys' fees that they are entitled to recover pursuant to 18 U.S.C. § 1595(a).

144.    Plaintiffs and members of the Proposed Class also seek pre- and post-judgment interest and attorneys' fees and costs as allowed by statute as they are entitled to recover pursuant to 18 U.S.C. 1595(a).

**COUNT II**
**THE TRAFFICKING VICTIMS PROTECTION ACT**
**Attempt to Commit Forced Labor (18 U.S.C. § 1594(a))**
***On behalf of the Proposed Class***

145.    Plaintiffs and members of the Proposed Class reallege and incorporate by reference herein all allegations above as if stated in full herein.

146.    Plaintiffs and members of the Proposed Class are authorized to bring this claim against the Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595, because Defendants violated the attempt forced labor provisions of 18 U.S.C. § 1594(a).

147.    Defendants attempted to obtain the labor or services of Plaintiffs and members of the Proposed Class by the means described paragraphs 123-144, supra, in violation of 18 U.S.C. § 1594(a).

148.    Plaintiffs and members of the Proposed Class also are authorized to bring this claim under the TVPA, 18 U.S.C. § 1595, because the Defendants knowingly benefitted financially from

participating in a venture which the Defendants knew or should have known involved violations of attempted forced labor pursuant to 18 U.S.C. § 1594(a).

149.    The Defendants obtained the labor or services of Plaintiffs and members of the Proposed Class by the means described herein in violation of 18 U.S.C. § 1594(a).

150.    Plaintiffs and members of the Proposed Class have suffered damages in an amount to be determined at trial.  Plaintiffs and members of the Proposed Class request that the Court enter an Order pursuant to 18 U.S.C. § 1595(a) awarding Plaintiffs and members of the Proposed Class compensatory and punitive damages.

151.    Plaintiffs and members of the Proposed Class request that this Court enter an Order pursuant to 18 U.S.C. § 1593 awarding Plaintiffs and members of the Proposed Class mandatory restitution in addition to the recovery of their reasonable attorneys' fees that they are entitled to recover pursuant to 18 U.S.C. § 1595(a).

152.    Plaintiffs and members of the Proposed Class also seek pre- and post-judgment interest and attorneys' fees and costs as allowed by statute as they are entitled to recover pursuant to 18 U.S.C. 1595(a).

**COUNT III**
**THE TRAFFICKING VICTIMS PROTECTION ACT**
**Obstructing Enforcement in Violation of 18 U.S.C. § 1590**
***On behalf of the Proposed Class***

153.    Plaintiffs and members of the Proposed Class reallege and incorporate by reference herein all allegations above as if stated in full herein.

154.    Plaintiffs and members of the Proposed Class are authorized to bring this claim against the Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595, because Defendants obstructive enforcement of the TVPA in violation of 18 U.S.C. § 1590.

155.    18 U.S.C. § 1590 states that "[w]hoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both."

156.    Defendants obstructed and attempted to obstruct, and interfered with the enforcement of the federal prohibition against forced labor. 18 U.S.C. § 1594(a).

157.    The Defendants' corporate scheme of utilizing solitary confinement, criminal prosecution, removal from the work program, downgrading detained immigrants' housing and/or revoking access to the commissary, among other sanctions, served the purpose of obscuring Plaintiffs from reporting Defendants' violations of the TVPA as described in this Complaint.

158.    Defendants were aware that their operation of Irwin was subject to the 2011 PBNDS (Revised 2016), which Defendants were required to follow pursuant to their IGSA.

159.    Defendants were aware that their conduct in the operation of Irwin was under federal investigation by the Office for Civil Rights and Civil Liberties (CRCL) and a U.S. Senate Subcommittee for, among other things, retaliation by facility staff towards noncitizens who reported poor conditions, inappropriate use of force, and additional serious allegations involving lack of medical care.

160.    Despites this, Defendants continued their deliberate scheme, pattern, and plan to coerce labor from Plaintiffs and members of the Proposed Class, and in so doing Defendants gained significant financial benefit from protecting, participating, and aiding the TVPA violations, described in this Complaint.

161.    Plaintiffs and members of the Proposed Class have suffered damages in an amount to be determined at trial.  Plaintiffs and members of the Proposed Class request that the Court enter

an Order pursuant to 18 U.S.C. § 1595(a) awarding Plaintiffs and members of the Proposed Class compensatory and punitive damages.

162.    Plaintiffs and members of the Proposed Class request that this Court enter an Order pursuant to 18 U.S.C. § 1593 awarding Plaintiffs and members of the Proposed Class mandatory restitution in addition to the recovery of their reasonable attorneys' fees that they are entitled to recover pursuant to 18 U.S.C. § 1595(a).

163.    Plaintiffs and members of the Proposed Class also seek pre- and post-judgment interest and attorneys' fees and costs as allowed by statute as they are entitled to recover pursuant to 18 U.S.C. 1595(a).

## COUNT IV
## UNJUST ENRICHMENT
### Georgia Common Law
### *On behalf of the Proposed Class*

164.    Plaintiffs and members of the Proposed Class reallege and incorporate by reference herein all allegations above as if fully restated herein.

165.    Defendants materially and significantly reduced their labor costs and expenses, and increased their corporate profits, by obtaining undercompensated labor from Plaintiffs and members of the Proposed Class.

166.    Plaintiffs and members of the Proposed Class conferred non-gratuitous benefits upon the Defendants by performing work for $1 to $3 per day for which the Defendants would otherwise have had to pay at least the applicable minimum hourly wage or more, thereby significantly and materially increasing the Defendants' profits and unjustly enriching the Defendants at the expense and to the detriment of Plaintiffs and members of the Proposed Class.

167.    The Defendants' retention of any benefit collected directly and indirectly from this undercompensated labor violated principles of justice, equity, and good conscience.

46

168.    As a direct and proximate result of the Defendants' forced labor practices, Plaintiffs and members of the Proposed Class have suffered concrete harm and injury, including physical and emotional injury, and the unlawful violation of their rights.

169.    Plaintiffs and members of the Proposed Class are entitled to recover from the Defendants all amounts that the Defendants have wrongfully and improperly obtained, and the Defendants should be required to disgorge to Plaintiffs and members of the Proposed Class the benefits they have unjustly obtained. Plaintiffs and members of the Proposed Class are also entitled to recover exemplary damages.

**COUNT V**
**Alien Tort Statute, 28 U.S.C. § 1350**
*On behalf of the Proposed Class*

170.    Plaintiffs and members of the Proposed Class reallege and incorporate by reference herein all allegations above as if stated in full herein.

171.    The Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, enacted in 1789, permits non-citizens to bring suit in U.S. courts for violations of: (1) the law of nations, and/or (2) of a treaty of the United States.

172.    To establish a violation of the "law of nations" under the ATS, federal courts are authorized to recognize a common law cause of action for violations of clearly defined, widely accepted human rights norms that are embodied in customary international law.  Such an international norm must be specific, universal, and obligatory.

173.    Under customary international law, Defendants are forbidden to subject persons held in *civil* detention, as is the case of detained immigrants at Irwin, to forced labor.  This prohibition of forced labor is a specific, universal, and obligatory international norm, as demonstrated by various treaties and conventions, including treaties and conventions that the

United States (and many other countries) have ratified or signed, including the Slavery Convention of 1926 (the "Slavery Convention") and the later Supplementary Convention on the Abolition of Slavery, the Slave Trade, Institutions and Practices Similar to Slavery (the "Supplementary Slavery Convention"), the United Nations International Labour Organization Convention No. 29 Concerning Forced or Compulsory Labour ("ILO Convention 29"), and the ILO Abolition of Forced Labour Convention (No. 105)[39] ("ILO Convention 105) (collectively, "International Slavery Conventions").

174.    Defendants' coercion of labor from *civilly* detained immigrants at Irwin, as detailed in this Complaint, is thus in violation of both: (1) customary international law which embodies a clearly defined, widely accepted human rights norms prohibiting the forced labor of the civilly detained, and (2) a treaty of the United States, namely the Slavery Convention, which incorporates the definition of "forced labor" as provided by ILO Convention 29, and ILO Convention 105.

### *Coerced Labor of the Civilly Detained Is A Clearly Defined, Widely Accepted, Human Rights Norm Constituting Customary International Law*

175.    The overwhelming majority of nations in the world are parties to the International Slavery Conventions. The United States itself is a signatory to the Slavery Convention. Collectively, this demonstrates that the international and universal prohibition on slavery has evolved, particularly after World War II, to forbid more contemporary forms of servitude and forced labor.

176.    The ILO Convention 29, which has been ratified by 180 nations, is "instructive when viewed in conjunction with the . . . Slavery Convention…" as "courts have applied the ILO

---

[39] ILO Abolition of Forced Labour Convention (No. 105), June 26, 1957, 320 U.N.T.S. 291, available at https://www.ilo.org/dyn/normlex/en/f?p=NORMLEXPUB:12100:0::NO::P12100_ILO_CODE:C105 (accessed, June 15, 2023).

Convention 29 to conclude that a forced labor claim under the ATS comprises three elements: (1) work or service performed; (2) under the menace of any penalty; (3) for which the person has not offered himself or herself voluntarily." *Aragon v. Che Ku*, 277 F.Supp.3d 1055, 1067 (D. Minn. 2017).

177.    Thus, U.S. courts have determined that the prohibition of forced labor is sufficiently specific, universal, and obligatory, and thus judicable under ATS.

178.    Consequently, the prohibition of forced labor of the civilly detained has become customary international law.

179.    Defendants' conduct, as articulated in this Complaint, which results in the coerced labor of civilly detained immigrants at Irwin, is thus in violation of customary international law.

### *Defendants' Conduct Violated Customary International Law Prohibiting Forced Labor, the Slavery Convention (which incorporates the ILO Convention 29), and the ILO Convention 105*

180.    The Supplementary Slavery Convention, in expressly widening the scope of the international prohibition to similar forms of forced labor or servitude, does not define "forced labor" but explicitly references the ILO Convention 29.  The ILO Convention 29 defines "forced or compulsory labor" as "all work or service which is exacted from any person under the menace of any penalty and for which the said person has not offered himself voluntarily."  The definition of "forced labor" as provided by the ILO Convention 29 has thus been extended to apply to the Slavery Convention, to which the US is a signatory.

181.    The United Nations International Labour Organization has issued a list of factors to help identify forced labor in practice and to interpret ILO Convention 29.  Factors that indicate the presence of the "menace of any penalty" include, *inter alia,* the actual presence or credible threat of: imprisonment or other physical confinement; financial penalties; deportation; and

deprivation of food, shelter, or other necessities.  Specific threats may not be necessary if the person is kept in a general state of fear such as to coerce them to work.

182.    To identify the lack of voluntary consent prong of the ILO Convention 29 definition, the ILO guidance includes, among others, the following indicators:  physical abduction, physical confinement in the work location (whether in prison or private detention), and induced indebtedness (including by inflated prices, reduced value of goods or services produced, or excessive charges).  Again, specific threats may not be necessary if the person is kept in a general state of fear such as to render their offer to work coerced.

183.    The actions of the Defendants as articulated in this Complaint meet both prongs of the ILO Convention 29 test and thus violate the Slavery Convention and international common law's prohibition of forced labor of the civilly detained.

184.    Here, Plaintiffs and members of the Proposed Class are *civil* detainees who had not been charged with any crime.

185.    Plaintiffs and members of the Proposed Class worked for the Defendants under the menace of penalty:

        (a)    At all relevant times, Plaintiffs and members of the Proposed Class were physically confined to Irwin, a prison facility owned and operated by the Defendants, and during which time Plaintiffs and members of the Proposed Class were physically prevented from leaving.

        (b)    At all relevant times, Plaintiffs and members of the Proposed Class were effectively threatened by the Defendants with deportation by the prospect of being rendered unable to confer meaningfully with their legal counsel to advance their effort to seek asylum or otherwise avoid deportation, and to

communication with immigration officials (including ICE and DHS) about their immigration claims and proceedings, unless Plaintiffs and members of the Proposed Class worked for the Defendants at subminimum and nearly free wages to pay for computer internet access and telephone access.

(c)    At all relevant times, Plaintiffs and members of the Proposed Class were forced to work for the Defendants under penalty of not receiving edible or medically-appropriate food or not receiving usable soap or shampoo and other essential hygiene and sanitary products, including but not limited to during a time of an infectious viral Covid-19 pandemic, because such life necessities were available only through purchase from the Irwin commissary, which is owned and operated by the Defendants.

(d)    Upon information and belief, members of the Proposed Class were forced to work for the Defendants under penalty of solitary confinement, lock down within one's own cell, threats of deportation, or other acts or threats of punishment, retaliation, or harm towards detained immigrants. Plaintiffs and members of the Proposed Class were kept by Defendants in a general state of fear which coerced them to work.

186.    Moreover, Plaintiffs and members of the Proposed Class worked for the Defendants under compulsion and did not offer their work or services voluntarily:

(a)    At all relevant times, Plaintiffs and members of the Proposed Class had been physically abducted under color of law by INS agents or other government authority, and involuntarily delivered into the custody and care of the Defendants.

51

(b)    At all relevant times, Plaintiffs and members of the Proposed Class worked physically confined to the Defendants' facility, and rendered all services and labor exclusively at the Defendants' facility, without the ability or liberty to work anywhere else or for any other employer.

(c)    At all relevant times, Plaintiffs and members of the Proposed Class were subject to the Defendants' system and scheme to impose induced indebtedness on them, consisting of a deliberate practice of providing absurdly low wages of typically $1 (and no more than $3) for a single day of work (no matter how many hours worked or what job tasks this entailed) while charging grossly excessive fees to purchase necessities at the Irwin commissary by making edible or medically-appropriate food available only through purchase from the Defendants-owned commissary at Defendants' unilaterally-determined price and by charging for computer and telephone access necessary to meaningfully contribute to Plaintiffs' and members of the Proposed Class individual attempts to achieve freedom from the Defendants' confinement facility—up to and including a coercive and arbitrarily exploitative exchange rate by which an entire day's physical labor "earned" no more than approximately 4 minutes of video call time and approximately 10 minutes of tablet time.

187.    Furthermore, Defendants also acted in violation of ILO Convention 105, to which the United States is a signatory.  The ILO Convention 105 requires all ratifying members to "suppress any form of forced labor for certain prohibited purposes, including political and

ideological education, economic development, as a means of labor discipline, as punishment for participating in strikes, and as a means for racial, social, national, or religious discrimination."[40]

188.     Plaintiffs and members of the Proposed Class have therefore stated a cognizable claim under the ATS for Defendants' violation of customary international law, the Slavery Convention (to which the United States is a signatory and which incorporates the definition of "forced labor" from the ILO Convention 29), and ILO Convention 105 by coercing the labor of civilly detained immigrants at Irwin, as described in this Complaint.

189.     Plaintiffs and members of the Proposed Class have suffered damages in an amount to be determined at trial.

190.     Plaintiffs and members of the Proposed Class are entitled to recover compensatory and punitive damages.

191.     Plaintiffs and members of the Proposed Class are entitled to recover mandatory restitution in the full amount of their losses.

192.     Plaintiffs and members of the Proposed Class are entitled to recover their costs and reasonable attorney's fees.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of the Proposed Class request that the Court:

a.     Certify this action as a class action, with the Proposed Class as defined above;

b.     Find that Plaintiffs are proper representatives of the Proposed Class, and appoint the undersigned as Class Counsel;

---

[40] *John Roe I. v. Bridgestone Corp.*, 492 F.Supp.2d 988, 1012 (S.D. Ind. 2007).

c.      Order the Defendants to identify and disclose to Plaintiffs all members of the Proposed Class;

d.      Order the Defendants to pay for notifying all members of the Proposed Class of the pendency of this suit;

e.      Award declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and members of the Proposed Class;

f.      Order disgorgement of the Defendants' unjustly-acquired revenue, profits, and other benefits resulting from its unlawful conduct;

g.      Award Plaintiffs and members of the Proposed Class monetary damages for the Defendants' forced labor, or in in the alternative, attempted forced labor, unjust enrichment, obstruction of enforcement of the TVPA, and violation both US treaties and of universal and obligatory international human rights norms prohibiting forced labor, in an amount to be determined at trial;

h.      Award Plaintiffs and members of the Proposed Class their reasonable litigation expenses and attorney's fees;

i.      Award Plaintiffs and members of the Proposed Class pre- and post-judgment interest to the extent allowable; and

j.      Award any further relief that the Court deems just and equitable.

## DEMAND FOR TRIAL BY JURY

Plaintiffs, individually and on behalf of the Proposed Class, respectfully request a trial by jury as to all matters so triable.

Respectfully submitted,

**GRANT & EISENHOFER P.A.**

Dated: June 16, 2023

*/s/ Barbara J. Hart*
Barbara J. Hart (*Pro Hac Vice*)
Irene R. Lax (*Pro Hac Vice*)
485 Lexington Ave. 29th Floor
New York, NY 10017
Phone (646) 722-8500
bhart@gelaw.com
kfisch@gelaw.com
ilax@gelaw.com

**GRANT & EISENHOFER P.A.**
Samuel Mukiibi (*Pro Hac Vice Forthcoming*)
Pooja Mehta (*Pro Hac Vice Forthcoming*)
123 Justison Street
Wilmington, Delaware 19801
Phone (302) 622-7500
smukiibi@gelaw.com
pmehta@gelaw.com

**MITCHELL SHAPIRO GREENAMYRE & FUNT LLP**
Zachary Greenamyre (GA Bar No. 293002)
3490 Piedmont Road, Suite 650
Atlanta, Georgia 30305
Phone (404) 812-4747
zack@mitchellshapiro.com

**ATTORNEYS FOR PLAINTIFFS AND THE PROPOSED CLASS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of June, 2023, I filed the foregoing **FIRST AMENDED COMPLAINT** electronically through the CM/ECF system, which caused the following counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

John T. Rouse, Esquire (Ga Bar No. 868514)
**MCGLINCHEY STAFFORD, PLLC**
1020 Highland Colony Pkwy, Ste. 406
Ridgeland, Mississippi 39157

Deirdre C. Mcglinchey, Esquire
Magdalen Blessey Bickford, Esquire
**MCGLINCHEY STAFFORD, PLLC**
601 Poydras Street, 12th Floor
New Orleans, Louisiana 70130

*Counsel for Defendants*

/s/ *Barbara J. Hart*
Barbara J. Hart