IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | |
|---|---|
| NILSON BARAHONA, NIKOLAS GAZETAS, and OMAR ISAIAS TAVIRA GARCIA,  Plaintiffs,  v.  LASALLE MANAGEMENT COMPANY, L.L.C., d/b/a LASALLE CORRECTIONS, LASALLE SOUTHEAST, LLC, LASALLE CORRECTIONS, LLC, CGL IRWIN PROPERTIES, LLC, and CGL/LASALLE IRWIN PROPERTIES, LLC  Defendants. | CASE NO: 7:23-cv-24-WLS |

## ORDER

Before the Court are the following motions to dismiss Plaintiffs' First Amended Complaint (Doc. 30) ("Complaint"):

1. LaSalle Southeast, LLC's Rule 12(b)(6) Motion to Dismiss (Doc. 36) ("LaSalle SE MTD");

2. Motion to Dismiss on Behalf of CGL/LaSalle Irwin Properties, LLC Pursuant to Rule 12(b)(6) (Doc. 39) ("CGL/LaSalle Irwin Properties MTD"); and

3. Motion to Dismiss on Behalf of LaSalle Management Company, L.L.C. and LaSalle Corrections, LLC Pursuant to Rule 12(b)(2) and Rule 12(b)(6) (Doc. 37) ("LaSalle Management/LaSalle Corrections MTD," and together with LaSalle SE MTD and CGL/LaSalle Irwin Properties MTD, the "Motions to Dismiss").

Defendants LaSalle Management and LaSalle Corrections move to dismiss Plaintiffs' Complaint asserting that, under Federal Rule of Civil Procedure 12(b)(2), this Court lacks personal jurisdiction over them. Alternatively, LaSalle Management and LaSalle Corrections move to dismiss Plaintiff's Complaint under Rule 12(b)(6), and adopt and incorporate LaSalle

1

SE's arguments set forth in the LaSalle SE MTD.[1] The normal procedure is for a party to first address personal jurisdiction issues. However, LaSalle Management and LaSalle Corrections chose to present together their 12(b)(2) motion and 12(b)(6) motion, incorporating another Party's filings. Since the 12(b)(2) and 12(b)(6) grounds are independent, the Court is justified in addressing LaSalle Management and LaSalle Corrections' 12(b)(6) joint motion along with the LaSalle SE MTD which is incorporated into their motion.

Plaintiffs' responses in opposition to the Motions to Dismiss and Defendants' replies thereto were timely filed, and on June 25, 2024, the Court heard oral arguments. Upon full review and consideration of the record, the Motions to Dismiss, responses and replies thereto, as well as the oral arguments of counsel, and for the reasons set forth below, the Court **DENIES** the LaSalle SE MTD and the CGL/LaSalle Irwin Properties MTD. Further, the Court **DENIES**, **without prejudice** as detailed in the Court's Conclusions below, the Rule 12(b)(6) motion contained in the LaSalle Management/LaSalle Corrections MTD. A separate order will be entered with respect to the Rule 12(b)(2) arguments made in the LaSalle Management/LaSalle Corrections MTD.[2]

**I.   SUMMARY**

Plaintiffs, Nilson Barahon, Nikolas Gazetas, and Omar Isaias Tavira Garcia, are former civilly-detained immigrants who were housed at the Irwin County Detention Center ("Irwin Facility") in Ocillia, Georgia. On March 10, 2023, the Plaintiffs filed this class action against LaSalle Southeast, LLC ("LaSalle SE"), LaSalle Management Company, L.L.C, dba LaSalle Corrections ("La Salle Management"), LaSalle Corrections, LLC ("LaSalle Corrections"),

---

[1] For future filings before the Court, the Parties are notified that the Court disfavors, and gives little weight to, the adoption and incorporation of one Party's motion and brief into a motion and brief filed on behalf of another Party, particularly without a showing as to how such materials *specifically* apply to the incorporating Party.

[2] At the conclusion of the arguments on the Rule 12(b)(2) jurisdictional issues raised in the LaSalle Management/LaSalle Corrections MTD, the Court allowed the Plaintiffs time to conduct limited discovery on the jurisdictional issues, and permitted the Parties to file supplemental briefs on that issue. By Order (Doc. 72) entered September 18, 2024, the limited discovery deadline was extended to October 3, 2024, and the supplemental briefing deadline was extended to October 17, 2024.

Irwin County Detention Center, LLC ("ICDC LLC"),[3] CGL Irwin Properties, LLC ("CGL Irwin Properties"), and CGL/LaSalle Irwin Properties, LLC ("CGL/LaSalle Irwin Properties"), alleging five causes of action against the Defendants. Counts I, II, and III allege violations of the Trafficking Victims Protection Act ("TVPA"), as amended, 18 U.S.C. §§ 1589, 1594(a), 1590, respectively. Count IV alleges a claim for unjust enrichment under Georgia common law, and Count V alleges violations of the Alien Tort Statute, 28 U.S.C. § 1350. The class which Plaintiffs seek to certify is: "All civil immigration detainees who performed work for Defendants at [the Irwin Facility] starting ten years prior to the date this Action was filed (March 10, 2023) until the date of final judgment in this matter." (Doc. 30 ¶ 113).

## II. STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a party to assert by motion the defense of failure to state a claim upon which relief can be granted. A motion to dismiss a plaintiff's complaint under Rule 12(b)(6) should not be granted unless the plaintiff fails to plead enough facts to state a claim for relief that is plausible, and not merely conceivable, on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Dismissal for failure to state a claim is proper if the factual allegations are not 'enough to raise a right to relief above the speculative level.'" *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010) (quoting *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008)). In other words, the factual allegations must "raise a reasonable expectation that discovery will reveal evidence of" the plaintiff's claims. *Twombly*, 550 U.S. at 556. "But Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because it strikes a savvy judge that actual proof of those facts is improbable." *Barrientos v. CoreCivic, Inc.*, 332 F. Supp. 3d 1305, 1307 (M.D. Ga. 2018) (Land, J.), *aff'd*, 951 F.3d 1269 (11th Cir. 2020) (internal quotation marks omitted) (citations omitted) [hereinafter *Barrientos I*].

The Court must conduct its analysis "accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Hill v. White*, 321 F.3d 1334,

---

[3] By Order (Doc. 56) entered February 27, 2024, Plaintiffs consented to ICDC LLC's dismissal without prejudice.

1335 (11th Cir. 2003). In evaluating the sufficiency of a plaintiff's pleadings, the Court makes reasonable inferences in plaintiff's favor, but is not required to draw plaintiff's inference. *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012). The Supreme Court instructs that while considering a motion to dismiss, a court must accept as true all the allegations contained in a complaint. This principle, however, is inapplicable to legal conclusions, which must be supported by factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing *Twombly*, 550 U.S. at 555 (courts "are not bound to accept as true a legal conclusion couched as a factual allegation" in a complaint). A district court may consider an extrinsic document only if it is central to a plaintiff's claim and its authenticity has not been challenged. *SFM Holdings, Ltd. v. Banc of America Sec., LLC.*, 600 F.3d 1334, 1337 (11th Cir. 2010).

### III. FACTUAL ALLEGATIONS

The Court accepts the allegations in the Plaintiffs' Complaint as true for purposes of the pending Motions to Dismiss. Plaintiffs allege the following:

#### A. Defendants

Defendants LaSalle SE, LaSalle Management, and LaSalle Corrections, are responsible, directly or through one or more subsidiaries, for the day-to-day operations of the Irwin Facility. (Doc. 30 ¶¶ 21–23). CGL LaSalle Irwin Properties is a joint venture of CGL Irwin Properties and LaSalle SE. (*Id.* ¶ 26). Defendant CGL/LaSalle Irwin Properties is the owner of the Irwin Facility, including the land and improvements thereon. (*Id.* ¶ 26).

Plaintiffs allege that by virtue of an Intergovernmental Service Agreement ("IGSA"), the United States Immigration and Custom Enforcement ("ICE") division of the Department of Homeland Security, contracted with Irwin County, Georgia ("County"), and Defendants to detain, house and/or control on behalf of ICE a minimum of 600 immigrant detainees awaiting civil immigration proceedings. (*Id.* at 9 n.9, ¶¶ 1, 8, 28). A copy of the IGSA is not in the record, and it is unclear at this time which Defendant was a party to the IGSA.

Pursuant to an Operation, Management and Maintenance Agreement ("OMMA"), the County contracted with the Defendants, and specifically LaSalle SE and CGL/LaSalle Irwin Properties, to use the Irwin Facility to house detainees which ICE referred to the County.

4

Under the OMMA, LaSalle SE agreed to operate, manage, and maintain the Irwin Facility which would be located on property owned by CGL/Lasalle Irwin Properties. (*Id.* ¶¶ 23, 26, 28). At the hearing, the Parties agreed that the OMMA is central to the Plaintiffs' claims and Plaintiffs' counsel confirmed that Plaintiffs do not contest the authenticity of the OMMA. Based on the Parties' agreement, the Court considered the OMMA in its decision.[4]

### B. Conditions at the Irwin Facility

Plaintiffs allege the Defendants maintained a deprivation scheme in which Defendants forced detainees, including Plaintiffs, to work by depriving detainees of basic necessities. Plaintiffs state the detainees at the Irwin Facility were fed three times a day. However, the amount of food served was insufficient, the food was severely deficient in nutritional value, and of poor quality. (Doc. 30 ¶ 42–43, 63–65). Further, because the last of these inadequate meals was served around 3:00 p.m. each day, the detainees were often hungry later in the day, but had to wait until the next day for another meal. (*Id.*) The detainees feared retaliation or punishment if they asked for additional food; and thus, had no choice but to supplement their diets by purchasing items from the Irwin Facility commissary, or to suffer from hunger. (*Id.*) The Plaintiffs allege the water supplied at the Irwin Facility was barely potable in that it was brown in color, hard to consume, and often made detainees ill. (*Id.* ¶ 64). Again, the commissary was the detainees' only available source to obtain other liquids to drink.

The Plaintiffs also allege that the Defendants did not provide detainees with basic necessities. Defendants initially supplied detainees with a very limited amount of low quality basic hygienic products such as soap, shampoo, toothpaste, and a toothbrush. However, once that initial limited supply was gone, Defendants refused to replace the items, thereby forcing detainees to purchase the basic hygienic products from the commissary. Because of the low quality, some of the soap and shampoo products, caused detainees to break out in rashes or caused other medical reactions. The poor dental products caused tooth and/or other dental problems. (*Id.* ¶¶ 67–68). Defendants failed to provide adequate or timely medical care to treat

---

[4] The Complaint refers to a partially redacted copy of the OMMA (Doc. 16-3) which was attached to the first motion to dismiss filed by LaSalle Management and LaSalle Corrections (Doc. 16). LaSalle SE also attached a copy of the OMMA, with additional redactions, to the LaSalle SE MTD (Doc. 36-3). The Complaint refers to Doc. 16-3, and to the extent it has considered the OMMA, the Court considered Doc. 16-3 in this decision.

these reactions, again forcing detainees to buy products from the commissary to take care of their own medical symptoms. (*Id.*)

Plaintiffs alleged that the electronic tablets provided by Defendants at the Irwin Facility were the detainees only internet access. (*Id.* ¶ 53). The Irwin Facility policy allowed a detainee 15 free minutes of access to a tablet every 4 hours ("free-access period"). Free-access periods could not be accumulated to allow a session longer than 15 minutes. Thus, after such session expired, a detainee had to wait another 4 hours before receiving another free-access period. Significantly, free use of the tablets was limited to certain tasks such as filling out a commissary order or a grievance/medical request form or to obtain status updates on a detainee's individual immigration proceedings. Detainees paid $.15 to $.25 per minute to use a tablet outside of their free-access periods. Phone access cost detainees $.21 per minute, and video calls on the Irwin Facility tablets cost $3.00 per 30 *seconds*. Thus, a detainee being paid $1 per day had to work three days for 30 *seconds* of video call time. In addition, the Irwin Facility tablets only displayed information in English although many of the detainees at the Irwin Facility had none or very little English language proficiency. (*Id.* ¶¶ 55–61).

Access to the Irwin Facility tablets was critical for Plaintiffs to be able to contact their attorneys, contact loved ones, check on immigration proceedings, and communicate with immigration officials about medical requests and grievances. In addition, once the Defendants installed tablets at the Irwin Facility, the tablets were the only method by which a detainee could place an order for purchases from the commissary because written orders were no longer accepted. Plaintiffs allege the limited free-access periods were insufficient for the detainees to accomplish their necessary communications, and the detainees had to choose between communicating with loved ones, legal counsel, immigration officials for information on their immigration proceedings, filing grievances, or requests for medical services, or sending requests to the commissary. The detainees' only alternative was to work to obtain funds to pay for more internet access. (*Id.*)

The Plaintiffs also allege that the detainees' access to outside third parties, their attorneys, and immigration officials was particularly crucial for those detainees who were eligible for release on immigration bond, parole, or discretionary orders of supervision. (*Id.* ¶ 54). Plaintiffs allege a more nefarious purpose for Defendants' limiting detainees' internet

6

access was to cut off detainees' contacts so as to minimize the number of transfers into and out of the Irwin Facility—which in turn reduced the Defendants' expenses incurred in processing detainees being released from the Irwin Facility as well as those entering the facility, such as initial health screening, new bunk cleanings, fresh laundry, and other expenses. In addition, Plaintiffs allege minimizing the number of transfers out of the Irwin Facility resulted in Defendants maintaining a higher daily bed rate and increased profits. (*Id.*)

The Irwin Facility commissary is the only place inside the facility where detainees can purchase basic necessities, including hygiene products, clothes, food, and phone cards, among other items. (*Id.* ¶ 74). The Defendants own the commissary and the Plaintiffs allege the products are overpriced, with basic necessities marked up by 200 percent or more. (*Id.* ¶¶ 73, 75).

### C. The "Voluntary Work Program"

#### 1. Performance Based National Detention Standards

Both Parties recognize that, as a private contractor operating an ICE detention facility, Defendants were subject to, and required to follow, the ICE Performance Based National Detention Standards ("PBNDS"), the operative version of which was promulgated in 2011 and revised in 2016.[5] Under the PBNDS, detainees "shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping." PBNDS § 5.8(II)(2). In particular, detainees are required to maintain their immediate living area in a neat and orderly manner which includes making their beds daily, stacking loose papers, keeping the floor free of debris and clutter, and refrain from hanging clothing, pictures, or other items from beds, lighting fixtures, or other furniture. *Id.* § 5.8(V)(C). Otherwise, detainees "shall not be required to work."

With respect to voluntary work, the PBNDS provides that "[d]etainees *shall be provided* the opportunity to participate in a voluntary work program" through which they may earn monetary compensation. *Id.* § 5.8(V)(A), (K) (emphasis added). In addition to other responsibilities, a volunteer detainee is expected to be ready to report to work at the required

---

[5] *See* U.S. Immigration & Customs Enf't, Performance-Based National Detention Standards 2011 (rev. 2016), *available at*, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

7

time, may not leave an assignment without permission, and may not evade attendance and performance standards in assigned activities nor encourage others to do so. *Id.* § 5.8(V)(M). Finally, the PBNDS provides circumstances under which a detainee may be removed from a work detail. Those causes include: unsatisfactory performance; disruptive behavior, threats to security, etc.; physical inability to perform the essential elements of the job; prevention of injury to detainee; or as a sanction for an infraction of a facility rule. *Id.* § 5.8(V)(L).

### 2. Irwin Facility Voluntary Work Program

Plaintiffs allege that Defendants' Detainee Handbook sets out a voluntary work program at the Irwin Facility. (*Id.* ¶¶ 37–39). Work assignments include: (a) sweeping and mopping floors; (b) preparing, cooking, and serving meals; (c) washing dishes and trays; (d) cleaning the kitchen and cafeteria before and after meals; (e) unloading food trucks that arrive at the Irwin Facility; (f) cleaning the hallways, and other common areas of the Irwin Facility; and (g) barber services. (Doc. 30 ¶ 39). The kitchen jobs were highly valued by Plaintiffs because of the potential to receive $3 (instead of $1) per day, and detainees performing the kitchen jobs received extra food.

Under the Defendants' voluntary work program, detainees were paid $1 per day, no matter how many hours they worked. While Defendants paid $3 per day for a limited number of job positions, the vast majority of the detainees were paid $1 per day. (*Id.* ¶¶ 4–6, n.3, ¶ 45).

Plaintiffs allege the Defendants used the threats of removing detainees from the work force if a detainee refused to work or failed to complete their job responsibilities—even if they were ill or otherwise unable to work. Other tactics used by Defendants to force detainees to work included: (a) threats to impose sanctions, including solitary confinement or lockdown in a detainee's cell; (b) threats of criminal prosecution for disobeying a detention officer's order; (c) taking away detainees' free time or time that detainees could speak to their families; (d) downgrading a detainee's housing to housing that is less safe, sanitary, or private, or that was more restrictive or isolating; (e) revoking access to the commissary; and (f) denying access to medical care. Plaintiffs allege that if detainees were injured while working or otherwise in need of medical care, the detainees could not leave their work shift to seek medical attention, because if they did so, Defendants' employees and agents would threaten the detainee with the loss of their job position. Finally, Plaintiffs allege that detainees who submitted to the work

8

program were awarded with more favorable living conditions, access to a common area, given greater freedom of mobility, and additional bedding or clothing. (*Id.* ¶ 52, 70–72, 76, 84–85).

Indeed, Plaintiffs allege that the Detainee Handbook, which every detainee received upon entry to the Irwin Facility, provided that a detainee who refuses to work, or to accept a program assignment,[6] may be punished by: (a) having criminal proceedings started against such detainee, (b) being placed in disciplinary segregation or restricted to the detainee's quarters, (c) loss of privileges, (d) loss of job, (e) change in housing, as well as other methods of punishment. (*Id.* ¶ 78).

Plaintiffs allege that the Defendants maintained the above conditions at the Irwin Facility as part of a "deprivation scheme" that provided the Defendants with a cheap supply of labor to operate the facility, thereby enabling Defendants to increase their profits. In summary, according to Plaintiffs, Defendants' scheme worked as follows:

(1) Detainees were deprived of (a) adequate or nutritional food and water; (b) basic necessities and hygiene products such as soap, shampoo, toothpaste, and toothbrush; (c) adequate or timely medical products or care, some of which medical needs were the result of rashes or other reactions resulting from the low quality hygiene products that were supplied; and (d) affordable or sufficient contact with legal representatives, immigration officials, and loved ones.

(2) The commissary, owned by Defendants, was detainees only source to purchase the food, drinks, basic necessities, hygiene products, medical products, and other items that Defendants were supposed to, but did not, provide to detainees.

---

[6] The Plaintiffs have not indicated whether the above punishments are imposed only on a detainee who has first agreed to work under the Voluntary Work Program, or whether Defendants imposed those punishments on detainees who had not entered the Voluntary Work Program. The PBNDS provides that a detainee "shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping." PBNDS § 5.8(II)(2). Thus, the Court interprets this allegation to mean that the Detainee Handbook provided that such punishments may be imposed on detainees who had volunteered to work under the program, and then refused to work—rather than interpreting the allegation to allege that Defendants were also attempting to force detainees to work who had not agreed to enter the Voluntary Work Program. A copy of the Detainee Handbook is not in the record of this case. Plaintiffs' mere reference to a copy of the Detainee Handbook filed in another case in this Court is insufficient to bring such document into the record of this case. Nor has the Detainee Handbook been authenticated so as to permit the Court to consider such document as one of the extrinsic documents that the Court may consider in resolving the current Motions to Dismiss.

9

(3) The detainees had to pay excessive fees to receive adequate access to the Irwin Facility tablets or pay exorbitant phone expense to effectively communicate with their legal representatives, immigration officials, or loved ones;

(4) Detainees participated in the voluntary work program to earn money to purchase the products which Defendants were supposed to provide to them;

(5) Once detainees were in the voluntary work program, Defendants used multiple threats outlined above to force the detainees to continue to work.

Therefore, according to Plaintiffs, participation in the voluntary work program was not voluntary. (*Id.* ¶ 51).

## IV.  SUMMARY OF THE MOTIONS TO DISMISS

Each Defendant contends that Plaintiffs failed to allege with specificity facts against such Defendant that are sufficient to establish any cause of action against that Defendant. The Court finds, for purposes of the Motions to Dismiss, that such arguments are without merit. Plaintiffs allege that all of the Defendants comprise a single privately-held, for-profit business that owns and operates the Irwin Facility. Indeed, the Defendants admitted at the hearing, that multiple LaSalle entities, in multiple states, use the tradename "LaSalle Corrections." Under the motion to dismiss standard, the Court accepts the Plaintiffs' allegations as true.

Defendant LaSalle SE moves to dismiss the Complaint under Rule 12(b)(6) for failure to state a claim as to all five Counts. As noted above, Defendants LaSalle Management and LaSalle Corrections adopted and incorporated LaSalle SE's Rule 12(b)(6) arguments into their motion to dismiss (Doc. 37). Defendant CGL/LaSalle Irwin Properties "conditionally" joins and adopts the arguments in the LaSalle SE MTD, "if the instant *Motion to Dismiss* for lack of jurisdiction is denied." (Doc. 39-1 at 11 (emphasis in original)). However, CGL/LaSalle Irwin Properties did not present a lack of personal jurisdiction argument in its motion to dismiss (Doc. 39-1); and Plaintiffs' response, not surprisingly, did not address any such argument (Doc. 47). Granted, CGL/LaSalle Irwin Properties included a statement in its Standard of Review that: "The plaintiff has the burden of establishing a prima facie case of personal jurisdiction over a nonresident defendant. . . . Where the defendant submits affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce

10

evidence supporting jurisdiction." (*Id.* at 4 citations omitted). This is the entirety of any jurisdictional argument present in CGL/LaSalle Irwin Properties' motion to dismiss. CGL/LaSalle Irwin Properties did not raise a lack of personal jurisdiction as to itself at the hearing, and the Court's Order, as amended (Docs. 62, 66, 72), allowing limited discovery on the issue of personal jurisdiction, applied only to the motion to dismiss (Doc. 37) filed by LaSalle Management and LaSalle Corrections.

The "courts have an independent obligation to determine whether subject matter jurisdiction exists." *Hensley v. Hartford Cas. Ins. Co.*, 113 F.4th 1327, 1332 (11th Cir. 2024). However, the Court has no obligation to search the record for facts that might support, or be relevant to, CGL/LaSalle Irwin Properties' *personal* jurisdiction argument, and the Court declines to do so. *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 (11th Cir. 2007) (declining to address perfunctory and underdeveloped argument); *Holland v. Dep't of Health & Hum. Servs.*, 51 F. Supp. 3d 1357, 1373 (N.D. Ga. 2014). Thus, to the extent CGL/LaSalle Irwin Properties attempts or intends to raise an argument that the Court lacks personal jurisdiction over CGL/LaSalle Irwin Properties, the Court finds such argument has been abandoned. The Court will solely address the Rule 12(b)(6) arguments explicitly made and developed in CGL/LaSalle Irwin Properties' brief (Doc. 39-1), including those arguments adopted from the LaSalle SE MTD, to the extent they are shown to be applicable to CGL/LaSalle Irwin Properties.

## V.    LASALLE SOUTHEAST, LLC'S MOTION TO DISMISS (DOC. 36)

LaSalle SE attempts to recharacterize Plaintiffs' allegations as violations of the Eighth Amendment based on Plaintiffs' conditions of confinement and violations of the Fair Labor Standards Act minimum wage standards. The question in a Rule 12(b)(6) motion is whether the Plaintiffs stated a claim under the law or statutes as alleged in their Complaint. It is not the Defendants' prerogative to recharacterize Plaintiffs' claims. The Court agrees with Plaintiffs and rejects such attempt at recharacterization. (Doc. 45 at 6).

### A. Plaintiffs Alleged Sufficient Facts to State a Claim under the TVPA

The TVPA prohibits anyone from knowingly providing or obtaining the labor or services of a person by one or more of the following means:

11

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme . . . intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

18 U.S.C. § 1589(a). The violations of § 1589(a) are stated in the alternative. Thus, for purposes of defeating the LaSalle SE MTD as to Count I, Plaintiffs need only allege sufficient facts to establish the elements of any one of subparagraphs (1) through (4) of § 1589(a). Further, anyone who knowingly benefits, financially or by receiving anything of value, from another's violation of the TVPA has also violated the statute. *Id.* § 1589(b). Section 1595 permits injured parties to bring private causes of action against the alleged offenders and against anyone who is alleged to have knowingly assisted in or benefitted from the violations.

In arguing that the Plaintiffs failed to state a claim against Defendants for violations of the TVPA, LaSalle SE begins by pointing out that "Congress explicitly declared that the purpose of the TVPA was 'to combat *trafficking in persons*, a contemporary manifestation of *slavery* whose victims are predominantly women and children, to ensure just and effective punishment of *traffickers*, and to protect their victims.'" (Doc. 36-1 at 6 (emphasis in original)). To the extent, if any, that LaSalle SE contends that it is not subject to the provisions of the TVPA or that Plaintiffs are not the parties whom Congress intended to protect by enacting the TVPA, LaSalle failed to develop such argument, and it is waived. *U.S. Steel Corp.*, 495 F.3d at 1287. Further, and more significantly, the Eleventh Circuit has found

> [T]hat: (1) under the plain language of the statute, the TVPA covers the conduct of private contractors operating federal immigration detention facilities; (2) the TVPA does not bar private contractors from operating the sort of voluntary work programs generally authorized under federal law for aliens held in immigration detention facilities; but (3) private contractors that operate such work programs are not categorically excluded from the TVPA and may be liable if they knowingly obtain or procure the labor or services of a program participant through the illegal coercive means explicitly listed in the TVPA.

*Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1271 (11th Cir. 2020) [hereinafter "*Barrientos II*"].

Plaintiffs' first three counts allege violations of §§ 1589, 1594(a), and 1590 of the TVPA. LaSalle SE did not address the Plaintiffs' three TVPA counts separately. Rather, it asserts all of the claims fail because Plaintiffs have not alleged sufficient facts to establish the required elements of the forced labor claim under § 1589. LaSalle SE states the standard of review correctly. However, the Court has reviewed the LaSalle SE MTD, and notes that the vast majority of its arguments seek to have the Court rule on the merits of the Plaintiffs' claims as opposed to determining whether the Plaintiffs have alleged sufficient facts to establish those claims for the requirements of pleadings. Thus, such arguments by Defendants are more appropriate at the summary judgment stage rather than at the present motion to dismiss stage.

Plaintiffs allege that Defendants coerced the labor of Plaintiffs through the abuse or threatened abuse of law and legal process, in violation of 18 U.S.C. § 1589(a)(3). The TVPA defines "abuse or threatened abuse of law or legal process" as "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." *Id.* § 1589(c)(1). Plaintiffs allege the Detainee Handbook specifically provides that a detainee who refuses to work may be punished by having criminal proceedings started against such detainee. Plaintiffs clearly allege that Defendants threatened to initiate criminal proceedings against detainees when they refused to work.

In addition, Plaintiffs allege that Defendants used physical restraint, or threats of same, to force Plaintiffs to work in violation of § 1589(a)(1), and in particular, Plaintiffs allege that Defendants threatened to, or did, restrain Plaintiffs in their cells or placed detainees in solitary confinement if they refused orders to work. Further, the Detainee Handbook provided that detainees who refused to work may be placed in disciplinary segregation or restricted to the detainee's quarters.

Finally, TVPA § 1589(a)(2) is violated when the labor or services of a person is obtained by means of serious harm or threats of serious harm.

> Courts have long recognized that "solitary confinement bears 'a further terror and peculiar mark of infamy.'" *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (quoting *In re Medley*, 134 U.S. 160, 170 (1890). Solitary confinement alone constitutes serious harm, which Congress defined to include

13

> psychological harm. *See* 18 U.S.C. § 1589(c)(2). Thus, the court finds that solitary confinement, or the threat of solitary confinement, sufficiently alleges the means to achieve forced labor, and the court therefore concludes that [plaintiff] has sufficiently stated a claim for a TVPA violation sufficient to overcome the motion to dismiss.

*Gonzalez v. CoreCivic, Inc.*, No. 1:18-CV-169-LY, 2019 WL 2572540, at *2 (W.D. Tex. Mar. 1, 2019), *aff'd*, 986 F.3d 536 (5th Cir. 2021). Plaintiffs allege that Defendants' threats to, or restriction of detainees to their cells or placing detainees in solitary confinement if they refused orders to work also violated § 1589(a)(2) because such tactics caused serious harm, or were threats to cause serious harm. Again, the Detainee Handbook provided that detainees who refused to work may be placed in disciplinary segregation or restricted to the detainee's quarters.

At this stage, the Plaintiffs plausibly alleged claims under the physical restraint or threats of physical restraint prong of the TVPA § 1589(a)(1); serious harm or threats of serious harm prong of the TVPA § 1589(a)(2); and under the "legal process" prong of the TVPA § 1589(a)(3). LaSalle SE did not develop any arguments addressing Plaintiffs' allegations in Counts II and III which asserted violations of TVPA §§ 1594(a) and 1590, respectively. Accordingly, the LaSalle SE MTD Plaintiffs' TVPA claims contained in Counts I, II, and III of the Complaint is **DENIED**.

### B. Plaintiffs Alleged Sufficient Facts to State a Claim for Unjust Enrichment under Georgia Law

LaSalle SE asserts that Plaintiffs' unjust enrichment claim should be dismissed because it is preempted by federal law and because, even if not preempted, LaSalle SE's compensation to Plaintiffs was not unjust as Plaintiffs were not entitled to be compensated at the federal minimum wage while detained at ICDC.

Plaintiffs counter that they are not asserting that Defendants violated the federal minimum wage or that they were entitled to be compensated at that rate. Rather, Plaintiffs contend that the federal or Georgia minimum wage might be relevant in establishing the amount of the benefit Defendants gained by Plaintiffs' work if Defendants had been required to hire outside workers. Plaintiffs further contest that federal law has preempted their claim. In addition, Plaintiffs allege Defendants were unjustly enriched because Plaintiffs were forced

14

to purchase items from the Defendants' commissary at exorbitant prices to pay for basic necessities, medical products, and hygienic products that Defendants should have been providing to the detainees.

Considering Georgia law, the court in *Barrientos I*, stated: "The concept of unjust enrichment in law is premised upon the principle that a party cannot induce, accept, or encourage another to furnish or render something of value to such party and avoid payment for the value received." *Barrientos I*, 332 F. Supp. 3d at 1312-13. In *Barrientos I*, the district court found that an unjust enrichment claim can be based on the detainees allegations of coercion. *Id.* at 1313. The court noted that plaintiffs/detainees alleged that the defendant, a private contractor operating an ICE detention facility, coerced plaintiffs to provide labor to defendant, defendant benefitted from that labor, and that defendant should compensate plaintiffs for the benefit conferred because it would be unjust to allow defendant to retain such benefit. *Id.* Based on those allegations, the court stated that it could not "say that Georgia would not recognize an unjust enrichment claim under these circumstances." *Id.* As such, the court denied defendant's motion to dismiss plaintiffs' unjust enrichment claims. *Id.*

Here, Plaintiffs allege that the Defendants, together a conglomerate operating an ICE detention facility, coerced Plaintiffs to provide labor to Defendants, Defendants benefitted from that labor, and that Defendants should compensate Plaintiffs for the benefit conferred because it would be unjust to allow Defendants to retain such benefit.

Like the court in *Barrientos I*, the Court finds that Plaintiffs have stated a plausible claim against Defendants for unjust enrichment. Accordingly, the LaSalle SE MTD Plaintiffs' unjust enrichment claim, Count IV of the Complaint, is **DENIED**.

### C. Plaintiffs Alleged Sufficient Facts to State a Claim under the ATS

The Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, enacted in 1789, contains a single sentence: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." *Id.* "Deconstructed, the ATS provides federal district courts with jurisdiction to hear cases that contain the following four elements: (1) a civil action (2) by an alien (3) for a tort (4) committed in violation of the law of nations or a treaty of the United States." Stephen P. Mulligan, Cong. Rsch. Serv., R44947, *The Alien Tort Statute: A Primer* 1 (2022). The first three elements are self-

15

explanatory and easily met by Plaintiffs. It is the fourth element that requires further review. This element requires that the tort asserted—here forced labor—be committed in violation of (a) the law of nations or (b) of a treaty of the United States. *See Magnifico v. Villanueva*, 783 F. Supp. 2d 1217, 1223–24 (S.D. Fla. 2011) ("To bring a cause of action under the ATS, the plaintiff must be an alien suing for a tort committed in violation of the law of nations"). Plaintiffs assert that by forcing Plaintiffs to work, Defendants violated both the law of nations and a treaty of the United States.

    1. <u>Law of Nations Violations</u>

With respect to causes of action under this first clause of the ATS, the Supreme Court has found that the ATS is only jurisdictional, and "at the time of enactment the jurisdiction enabled federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law[.]" *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 (2004). At the time the ATS was enacted in 1789, the limited claims recognized for purposes of the statute were violations of safe conducts, infringement of the rights of ambassadors, and piracy. *Id.* at 724. After thoroughly analyzing the history of the ATS, the Supreme Court found that modern-day ATS jurisdiction is not limited to those three actions. *Id.* at 724. However, the Supreme Court found that district courts should exercise restraint and "require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." *Id.* at 725. If the district court determines that the claim meets this first criteria, then the court should determine whether allowing the case to proceed is an "appropriate" exercise of judicial discretion. *Id.* at 738.

Plaintiffs allege that in forcing the detainees to work, the Defendants violated customary, widely accepted international law regarding human rights which prohibit forced labor of civilly detained people. Defendants argue that what constitutes "forced labor" is not sufficiently defined and universally recognized to be cognizable under the ATS. As support for their position that the prohibition of forced labor is a "specific, universal, and obligatory norm," the Plaintiffs point to multiple treaties and conventions that many countries, including the United States, have ratified or signed, including the Slavery Convention of 1926 and the later Supplementary Convention on the Abolition of Slavery, the Slave Trade, Institutions and

Practices Similar to Slavery, the United Nations International Labour Organization Convention No. 29 Concerning Forced or Compulsory Labour ("ILO Convention 29"), and the ILO Abolition of Forced Labour Convention (No. 105) ("ILO Convention 105"). The Court finds that action taken by a party to force a class of individuals to work would violate specific norms accepted by the civilized world, and further finds that allowing this claim to proceed is an appropriate exercise of discretion. *See Magnifico*, 783 F. Supp. 2d 1224 n. 6 (denying defendant's motion to dismiss plaintiffs' TVPA and ATS claims, and stating "the undersigned has no doubt that human trafficking and forced labor violate specific norms accepted by the civilized world.")

### 2. United States Treaty Violations

Plaintiffs also assert that Defendants' coercion of labor from the detainees, as detailed in the allegations in the Complaint, violate the Slavery Convention of 1926 and ILO Convention 105. The United States is a signatory to both treaties. LaSalle SE contends that Plaintiffs' claim of forced labor under the ILO Convention 29 via the ATS should be dismissed because federal courts have held that the ILO Convention 29 does not provide a cause of action under the ATS where the United States did not ratify the convention.

Plaintiffs note they have not stated a claim under ILO Convention 29. Rather, the Plaintiffs refer to the ILO Convention 29 only because it includes the definition of "forced labor" which is adopted by the Slavery Convention of 1926. LaSalle SE did not move to dismiss Plaintiffs ATS claim based on violations of the Slavery Convention of 1926 or ILO Convention 105.

The Court finds that Plaintiffs have stated a plausible claim against Defendants for violations of the ATS. Accordingly, the LaSalle SE MTD Plaintiffs' ATS claim, Count V of the Complaint, is **DENIED**.

### D. Ruling on Class Certification is Premature

Citing to *Barrientos v. CoreCivic, Inc.*, No. 4:18-CV-70, 2023 WL 266852 (M.D. Ga. Mar. 28, 2023) [hereinafter *Barrientos III*], LaSalle SE asserts that Plaintiffs claims are ill-suited for a class action and requests that the class action allegations be dismissed. As the Plaintiffs note, discovery has not been conducted in this case. Further, based on the references to

17

evidence and discovery contained in *Barrientos III*, 2023 WL 266852, at *3–4, it is clear that the Court there was not making its decision based solely on the face of the complaint, as LaSalle SE is requesting the undersigned to do at this time.

> While it is sometimes possible to decide the propriety of class certification from the face of the complaint, the Supreme Court has emphasized that class certification is an evidentiary issue, and it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.

*Herrera v. JFK Med. Ctr. Ltd. P'ship*, 648 F. App'x 930, 934 (11th Cir. 2016) (internal quotations marks omitted) (citation omitted). LaSalle seems to believe that because the facts and claims in this case are substantially similar to those in *Barrientos III*, that the issue of class certification is easily resolved. The undersigned notes that the first statement in *Barrientos III*, is that the Court "has spent too much time considering the pending motion for class certification, partly because it has been vacillating on whether the claims in this case are appropriate for class resolution." *Id.* 2023 WL 266852 at, *1. While the *Barrientos III* Court came to the conclusion that plaintiffs there failed to carry their burden of establishing that the case should be certified for class-action purposes, it is clear that it did not come to that decision lightly, and it is highly questionable, given the Court's vacillation, that it would have done so without allowing some discovery.

Accordingly, the Court finds LaSalle SE's request to dismiss the Plaintiffs' class allegations is premature, and thus it is **DENIED, WITHOUT PREJUDICE**. The Court will consider whether a class should be certified upon the filing of an appropriate Rule 23 motion presented after appropriate discovery is conducted.

### VI. CGL/LASALLE IRWIN PROPERTIES, LLC'S MOTION TO DISMISS (DOC. 39)

CGL/LaSalle Irwin Properties adopted the LaSalle SE MTD with respect to the Rule 12(b)(6) arguments, reserving any additional arguments contained in its own motion to dismiss (Doc. 39). Like LaSalle SE, CGL/LaSalle Irwin Properties asserts the TVPA claims fail because Plaintiffs have not alleged sufficient facts to establish the required elements of the forced labor claim and because Plaintiffs have not alleged that CGL/LaSalle Irwin Properties forced Plaintiffs to work. These arguments have been addressed above and found to be unpersuasive.

CGL/LaSalle Irwin Properties presents an additional argument—that its mere ownership of the Irwin Facility building is insufficient to subject it to liability for injuries sustained by "invitees." (Doc. 39-1 at 6). According to CGL/LaSalle Irwin Properties, a property owner, "is not an insurer of the safety of the entrants, and no presumption of liability attaches to an owner or occupier from a mere showing that an alleged employment injury was sustained by someone who was on the premises." (Doc. 39-1 at 6). CGL/LaSalle Irwin Properties failed to develop this confusing, unreasoned argument, and the Court declines to consider it further. *U.S. Steel Corp.*, 495 F.3d at 1287.

CGL/LaSalle Irwin Properties also contends it had nothing to do with the operation, management, or maintenance of the Irwin Facility, and that Plaintiffs failed to allege with specificity facts against CGL/LaSalle Irwin Properties sufficient to establish any cause of action. However, as the Court previously noted, for purposes of resolving the Motions to Dismiss, the Court accepts the Plaintiffs' allegations as being made against each Defendant whether specifically named or not.

The Court finds that Plaintiffs have plausibly alleged claims under the physical restraint or threats of physical restraint prong of the TVPA § 1589(a)(1); serious harm or threats of serious harm prong of the TVPA § 1589(a)(2); and/or under the "legal process" prong of the TVPA § 1589(a)(3). Further, a beneficiary of the alleged wrongful conduct may be liable under the TVPA § 1589(b). Accordingly, the CGL/LaSalle Irwin Properties MTD Plaintiffs' TVPA claims contained in Count I of the Complaint is **DENIED**.

With respect to Counts II through V of the Complaint, CGL/LaSalle Irwin Properties adopted LaSalle SE's MTD without advancing any additional arguments. The Court has denied the LaSalle SE MTD with respect to Counts II through V. Accordingly, for the same reasons stated above pertaining to the denial of the LaSalle SE MTD, the CGL/LaSalle Irwin Properties MTD Counts II through V is **DENIED**.

## VII. CONCLUSION

Based on the foregoing, it is hereby **ORDERED**, that:

19

1. LaSalle Southeast, LLC's Rule 12(b)(6) Motion to Dismiss (Doc. 36), including its request for dismissal of the class allegations, is **DENIED**. The denial of the request for dismissal of the class allegations is **without prejudice**.

2. The Motion to Dismiss on Behalf of CGL/LaSalle Irwin Properties, LLC Pursuant to Rule 12(b)(6) (Doc. 39) is **DENIED**. Such motion (Doc. 39) is further **DENIED**, to the extent Defendant CGL/LaSalle Irwin Properties, LLC, attempted or intended to present an argument to dismiss for lack of personal jurisdiction under Rule 12(b)(2).

3. The Motion to Dismiss on Behalf of LaSalle Management Company, L.L.C. and LaSalle Corrections, LLC Pursuant to Rule 12(b)(2) and Rule 12(b)(6) (Doc. 37) is resolved as follows:

   A. At the conclusion of the October 17, 2024 supplemental briefing deadline, the Rule 12(b)(2) motion contained in Doc. 37 will be taken under advisement, and a separate order will be entered with respect thereto at the appropriate time; and

   B. The Rule 12(b)(6) motion contained in Doc. 37 is **DENIED, WITHOUT PREJUDICE**, solely for the purpose of permitting Defendants LaSalle Management Company, L.L.C. and LaSalle Corrections, LLC, the opportunity to file a renewed Rule 12(b)(6) motion in the event their Rule 12(b)(2) motion is denied *and* that denial results in a proper basis to file a renewed Rule 12(b)(6) motion.

**SO ORDERED**, this 30th day of September 2024.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**