IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

NILSON BARAHONA,                          :
NIKOLAS GAZETAS, and                      :
OMAR ISAIAS TAVIRA GARCIA,                :
                                          :
                                          :
        Plaintiffs,                       :
    v.                                    :       CASE NO:
                                          :       7:23-cv-24-WLS
LASALLE MANAGEMENT COMPANY, L.L.C.,       :
d/b/a LASALLE CORRECTIONS,                :
LASALLE SOUTHEAST, LLC,                   :
LASALLE CORRECTIONS, LLC,                 :
CGL IRWIN PROPERTIES, LLC, and            :
CGL/LASALLE IRWIN PROPERTIES, LLC         :
                                          :
        Defendants.                       :
_____   :

## ORDER

Before the Court is the Motion to Dismiss on Behalf of LaSalle Management Company, L.L.C. and LaSalle Corrections, LLC Pursuant to Rule 12(b)(2) and Rule 12(b)(6) (Doc. 37) ("Rule 12(b)(2) Motion"). For the reasons discussed herein, the Motion, as made under Rule 12(b)(2), is **DENIED IN PART and GRANTED IN PART**.

## I.    BACKGROUND

### A. Parties

Plaintiffs, Nilson Barahona, Nikolas Gazetas, and Omar Isaias Tavira Garcia, are former civilly-detained immigrants who were each at the Irwin County Detention Center ("Irwin Facility") in Ocillia, Georgia, for periods of time between about June 2019 and January 2021. On June 16, 2023, Plaintiffs filed their First Amended Complaint (Doc. 30) ("Complaint")[1] alleging five causes of action against LaSalle Management Company, L.L.C., d/b/a LaSalle Corrections ("LaSalle Management") and LaSalle Corrections, LLC. Together LaSalle Management and LaSalle Corrections, LLC are referred to herein as the "Moving

---

[1] Plaintiffs' original complaint was filed March 10, 2023.

Defendants." Also named as Defendants are LaSalle Southeast, LLC ("LaSalle SE"), CGL Irwin Properties, LLC, and CGL/LaSalle Irwin Properties, LLC. ("CGL/LaSalle Irwin"). The Moving Defendants, LaSalle SE, CGL Irwin Properties, LLC, and CGL/LaSalle Irwin are referred to collectively as "Defendants."

### B. Motions to Dismiss

On July 21, 2023, LaSalle SE and CGL/LaSalle Irwin filed motions to dismiss under Rule 12(b)(6) (Docs. 36 & 39, respectively) (together with the Moving Defendants' Rule 12(b)(2) Motion, the "Motions to Dismiss"). On that same date, the Moving Defendants filed the instant Rule 12(b)(2) Motion, in which they specially appeared to contest the Court's personal jurisdiction over them, and alternatively, incorporated LaSalle SE's arguments for dismissal under Rule 12(b)(6). On September 8, 2023, Plaintiffs filed Responses (Docs. 45, 46, & 47) to the Motions to Dismiss, and on October 6, 2023, Defendants filed Replies (Docs. 50, 51, & 52). On June 25, 2024, the Court heard oral arguments on the Motions to Dismiss (Docs. 36, 37, & 39).[2]

At the conclusion of the June 25, 2024 hearing, the Court took the Rule 12(b)(6) portions of the Motions to Dismiss under advisement (*see* Doc. 62). In its Order entered September 30, 2024, denying the Motions to Dismiss as to Rule 12(b)(6), the Court determined that the Plaintiffs stated plausible claims against Defendants, including the Moving Defendants, under the TVPA, for unjust enrichment, and for violations of the ATS. (Doc. 73 at 14–17).[3]

At the request of the Plaintiffs, the Court allowed Plaintiffs until August 24, 2024, to conduct limited discovery into the jurisdictional issues raised in the Moving Defendants' Rule

---

[2] This case was originally assigned to the Late Judge Hugh Lawson. A hearing on the Motions to Dismiss which had been scheduled for February 29, 2024, before Judge Lawson was continued. On April 8, 2024, the case was reassigned to the undersigned and the hearing was rescheduled for June 25, 2024.

[3] The Moving Defendants chose to present their 12(b)(2) and 12(b)(6) motions as alternate bases for dismissal. Instead of setting out separate arguments for dismissal under Rule 12(b)(6), they adopted and incorporated LaSalle SE's arguments for dismissal under Rule 12(b)(6). (*See* Docs. 36 & 37). As such, the Court addressed the Moving Defendants' Rule 12(b)(6) motion at the same time as LaSalle SE's Rule 12(b)(6) motion. (*See* Doc. 73). Therein, the Moving Defendants' Rule 12(b)(6) motion was denied without prejudice solely to allow renewal of their Rule 12(b)(6) motion in the event denial of their Rule 12(b)(2) motion results in a proper basis to file a renewed Rule 12(b)(6) motion on grounds not addressed in the Court's prior Rule 12(b)(6) Order (Doc. 73).

12(b)(2) Motion. (Doc. 62 at 2). Specifically, Plaintiffs were allowed to take the depositions of three representatives of entities with knowledge of the organizational structure, ownership interests, affiliations, etc., of those entities using, comprising, operating under, or connected with the named Defendants. Plaintiffs were allowed to propound to the Moving Defendants and/or any of the named Defendants twelve (12) interrogatories, eight (8) admissions, and eight (8) requests for production. The Parties were allowed to file supplemental briefs which were due simultaneously on September 9, 2024. After extensions of the discovery period and briefing deadlines agreed to by the Parties, supplemental briefs (Docs. 74 & 76) were filed on October 17, 2024. The Rule 12(b)(2) Motion is thus fully briefed and ripe for ruling.

### C. Plaintiffs' Claims

Because the Court has already fully discussed Plaintiffs' allegations in its September 30, 2024 Order (Doc. 73) resolving Defendants' Motions to Dismiss under Rule 12(b)(6) (Docs. 36, 39, and in part Doc. 37), the Court will not provide a full summary here. (Doc. 73 at 4–10). Instead, the Court incorporates that summary by reference (*id.*), and highlights the relevant allegations here.

The crux of Plaintiffs' Complaint is that while detained at the Irwin Facility they were deprived of the basic necessities of life including sufficient food, potable water, and medical and hygienic products. Because of this deprivation, Plaintiffs had to purchase such necessities from the Irwin Facility commissary at exorbitant prices. In addition, Plaintiffs were deprived of contact with loved ones, immigration officials, and legal representation. Finally, Plaintiffs allege they were forced to work for as little as $1 per day and were severely punished if they refused to work.

Plaintiffs allege that LaSalle SE is a subsidiary or affiliate of LaSalle Management and LaSalle Corrections, LLC, and that LaSalle SE, LaSalle Management, and LaSalle Corrections, LLC, are each responsible—directly or through one or more subsidiaries or affiliates—for the day-to-day operations of the Irwin Facility, pursuant to an Intergovernmental Service Agreement ("IGSA"). (Doc. 30 ¶¶ 21–23). A copy of the IGSA is not in the record.

Plaintiffs allege that by virtue of the IGSA, the United States Immigration and Custom Enforcement ("ICE") division of the Department of Homeland Security, contracted with Irwin County, Georgia, and Defendants  to detain, house and/or control on behalf of ICE a

minimum of 600 immigrant detainees awaiting civil immigration proceedings. (*Id.* at 9 n.9 & ¶¶ 1, 8, 28).

Private contractors operating an ICE detention facility, are subject to, and required to follow, the ICE Performance Based National Detention Standards ("PBNDS"), the relevant version of which was promulgated in 2011 and revised in 2016.[4] Under the PBNDS, detainees "shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping." PBNDS § 5.8(II)(2). Plaintiffs allege that Defendants' Detainee Handbook sets out a voluntary work program at the Irwin Facility which, as applied to the Plaintiffs/detainees, violated the requirements of the PBNDS by forcing or coercing Plaintiffs to work and punishing them if they refused to work. (Doc. 30 ¶¶ 37–39).

Under the Defendants' voluntary work program, detainees were paid $1 per day, no matter how many hours they worked. While Defendants paid $3 per day for a limited number of job positions, the vast majority of the detainees were paid $1 per day. (*Id.* ¶¶ 4–6, n.3, ¶ 45).

Plaintiffs allege the Defendants used the threats of removing detainees from the work force if a detainee refused to work or failed to complete their job responsibilities—even if they were ill or otherwise unable to work. This action would result in a detainee being unable to purchase necessities from the commissary which were not being provided as required by the PBNDS. Other tactics used by Defendants to force detainees to work included: (a) threats to impose sanctions, including solitary confinement or lockdown in a detainee's cell; (b) threats of criminal prosecution for disobeying a detention officer's order; (c) taking away detainees' free time or time that detainees could speak to their families; (d) downgrading a detainee's housing to housing that is less safe, sanitary, or private, or that was more restrictive or isolating; (e) revoking access to the commissary; and (f) denying access to medical care. Plaintiffs allege that if detainees were injured while working or otherwise in need of medical care, the detainees could not leave their work shift to seek medical attention, because if they did so, Defendants' employees and agents would threaten the detainee with the loss of their job position. Finally, Plaintiffs allege that detainees who submitted to the work program were awarded with more

---

[4] *See* U.S. Immigration & Customs Enf't, Performance-Based National Detention Standards 2011 (rev. 2016), available at, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

favorable living conditions, access to a common area, given greater freedom of mobility, and additional bedding or clothing. (*Id.* ¶ 52, 70–72, 76, 84–85).

Plaintiffs contend that the named Defendants comprise a conglomerate that operates the Irwin Facility and that due to this organizational structure all Defendants are responsible for the deprivations Plaintiffs suffered at the Irwin Facility.

The five claims stated in the Complaint are asserted against all Defendants. Counts I, II, and III assert violations of the Trafficking Victims Protection Act ("TVPA"), as amended, 18 U.S.C. §§ 1589, 1594(a), 1590, respectively. Count IV alleges a claim for unjust enrichment under Georgia common law, and Count V alleges violations of the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350. Plaintiffs seek class certification for "[a]ll civil immigration detainees who performed work for Defendants at [the Irwin Facility] starting ten years prior to the date this Action was filed (March 10, 2023) until the date of final judgment in this matter." (Doc. 30 ¶ 113).

### 1. **The TVPA**

The TVPA prohibits anyone from knowingly providing or obtaining the labor or services of a person by one or more of the following:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme . . . intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

18 U.S.C. § 1589(a). As to Count I, Plaintiffs need only allege sufficient facts to establish the elements of any one of subparagraphs (1) through (4) of § 1589(a). Further, anyone who knowingly benefits, financially or by receiving anything of value, from another's violation of the TVPA has also violated the statute. *Id.* § 1589(b). Section 1595 permits injured parties to bring private causes of action against the alleged offenders and against anyone who is alleged to have knowingly assisted in or benefitted from the violations.

### 2. Unjust Enrichment

Under Georgia law, "[t]he concept of unjust enrichment in law is premised upon the principle that a party cannot induce, accept, or encourage another to furnish or render something of value to such party and avoid payment for the value received." *Barrientos v. CoreCivic, Inc.*, 332 F. Supp. 3d 1305, 1312-13 (M.D. Ga. 2018) (Land, J.), *aff'd*, 951 F.3d 1269 (11th Cir. 2020).

### 3. Alien Tort Statute

The ATS, enacted in 1789, contains a single sentence: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." *Id.* "Deconstructed, the ATS provides federal district courts with jurisdiction to hear cases that contain the following four elements: (1) a civil action (2) by an alien (3) for a tort (4) committed in violation of the law of nations or a treaty of the United States." Stephen P. Mulligan, Cong. Rsch. Serv., R44947, The Alien Tort Statute: A Primer 1 (2022). The fourth element requires that the tort asserted—here forced labor—be committed in violation of (a) the law of nations or (b) of a treaty of the United States. *See Magnifico v. Villanueva*, 783 F. Supp. 2d 1217, 1223–24 (S.D. Fla. 2011) ("To bring a cause of action under the ATS, the plaintiff must be an alien suing for a tort committed in violation of the law of nations"). Plaintiffs allege that in forcing the detainees to work, the Defendants violated customary, widely accepted international law regarding human rights which prohibit forced labor of civilly detained people.

## II.    STANDARD OF REVIEW

"Generally, '[a] plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction.'" *N. Am. Sugar Indus., Inc. v. Xinjian Goldwind Sci. & Tech Co.*, 124 F.4th 1322, 1333 (11th Cir. 2025) (alteration in original) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009)). Even so, "[w]hen a defendant challenges personal jurisdiction in a Rule 12(b)(2) motion to dismiss, the district court must hear and decide the issue 'before trial unless the court orders a deferral until trial." *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364 (11th Cir. 2021) (quoting Fed. R. Civ. P. 12(i)). As such,

a district court has the discretion to hold an evidentiary hearing under Rule 12(i) to adjudicate the issue of personal jurisdiction. *N. Am. Sugar*, 124 F.4th at 1333 (quoting *AcryliCon*, 985 F.3d at 1364–65). In the absence of an evidentiary hearing, however, a court applies a "prima facie standard." *Id.* (evaluating Rule 12(b)(2) motion on a prima facie standard after jurisdictional discovery when no evidentiary hearing was held) (quoting *AcryliCon*, 985 F.3d at 1364–65).

Even under the prima facie standard, a "defendant challenging jurisdiction may submit 'affidavit evidence in support of its position.'" *N. Am. Sugar*, 124 F.4th at 1333 (quoting *Mazer*, 556 F.3d at 1274). If so, the burden "shifts back to the plaintiff to produce evidence supporting jurisdiction." *Id.* (quoting *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002)); *see also Polskie Linie Oceaniczne v. Seasafe Transp. A/S*, 795 F.2d 968, 972 (11th Cir. 1986) ("[T]he plaintiff is required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint" (internal quotation marks omitted)). Once the burden has shifted to the plaintiff,

> [it] meets its burden if it presents enough evidence to withstand a motion for judgment as a matter of law. *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006). The court accepts as true all unchallenged facts in plaintiff's complaint, and then considers all affidavit evidence proffered by the parties. To the extent that "the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Diamond Crystal [Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010)]. Whether the plaintiff satisfies the prima facie requirement is a purely legal question; the district court does not weigh evidence or make credibility determinations.

*AcryliCon*, 985 F.3d at 1365.

## III.    EVIDENCE OBTAINED DURING JURISDICTIONAL DISCOVERY

The Moving Defendants attached the Declaration of Sharon Bennett, Controller for LaSalle Management, (Doc. 37-2) ("Bennett Declaration") to their Rule 12(b)(2) Motion. During the limited discovery period, Plaintiffs took the depositions of (1) Ms. Bennett, (2) Robert Jay Eason, Director of Operations for Southwestern Correctional, LLC ("SW Correctional"),[5] and (3) James McCormick, who was employed as Regional Director for

---

[5] The Moving Defendants noted that at times Mr. McCormick erroneously referred to Southwest Correctional, LLC as LaSalle Southwest or Southwest Corrections. (Doc. 74 at 5 n.28). The Court notes that Southwest

LaSalle Management between 2019 and 2021, and is currently Director of Operations of SW Correctional. In addition, the Moving Defendants produced their responses to Plaintiffs' interrogatories and requests for production of documents. Plaintiffs bear the burden to meet this evidence with admissible evidence supporting jurisdiction, which they have done. *See N. Am. Sugar*, 124 F.4th at 1333.

### A. Certain Evidentiary Documents Submitted by Plaintiffs and Moving Defendants' Objections

Because Moving Defendants support their Rule 12(b)(2) Motion with a sworn declaration and deposition testimony, Plaintiffs have the burden to produce evidence to counter the assertions of fact made in the Moving Defendants' evidentiary documents. *See N. Am. Sugar*, 124 F.4th at 1333 (once defendant challenging jurisdiction submits affidavit evidence in support of its position, burden shifts back to the plaintiff to produce evidence supporting jurisdiction).

### 1. <u>Plaintiffs' Additional Evidence</u>

In addition to portions of the above evidence, Plaintiffs cite to various newspaper articles, information posted on Moving Defendants' internet webpages and social media pages. They also cite to the testimony of Dr. Pamela Hearn, the Medical Director of LaSalle Corrections, given during a hearing before the U.S. Senate on November 15, 2022 (the "Hearn Senate Testimony").[6] Finally, Plaintiffs cite to a deposition transcript filed in another case before this Court.[7] That being the deposition of Robert David Paulk, Warden of the Irwin Facility during the time period relevant to this case (the "Paulk Deposition"). (*See* Doc. 46 at 7–8 & Doc. 76 at 7, 16–17).[8]

---

Correctional, LLC is also at times referred to as LaSalle Southwestern during Mr. Eason's deposition. Consistent with the Moving Defendant's notation regarding Mr. McCormick's deposition and with their statement that Mr. Eason is the Director of Operations for Southwestern Correctional, LLC (Doc. 74 at 4), the Court construes the inconsistent references in Mr. Eason's deposition to also be to Southwest Correctional, LLC (defined herein as "SW Correctional").

[6] https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/Hearn%20Testimony.pdf.

[7] *See* Robert David Paulk Dep., *Moncus v. Lasalle Mgmt. Co.*, LLC, No. 19-cv-75 (M.D. Ga. Apr. 6, 2020), ECF No. 114).

[8] Plaintiffs also cite to Rodney Cooper's, Executive Director of LaSalle Corrections, Congressional testimony given July 13, 2020, and *available at* https://www.congress.gov/116/chrg/CHRG-116hhrg43192/CHRG-116hhrg43192.pdf, and to a report of the U.S. Department of Homeland Security Office of Inspector General,

## 2. <u>Whether Judicial Notice is Appropriate</u>

A court may take judicial notice of a fact that is not subject to reasonable dispute when either (1) it is generally known within the trial court's territorial jurisdiction or (2) it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). "The court: (1) may take judicial notice on its own; or (2) must take judicial notice if a party requests it and the court is supplied with the necessary information. . . . The court may take judicial notice at any stage of the proceeding." *Id.* 201(c)–(d). Even where it may be appropriate to take judicial notice of documents, there are limits on the use that can be made of such documents. For instance, "a court may take notice of another court's order only for the limited purpose of recognizing the "judicial act" that the order represents or the subject matter of the litigation." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994); *see also Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 651 (11th Cir.), *cert. denied* 141 S. Ct. 309 (2020) (district court acted properly when it took judicial notice of the online state court dockets and documents in petitioner's criminal cases where petitioner was on notice of court taking judicial notice and had an opportunity to object); *Thorpe v. Walter Inv. Mgmt. Corp.*, 111 F. Supp. 3d 1336, 1350 (S.D. Fla. 2015) (taking judicial notice of filings in other court cases but only "for the limited purpose of establish[ing] the fact of such litigation and related filings, and not the truth of the allegations contained within") (citation and internal quotation marks omitted).

## 3. <u>Analysis</u>

The Plaintiffs did not attach copies of the above documents to their briefs, but provided internet links or case citations to the materials. The Moving Defendants object to Plaintiffs' introduction of these materials arguing that such evidence is hearsay, unverifiable, or unreliable. (*See* Doc. 52 at 5–6.) As discussed below, the Court finds that to a certain extent the Moving Defendants are correct. As indicated by their objections, the Moving Defendants

---

OIG-22-14, Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center (Jan. 3, 2022), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf. These reports relate to Plaintiffs' assertion that the Court can exercise jurisdiction over the Moving Defendants under an alter ego theory. Because the Court need not, and does not, reach Plaintiffs' alter ego theory, it also does not consider whether it is appropriate to consider these evidentiary materials proffered by Plaintiffs.

were on notice of Plaintiffs' citation to the above materials and to the possibility that the Court could take judicial notice of such materials. The Court considers each document or category of documents in turn.

a.  <u>News Articles and Internet Websites</u>

The Court agrees with the Moving Defendants that statements contained in the various news articles and on the Moving Defendants' website and/or social media pages are inadmissible hearsay—particularly where, as here, those items are being offered for the truth of the matters asserted (*see* Doc. 52 at 2). "A statement of fact appearing in a newspaper does not itself establish that the fact is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *King v. Akima Glob. Servs.*, LLC, 775 F. App'x 617, 621 (11th Cir. 2019) (internal quotation marks omitted) (quoting Fed. R. Evid. 201(b) and *Cofield v. Ala. Pub. Serv. Comm'n*, 936 F.2d 512, 517 (11th Cir. 1991) (district court erred when it took judicial notice of news article as proof that plaintiffs had access to thousands of dollars hidden somewhere). The same can be said for "facts" purportedly derived from an internet webpage or a social media webpage.

As such, the Court finds that judicial notice is not an appropriate vehicle by which to bring those documents into evidence.

b.  <u>Dr. Pamela Hearn's U.S. Senate Testimony</u>

With respect to the Hearn Senate Testimony, the Court again agrees with the Moving Defendants. The link Plaintiffs provided merely opens an unsigned seven-page PDF with the following heading appearing on each page:

> LaSalle Opening Statement of Dr. Hearn
> Congressional Hearing
> November 15, 2022

Nothing in the resulting PDF shows that the statements contained therein are those of Dr. Hearn given during the referenced hearing before the U.S. Senate. Testimony of a hearing before the U.S. Senate may well be a document of which the Court could take judicial notice. However, the document produced from the link provided, does not satisfy the requirement that the accuracy of the testimony cannot reasonably be questioned, and the Court declines to search for the official transcript among the vast internet universe.

The Court finds it inappropriate to take judicial notice of the Hearn Senate Testimony, at least insofar as the link provided does not meet the safeguards necessary for the Court to take judicial notice of such testimony.

> c. Deposition of Warden Paulk

In the *Moncus* case Warden Paulk was the corporate designee on behalf of the "LaSalle defendants" which term included all of the Defendants named herein, except LaSalle Corrections LLC. (Doc. 76 at 16–17). Plaintiffs contend that Warden Paulk testified that the Irwin Facility "is managed by LaSalle Corrections which is the operating agent of the Irwin [F]acility and which distributes tax documents, including W-2 forms, to Irwin [F]acility employees, including to the jail's warden and administrator." (*Id.* at 17). Plaintiffs did not attach the portions of the Paulk Deposition which they wish the Court to accept as evidence.

The Moving Defendants state that Plaintiffs representations as to Warden Paulk's testimony in *Moncus* is mischaracterized. The Moving Defendants refer the Court to Warden Paulk's testimony in which Defendants contend Warden Paulk "states that he was unaware of the 'reporting function' between LaSalle Management and LaSalle Southeast and does not know of the relationships between LaSalle Management Company or LaSalle Corrections with LaSalle Southeast." (Doc. 52 at 5). The Moving Defendants request that if the Court takes judicial notice of the portion of Warden Paulk's testimony cited by the Plaintiffs, that the Court also consider Warden Paulk's testimony that is contrary to such testimony as cited by the Moving Defendants. The Moving Defendants further argue that Warden Paulk's testimony in an unrelated matter as to the business relationships of these entities is not persuasive.

Thus, the Moving Defendants do not appear to contest that the Court may take judicial notice of the Paulk Deposition given in the *Moncus* case, but contest the completeness and relevance of such testimony to the facts of this case. The Court agrees with the Moving Defendants. *See Argos USA LLC v. Young*, No. 1:18-CV-02797, 2019 WL 4125968, at *4 (N.D. Ga. June 28, 2019) (declining to take judicial notice of deposition from another case). In addition, bringing the Paulk Deposition into this case adds unnecessary conflicting testimony to the jurisdiction question presently before the Court. Plaintiffs were aware of Warden Paulk's testimony in the *Moncus* case and could have taken his deposition during their jurisdictional discovery period or filed the appropriate motion if necessary to obtain authority to take such

deposition. In other words, Plaintiffs could have taken Paulk's deposition directly as to his knowledge as support for purposes of this case, but did not.

Thus, the Court declines to take judicial notice of the Paulk Deposition from the *Moncus* case.

## B.  Summary of Sources of Jurisdictional Facts Considered

The Court is bound to make its decision on whether to exercise jurisdiction over the Moving Defendants based on the record before it. In resolving the Moving Defendants' Rule 12(b)(2) Motion, the Court may consider: (a) the Complaint (Doc. 30), to the extent it is unchallenged by the competent evidence deduced from the depositions and declaration in the record,[9] and (b) the following evidence which is consistent with the above disposition of the Moving Defendants' evidentiary objections:

1.    The Bennett Declaration;

2.    Excerpts of the depositions of Ms. Bennett (Docs. 74-3 & 74-5), Mr. Eason (Doc. 74-4), and Mr. McCormick (Doc. 74-6), attached as exhibits to the Moving Defendants' Supplemental Brief;

3.    Moving Defendants' responses and objections to written discovery requests propounded by Plaintiffs attached as exhibits to the Moving Defendants' Supplemental Brief or filed separately under seal (Docs. 74-1, 74-2, 80, 80-1 & 80-2);[10] and

4.    Excerpts of the depositions of Ms. Bennett (Doc. 76-1), Mr. Eason (Doc. 76-3), and Mr. McCormick (Doc. 76-2) attached as exhibits to Plaintiffs' Supplemental Brief.

## C.  Statement of Jurisdictional Facts

### 1.  <u>Organization Information and Relationships Among Defendants</u>

LaSalle Management is a Louisiana limited liability company with its principal office located at 192 Bastille, Ste. 200, Ruston, Louisiana. (Doc. 37-2 Bennett Decl. ¶ 26; Doc. 80-2 at 1). Its registered agent is William K. McConnell, who is located at that same address. (Doc. 80-2 at 1). LaSalle Management is owned equally by its two members, McConnell Southeast

---

[9] *See N. Am. Sugar*, 124 F.4th at 1333 ("The Court accepts as true all unchallenged facts in plaintiff's complaint[.]").

[10] Ms. Bennett assisted LaSalle Management's legal counsel in responding to interrogatories propounded by Plaintiffs to LaSalle Management. (Doc. 80 at 4).

Corrections, LLC and P. H. Temple Family Interests, LP, both of which are located at the same address as LaSalle Management and its registered agent. (*Id.* & Doc. 80 at 5).

LaSalle Corrections, LLC is a Louisianna limited liability company. (*Id.* ¶ 11). "[I]ts principal place of business, its executive officers, and its managers are all located in Louisiana." (*Id.* ¶ 20). According to the Moving Defendants, LaSalle Corrections, LLC is an unused entity. (*Id.* ¶ 11). It has no contacts, employees, or business relationships. (*Id.*) "As an unused entity, LaSalle Corrections, LLC does not engage in and has never engaged in any conduct whatsoever in or relating to the state of Georgia, or *engaged in any conduct in or relating to any state other than Louisiana.*" (*Id.* ¶ 12 (emphasis added)). The Moving Defendants did not provide any information as to the identity of the owners, organizers, subsidiaries, affiliates, or any such information relating to LaSalle Corrections, LLC.

Insofar as connections among LaSalle Management, LaSalle Corrections, LLC, and LaSalle SE, Ms. Bennett declares:

1.    LaSalle Management is not a member of or parent company to LaSalle SE. (Doc. 37-2 Bennett Decl. ¶ 28).

2.    LaSalle Management is not a member of or parent company to LaSalle Corrections, LLC. (*Id.* ¶ 28).

3.    LaSalle Corrections, LLC is not a member, affiliate, parent or subsidiary of LaSalle SE. (*Id.* ¶ 13).

4.    LaSalle Corrections, LLC is not the parent company to, member of, or affiliate of, LaSalle Management. (*Id.* ¶ 29).

5.    LaSalle SE is not the parent company to, member of, or affiliate of, LaSalle Management. (*Id.*)

"LaSalle Corrections" is a tradename registered with the Louisiana Secretary of State and owned by LaSalle Management. (*Id.* ¶ 8). The trade name "is used generically to refer to a number of other entities bearing the LaSalle brand, including LaSalle Southeast, LLC." (*Id.* ¶ 9; *see also* Doc. 74-4 Eason Dep. 27:12–19 ("Well, first off, LaSalle Corrections is just a broad term, kind of a trademark or brand name that we use, you know[.]")).[11]

---

[11] Mr. Eason reports directly to Mr. Cooper (Eason Dep. 31:17–18 (Doc. 76-3)), who reports to the managing director of Lasalle Management, Mr. McConnell (*Id.* 30:3–12).

### 2. **Contacts through LaSalle Management Accounting and Support Services**

In her position as Controller for LaSalle Management, Ms. Bennett's "job responsibilities include, but are not limited to, managing accounts payable, payroll, accounting, and other [unspecified] financial services for [LaSalle Management]." (Doc. 37-2 Bennett Decl. ¶¶ 4–5). Ms. Bennett and the members of the accounting team which she supervises do not travel outside of Louisiana as part of their duties for LaSalle Management. (Doc. 74-3 Bennett Dep. 24:14–25:4). LaSalle SE does not have its own accounting department, but Ms. Bennett and account team members are able to access LaSalle SE's financial books and records, and the accounting team distributes payments on behalf of LaSalle SE. (Doc. 76-1 Bennett Dep. 43:21–44:3, 44:22–24). Ms. Bennett uses her same unique user name and password to access LaSalle SE's financial records as she does when she accesses LaSalle Management's financial records. (Doc. 74-3 Bennett Dep. 34:3–14). LaSalle SE pays LaSalle Management a management fee for LaSalle Management's accounting and support services. (Doc. 74-5 Bennett Dep. 24:16–19).

LaSalle SE sends all of its bills to LaSalle Management. The accounting team members process the expenses on LaSalle SE's behalf. Specifically, the members review the bills to be sure they have not already been paid, ensures timely payment, and retains copies of the paid bills. (Doc. 76-1 Bennett Dep. 47:19–48:23). Ms. Bennett explained that this service "provides us [LaSalle Management] the means of getting the activity, activity being revenues and expenses, to each of those into the accounting software . . . , for us to have a financial picture on a monthly basis." (*Id.* 48:6–10).

Further, LaSalle Management's personnel conducts audits of LaSalle SE's income and expenses. As to internal audits, Ms. Bennett explained:

> [W]e're in a consistent or a continuous auditing stage. . . . Based on the review, speaking specifically for LaSalle Southeast, as I stated earlier, they generate their own expenses. *The field is responsible for sending us those invoices.* The accounting team, part of the services that we provide for LaSalle Southeast is that we review those invoices as they come in, make sure that it makes sense to *us* [LaSalle Management], that . . . it's legible, that we can make a clear determination that we have not paid it on their behalf before.
>
> So, same thing with the payroll department. As stated earlier, the field generates calculations of hours for all the employees that they are requesting to

be paid during that time period. Those reports are sent to the *LaSalle Management corporate payroll team*, and as part of that service that we provide to LaSalle Southeast we review what they are asking us to pay, and we're running our own audit calculations of times and hours, regular overtime deductions. *So, I think we're in a continuous audit stage with the service that we provide.*

(Doc. 74-5 Bennett Dep. 22:16–23:12 (emphasis added)). LaSalle Management's accounting team also prepares "the normal accounting processes of financial reporting" for LaSalle SE. (*Id.* 30:6–17).

     Ms. Bennett further described the assistance she provides external auditors as part of the accounting and administrative services she oversees "on behalf of LaSalle Management Company for LaSalle Southeast," stating

[Such services] could include anything from documents that our external auditors need. It could be payroll registers. It could be validation of expenses that were paid. It could be 401(k) audits for those employees. Things such as like that, that our external auditors, you know, that they're doing, we're providing those documents for them.

(Doc. 74-5 Bennett Dep. 22:2–12). LaSalle Management's payroll team finalizes the figures for LaSalle SE's payroll, confirms with the accounting team that LaSalle SE's payroll account is funded, and then the payroll team completes the payroll process by uploading the payroll file to LaSalle SE's bank. "So, on the check date those deposits will hit . . . the individual's bank account" if such individual "has chosen direct deposit." (Doc. 74-3 Bennett Dep. 54:15–17; *see also generally id.* at 54–56). Further, if a check is designated to be printed, a hard copy of the check is printed, two signatures are obtained, and the check is mailed out. (Doc. 74-3 Bennett Dep. 54:18–21). LaSalle SE's payroll is funded out of LaSalle SE's operating account. (*Id.* at 55:21–23). It is significant to note, in accordance with Ms. Bennett's testimony, issues that may arise from LaSalle SE's submissions are not referred back to LaSalle SE for clarification or decision to pay, but to the LaSalle Management teams.

### 3.  Additional Contacts

     Although LaSalle Management contends that the accounting and support services provided by Ms. Bennett and the accounting department are the only contacts between LaSalle Management and LaSalle SE, through the jurisdictional discovery, it appears that is not entirely accurate. Between 2019 and 2021, Mr. McCormick was employed as Regional Director for

LaSalle Management. During that time, Mr. McCormick reported to Rodney Cooper, the Executive Director of LaSalle Management. Mr. McCormick's duties included overseeing provision of services to detention facilities in Louisiana and Georgia. As Regional Director, six facility wardens, including Warden David Paulk at the Irwin Facility, reported to Mr. McCormick. (Doc. 74-6 McCormick Dep. 30:9–16, 32:9–13, 36:20–25, 53:23–54:1).

While he was Regional Director for LaSalle Management, Mr. McCormick spoke with Warden Paulk about detainee issues and would discuss "[a]ny type of issues that may be relevant at the moment or at the – during the time[,]" (*Id.* 53:23–54:1), including food and security issues. Mr. McCormick does not specifically recall having a conversation about the commissary or the Voluntary Work Program with Warden Paulk. (*Id.* 53:9–54:21).

In his current position as Regional Warden for SW Correctional, Mr. McCormick still reports to Rodney Cooper, Executive Director of LaSalle Management. (Doc. 76-2 McCormick Dep. 9:21–25). Mr. McCormick visits the Irwin Facility every six to eight weeks, provides guidance, mentors, and supports the warden at the Irwin Facility. (Doc. 74-6 McCormick Dep. 44:24–45:10). He is familiar with the IGSA and has had discussions with the warden of the Irwin Facility regarding that contract. In particular, Mr. McCormick has discussed financial, employment, and security issues with the Irwin Facility warden. (*Id.* 35:11–36:10).

## IV.  LAW

As noted above, Plaintiffs assert claims against the Moving Defendants for (i) violations of the Trafficking Victims Protection Act, 18 U.S.C. §§ 1589, 1594, and 1595, (ii) unjust enrichment under Georgia law, and (iii) violations of the Alien Tort Statute, 28 U.S.C. § 1350. Thus, the Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claims.

> In federal question cases arising under a federal statute silent as to service of process, Rule 4(e) of the Federal Rules of Civil Procedure requires that we determine both jurisdiction and service of process using state amenability standards, that is, the state long-arm statute. Our analysis, however, goes beyond the state's long-arm statute. Jurisdiction over a non-resident defendant must also satisfy the Due Process Clause.

*Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1317 (11th Cir. 2006) (citation omitted). Because the above federal statutes are silent as to service of process, Georgia's long-arm statute applies. *Id.* After analyzing whether personal jurisdiction exists under Georgia's long-arm statute, the Court must analyze whether exercising jurisdiction over the Moving Defendants satisfies the Due Process Clause.

> Georgia's long-arm statute provides:
>
> A court of this state may exercise personal jurisdiction over any nonresident . . . as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he or she were a resident of this state, if in person or through an agent, he or she:
>
>> (1) Transacts any business within this state;
>>
>> (2) Commits a tortious act or omission within this state, . . . ;
>>
>> (3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state; [or]
>>
>> (4) Owns, uses, or possesses any real property situated within this state[.]

O.C.G.A. § 9-10-91. This Court must interpret and apply Georgia's long-arm statute as would the Georgia Supreme Court—that is literally. *Diamond Crystal*, 593 F.3d at 1258 (citing *Lockard v. Equifax, Inc.*, 163 F.3d 1259, 1265 (11th Cir. 1998)). Importantly, Georgia's long-arm statute "does not grant courts in Georgia personal jurisdiction that is coextensive with procedural due process." *Diamond Crystal*, 593 F.3d at 1259 (citing *Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames*, 620 S.E.2d 352, 354–55 (Ga. 2005)). Instead, the long-arm statute, read literally, imposes "independent obligations . . . distinct from the demands of procedural due process." *Id.*

Consistent with the standard of review discussed above, the Court will resolve all reasonable conflicts between the Moving Defendants' and Plaintiffs' evidence in favor of Plaintiffs. *See Diamond Crystal*, 593 F.3d at 1257 ("Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff."). To be sure, "[t]he burden . . . does not shift back to the plaintiff when 'the defendant's affidavits contain only conclusory assertions that

the defendant is not subject to jurisdiction.'" *Louis Vuitton*, 736 F.3d at 1350 (quoting *Stubbs*, 447 F.3d at 1360).

## V.    PERSONAL JURISDICTION OVER LASALLE MANAGEMENT

According to the Moving Defendants, the sole contact LaSalle Management had with Georgia during the relevant time period was that it contracted with LaSalle SE to provide virtual accounting and support services, and LaSalle Management is paid a fee for such services. The Moving Defendants urge the Court to dismiss LaSalle Management from this action because such contact is insufficient to meet the minimum contact requirements with this forum to support this Court's exercise of personal jurisdiction over LaSalle Management. Plaintiffs contend that the Court has jurisdiction over the Moving Defendants under Georgia's long-arm statute. The Court agrees with Plaintiffs that it has jurisdiction over LaSalle Management and explains why.

First, LaSalle Management's characterization of the contractual services it provides to LaSalle SE as "limited" (Doc. 74 at 4), is inconsistent with Ms. Bennett's deposition testimony. Upon consideration of her actual testimony, LaSalle Management is not merely providing typical accounting services as LaSalle Management would have this Court find. LaSalle SE does not have its own accounting department. LaSalle Management personnel has complete access to and essentially, through payments it determines are to be made, controls LaSalle SE's bank account(s)—particularly as to disbursements from such account(s). As Ms. Bennett testified, she uses the same user name and password to access LaSalle SE's financial records and LaSalle Management's financial records. Without an accounting department of its own, it is unclear whether anyone directly employed by LaSalle SE writes, or could write, checks on its own.

LaSalle SE is a Georgia limited liability company operating a federal detention center located in Georgia. The services provided by LaSalle Management to LaSalle SE are substantial and LaSalle Management also exercises discretion with regard to payments made from LaSalle SE's funds. Members of LaSalle Management's accounting team, headed by Ms. Bennett, review bills sent to LaSalle Management for payment to determine whether the bills are legitimate. The reasonable inference from Ms. Bennett's explanation of the "accounting"

services provided to LaSalle SE is that Ms. Bennett as the Controller of LaSalle Management and the head of the accounting and payroll teams, exercises discretion over which of LaSalle SE's expenses and bills are legitimate and therefore paid. Specifically, members of the accounting team review LaSalle SE's invoices as they come in. An invoice is reviewed to "make sure it makes sense to *us* [LaSalle Management], that . . . it's legible, that we can make a clear determination that we have not paid it on their behalf before." (Doc. 74-5 Bennett Dep. 22:22–23:1). From the accounting services activity, "activity being revenue and expenses" (Doc. 76-1 Bennett Dep. at 48:6–10), LaSalle Management personnel has "a financial picture on a monthly basis." (*Id.*) Whether that is a "financial picture" of the LaSalle entities as a whole or just LaSalle SE is unclear. But LaSalle Management retaining a monthly financial picture of LaSalle SE, a company with which it maintains it has no affiliation, is inconsistent with providing "limited" accounting and support services. The accounting team is further in a "continuous auditing" stage with respect to LaSalle SE and prepares the "normal accounting processes of financial reporting" for LaSalle SE. (Doc. 74-5 Bennett Dep. 30:6–17).

LaSalle Management provides significant payroll services to LaSalle SE. With respect to payroll, LaSalle SE "generates calculations of hours for all the employees that they are requesting to be paid during that time period." (*Id.* 23:3–5). The report is sent to "*LaSalle Management['s] corporate payroll team*" whose members "review what they [LaSalle SE] are asking us to pay, and *we're running our own audit calculations of times and hours, regular overtime deductions*." (Doc. 74-5 Bennett Dep. 23:6–10 (emphasis added)). After the payroll team confirms the accuracy of LaSalle SE's payroll figures, he bank account is funded. It's worth noting that Ms. Bennett's testimony reflects that LaSalle Management's payroll team confirms with LaSalle Management's accounting team—not with anyone at LaSalle SE—that LaSalle SE's bank account has sufficient funds to cover LaSalle SE's payroll. Then, LaSalle Management's payroll team takes the necessary steps to ensure that LaSalle SE's employees are paid, either through direct deposits into their individual bank accounts or by printing, signing, and mailing checks to employees. Members of the payroll team set up direct deposits into LaSalle SE's employees' bank accounts. It is reasonable to infer that a substantial number of those employees are Georgia residents. LaSalle Management has further contact with Georgia residents when the

payroll team members mail paychecks to those LaSalle SE employees whose paychecks are not direct deposited.

Finally, from her testimony, it appears Ms. Bennett also provides information and documents regarding LaSalle SE to external auditors as part of the accounting and administrative services she oversees "on *behalf of LaSalle Management Company* for LaSalle Southeast." (Doc. 74-5 Bennett Dep. 22:2–5 (emphasis added)). Those documents include anything the external auditors need such as "payroll registers[,]" "validation of expenses that were paid[,]" or "401(k) audits[.]" (*Id.* 22:6–12). The only reasonable inference as to why LaSalle Management's external auditors need financial information regarding LaSalle SE is that the entities are indeed affiliated and that LaSalle Management exercises substantial financial control over LaSalle SE.

Second, between 2019 and 2021, James McCormick was the Regional Director for LaSalle Management. David Paulk, warden at the Irwin Facility in Georgia reported to Mr. McCormick. The two discussed any detainee issues that arose. This is a substantial contact between LaSalle SE and LaSalle Management dealing with the operation of the Irwin Facility.

### A. Georgia's Long-Arm Statute

"When jurisdiction is based on a federal question arising under a statute that is silent regarding service of process, Rule 4(e) of the Federal Rules of Civil Procedure directs [a court] to look to the state long-arm statute in order to determine the existence of personal jurisdiction." *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626–27 (11th Cir. 1996) (citing *Cable/Home Commc'n Corp. v. Network Prods.*, 902 F.2d 829, 855 (11th Cir. 1990)). Because the Court's jurisdiction is based on claims under the TVPA and the ATS, and both of those statutes are silent on service, *see* § 18 U.S.C. §§ 1581–97 and 28 U.S.C. § 1350, respectively, the Court looks to the Georgia long-arm statute *See Sculptchair*, 94 F.3d at 626–27.

A court may exercise personal jurisdiction in Georgia if it "find[s] that at least one prong of the long-arm statute is satisfied. *Diamond Crystal*, 593 F.3d at 1260 (citing *Rudo v. Stubbs*, 472 S.E.2d 515, 516 (Ga. Ct. App. 1996)). One of these prongs allows jurisdiction over a defendant who "[transacts any business within [Georgia].]" O.C.G.A. § 9-10-91. Such jurisdiction exists only "if the nonresident defendant has purposely done some act or consummated some transaction in [Georgia.]" *Diamond Crystal*, 593 F.3d at 1260 (emphasis

and enumeration omitted) (quoting *Aero Toy Store, LLC v. Grieves*, 631 S.E.2d 734, 736–37 (Ga. 2006)). Transacting business does not require the nonresident's physical presence in Georgia. *Id.* (citing *Innovative Clinical*, 620 S.E.2d at 355). But instead may be shown through intangible conduct that shows that "it can fairly be said that the nonresident has transacted any business within Georgia." *Id.* (citing *Innovative Clinical*, 620 S.E.2d at 355–56).

LaSalle Management acknowledges that it provides what it describes as only accounting and unspecified support services to LaSalle SE. Nevertheless, LaSalle Management contends that it "does not do business in the State of Georgia and instead provides [only] virtual accounting and administrative business services to [LaSalle SE] pursuant to a contract between those entities." (Doc. 37-2 Bennett Decl. ¶ 37). The Court is unpersuaded that such activities as shown by the details in the Record do not constitute "[t]ransact[ing] any business within this state" sufficient to satisfy Georgia's long-arm statute. LaSalle Management admits that it provides virtual accounting and administrative business services to LaSalle SE pursuant to a contract between those entities and these include discretionary actions and decisions on LaSalle Management's part relative thereto.

> [A] defendant need not physically enter the state. As a result, a nonresident's mail, telephone calls, and other "intangible" acts, though occurring while the defendant is physically outside of Georgia, must be considered. *Innovative Clinical*, 620 S.E.2d at 355–56. Therefore, we examine all of a nonresident's tangible and intangible conduct and ask whether it can fairly be said that the nonresident has transacted any business within Georgia.

*Diamond Crystal*, 593 F.3rd at 1264. LaSalle SE is a Georgia limited liability company, that administers the Irwin Facility detention center in Irwin County, Georgia. The business relationship between LaSalle SE and LaSalle Management appears to be longstanding, to have been in place during the times relevant to this lawsuit, and to still be ongoing. (*See* Bennett Decl. ¶¶ 27, 36–37). The Court finds this transaction alone sufficient "to fairly say" that LaSalle Management has transacted business in Georgia, given its longstanding relationship to provide services to a Georgia limited liability company administering a Georgia detention facility. *See Diamond Crystal*, 593 F.3d at 1260. As such, the Georgia long-arm statute is satisfied.

To conclude the personal jurisdiction analysis, however, the Court proceeds to determine whether its exercise of jurisdiction under Georgia's long-arm statute comports with constitutional due process.

## B. Due Process

"Due process requires that a non-resident defendant have certain minimum contacts with the forum so that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Meier*, 288 F.3d at 1274 (citing *Int'l Shoe v. Wash.*, 326 U.S. 310, 316 (1945) and *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000)). "The nature and quality of these contacts, however, vary depending upon whether the type of personal jurisdiction being asserted is specific or general." *Consolidated Dev.*, 216 F.3d at 1291.

### 1. General Personal Jurisdiction

"'A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations,' without offending due process 'when their affiliations with the State are so "continuous and systematic" as to render them essentially at home in the forum State.'" *Carmouche v. Tamborless Mgmt., Inc.*, 789 F.3d 1201, 1204 (11th Cir. 2015) (quoting *Goodyear Dunlop Tires Operations, S.S. v. Brown*, 564 U.S. 915, 919 (2011)). If a court has general personal jurisdiction over a litigant, it may adjudicate any claim involving that litigant, regardless "of where the cause of action arose." *Oldfield v. Pueblo De Bahio Lora, S.A.*, 558 F.3d 1210, 1221 n.27 (11th Cir. 2009) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n.15 (1985) and *Meier*, 288 F.3d at 1274). "A corporation's place of incorporation and its principal place of business are 'paradigm all-purpose forums.'" *Carmouche*, 789 F.3d at 1204 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)). "Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable." *Daimler AG*, 517 U.S. at 137. Other contacts may also suffice in exceptional cases, but those contacts must be "so substantial and of such a nature as to render the corporation at home" in the forum state. *Carmouche*, 789 F.3d at 1204. "The execution of even a single contract may, in certain circumstances, satisfy the 'minimum contacts' test. *Stanley v. Loc. 926 of Int'l Union of Operating Eng'rs of AFL-CIO*, 354 F. Supp. 1267, 1271 (N.D. Ga. 1973) (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220 (1957)). "[G]eneral jurisdiction may arise of contacts with the forum state that are unrelated to litigation; however, there must be 'a showing of continuous and systematic general business contacts between the defendant and the forum state.'" *Ward v. Dickinson Fin. Corp. II*, No. 7:14-CV-8, 2015 WL 1020151, at *9 (M.D. Ga. Mar. 9, 2015) (quoting *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000)).

Here, LaSalle Management d/b/a LaSalle Corrections, is a Louisiana limited liability company with its principal place of business in Ruston, Louisiana. The tradename "LaSalle Corrections" is registered in Louisiana, not in Georgia. So, Georgia is not LaSalle Management's paradigmatic all-purpose forum under either its actual name or its tradename. *See Daimler AG*, 517 U.S. at 137. As discussed above, operating under a single continuous contract with LaSalle SE, as detailed above, *supra* at 18–20, LaSalle Management—in the performance of its "accounting" and administrative services—has had significant contact with and exercised substantial financial control over a Georgia limited liability company. While the Court believes the question of whether it should exercise general personal jurisdiction over LaSalle Management is arguably established, the Plaintiffs have not specifically argued that the Court may do so. Rather, the Plaintiffs' arguments focus on the three-part test for specific personal jurisdiction. (Doc. 76 at 15). As such, the Court turns to and also employs the specific personal jurisdiction analysis.

### 2.  <u>Specific Personal Jurisdiction</u>

In analyzing specific personal jurisdiction, the Eleventh Circuit applies a three-part test which examines:

> (1) whether the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum;
>
> (2) whether the nonresident defendant "purposefully availed" himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and
>
> (3) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice."

*Louis Vuitton*, 736 F.3d at 1355 (citing *Burger King*, 471 U.S. at 472–73; *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 413–14 (1984); *Int'l Shoe*, 326 U.S. at 316; *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220–21; and *Sculptchair*, 94 F.3d at 623–31). Plaintiffs bear the burden of satisfying the first two prongs, and if they carry their burden "a defendant must make a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Diamond Crystal*, 593 F.3d at 1267 (quoting *Burger King*, 471 U.S. at 472–73 and *Cable/Home Commc'n*, 892 F.2d at 858–59).

"To determine whether a defendant's conduct arose out of its contacts with the forum, '[courts] look to the affiliation between the forum and the underlying controversy, *focusing on any activity or occurrence that took place in the forum.*'" *Herederos De Robert Gomez Cabera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1310 (11th Cir. 2022) (emphasis adopted) (quoting *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1314 (11th Cir. 2018); *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 360 (2021)). The "essential foundation" of specific jurisdiction rests on whether "there is a strong relationship among the defendant, the forum, and the litigation[.]" *SkyHop Techs, Inc. v. Narra*, 58 F.4th 1211, 1229 (11th Cir. 2023) (quoting *Hall*, 466 U.S. at 433).

This first prong is satisfied because Plaintiffs' alleged causes of action under the TVPA and ATS are based on the treatment they received under a "voluntary work program" that was in place at the Irwin Facility. The Plaintiffs allege such program did not comply with the requirements of the PBNDS under which Defendants, including LaSalle Management, were required to operate an ICE detention facility. Specifically, Plaintiffs claim they were forced to work and were punished if they refused to do so. They were deprived of the basic necessities of life including sufficient food, water, and hygienic products. Plaintiffs allege the Irwin Facility commissary charged exorbitant prices for these necessities. In addition, Plaintiffs were deprived of contact with loved ones, immigration officials, and legal representation.

During the relevant time period, David Paulk, Warden of the Irwin Facility reported directly to Mr. McCormick, who was then the Regional Director at LaSalle Management. While he was Regional Director for LaSalle Management, Mr. McCormick spoke with Warden Paulk about detainee issues and would discuss "[a]ny type of issues that may be relevant at the moment or at the – during the time[,]" (*Id.* 53:23–54:1), including food and security issues.

Further, LaSalle Management, through it Controller, Sharon Bennett, essentially controlled substantial financial aspects of LaSalle SE including its ability financially to operate the Irwin Facility. LaSalle Management's accounting and payroll teams ensured that the Irwin Facility employees, the majority of whom are likely Georgia residents, receive their paychecks, as well as payment of LaSalle SE's other expenses and operations. Insofar as LaSalle SE's expenses, the Irwin Facility is responsible for sending its expense invoices to LaSalle Management for payment. However, LaSalle Management's accounting team does not simply pay any bill forwarded to them for payment. Significantly, members of the accounting team

24

had discretion apparently to review and determine, without consultation with LaSalle SE, whether LaSalle SE's expenses were legitimate before paying such expenses. Further, they audited LaSalle SE's financial records and maintained a monthly financial picture of LaSalle SE apparently for LaSalle Management. LaSalle Management's substantial control and discretion with respect to LaSalle SE's purse strings essentially allowed it to have significant control of the operation of the Irwin Facility. These contacts with Georgia and associated controls over LaSalle SE are sufficient for the Court to find that Plaintiffs' claims "arise out of or relate to" at least one of LaSalle Management's contacts with Georgia.

The second prong—purposeful availment of the privilege of conducting activities in Georgia is also met. LaSalle Management voluntarily contracted with LaSalle SE, a Georgia limited liability company, to provide services as detailed to LaSalle SE. Further, a member of LaSalle Management at least consulted with LaSalle SE's warden regarding the operations of the Irwin Facility, a Georgia detention center.

Plaintiffs have satisfied the first two prongs of the Due Process analysis, and the burden now shifts to the Moving Defendants to "make a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Diamond Crystal*, 593 F.3d at 1267. Under the third-prong

> [W]e look to the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies.

*Id.* at 1274 (internal quotation marks omitted). As to the first factor, the Moving Defendants "do not even attempt to explain why litigating in Georgia would be especially onerous, much less how any such inconvenience achieves a constitutional magnitude" so as to amount to a denial of due process. *Id.*; *see also McGee*, 355 U.S. at 224 (1957) (if forced to litigate outside its home state, insurer may be inconvenienced "but certainly nothing which amounts to a denial of due process"). On the other hand, in reviewing the remaining factors, the Irwin Facility is located in Georgia, and "Georgia has a 'manifest interest in providing effective means of redress for its residents.'" *Diamond Crystal*, 593 F.3d at 1274 (quoting *McGee*, 355 U.S. at 223). Georgia has an interest in adjudicating this dispute as it involves individuals detained in a

Georgia facility while Louisianna would have no interest in the Plaintiffs' claims. Plaintiffs' interest in obtaining convenient and effective relief as between the states and the interstate judicial system's interest in obtaining the most efficient resolution of the controversies before the Court are also served and therefore further fundamental substantive social policies. *Id.* 1274. Thus, the Court finds that its exercise of personal jurisdiction over LaSalle Management comports with "traditional notions of fair play and substantial justice."

Based on the foregoing, the Court finds that Plaintiffs met their prima facie burden to show this Court has personal jurisdiction over LaSalle Management Company, L.L.C., d/b/a LaSalle Corrections under the Georgia long-arm statute and the Due Process Clause of the Fourteenth Amendment, both for the purposes of general and personal jurisdiction.

### 3. <u>Alter Ego Theory</u>

The Plaintiffs also contend that the Court has jurisdiction over LaSalle Management under an alter ego theory based on its registered tradename "LaSalle Corrections" and the wide use the various LaSalle entities make of the tradename. As the Court has determined that it has jurisdiction under the Georgia long-arm statute and Due Process analysis, the Court need not, and does not, reach this argument.

## VI. PERSONAL JURISDICTION OVER LASALLE CORRECTIONS, LLC

Turning to the substance of the Parties' arguments as to LaSalle Corrections, LLC, the basis for Moving Defendants' motion rests substantially on their contention that LaSalle Corrections, LLC is Louisiana limited liability company that has absolutely no contacts with Georgia. (Barrett Decl. ¶¶ 11–12). The balance of their arguments rest on the unrebutted assertion that LaSalle Corrections, LLC is an "unused" entity and that LaSalle Corrections, LLC is not a member, affiliate, parent or subsidiary of LaSalle SE. (*Id.* ¶¶ 11, 13). Further, Plaintiffs point to nothing that shows LaSalle Corrections, LLC exercises any actual control over LaSalle SE. Therefore, the Court does not need to go through a detailed jurisdictional analysis as to LaSalle Corrections, LLC, and finds that Plaintiffs failed to meet their prima facie burden to show personal jurisdiction over LaSalle Corrections, LLC. As such, the Court cannot exercise personal jurisdiction over Defendant LaSalle Corrections, LLC.

## VII.  CONCLUSION

Based on the foregoing, the Rule 12(b)(2) portion of the Motion to Dismiss on Behalf of LaSalle Management Company, L.L.C. and LaSalle Corrections, LLC Pursuant to Rule 12(b)(2) and Rule 12(b)(6) (Doc. 37) is **GRANTED** to the extent that Defendant LaSalle Corrections, LLC, is **DISMISSED, without prejudice**, as a party to the above-captioned action.

Further, the Rule 12(b)(2) portion of the Motion to Dismiss on Behalf of LaSalle Management Company, L.L.C. and LaSalle Corrections, LLC Pursuant to Rule 12(b)(2) and Rule 12(b)(6) (Doc. 37) is **DENIED, without prejudice** consistent with this Order and the Court's prior Order (Doc. 73), as to Defendant LaSalle Management Company, L.L.C.

Additionally, with all Motions to Dismiss having been resolved, the case is ready to proceed to discovery with respect to the claims against Defendants LaSalle Management Company, L.L.C., d/b/a LaSalle Corrections, LaSalle Southeast, LLC, CGL Irwin Properties, LLC, and CGL/LaSalle Irwin Properties, LLC. The Court will notice a Scheduling and Discovery Conference by separate notice or Order.

**SO ORDERED**, this 31st day of March 2025.

/s/W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**